BOIES, SCHILLER & FLEXNER LLP
Jonathan D. Schiller *(pro hac vice)*
jschiller@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Telephone:   212.446.2300
Facsimile:    212.446.2350

David W. Shapiro (SBN 219265)
dshapiro@bsfllp.com
Kieran P. Ringgenberg (SBN 208600)
kringgenberg@bsfllp.com
1999 Harrison St., Suite 900
Oakland, CA 94612
Telephone:   510.874.1000
Facsimile:    510.874.1460

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC SELECT FUND,<br><br>                              Plaintiff,<br><br>           v.<br><br>THE BANK OF NEW YORK MELLON, a New York state chartered bank, and BNY MELLON, N.A., a nationally-chartered bank,<br>                              Defendants. | Case No.  CV 10-00198 JST (ANx)<br><br>**DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY, DECLARATIONS, AND REPORTS OF BELLA BORG-BRENNER AND ALLEN FERRELL**<br><br>**Date:** January 9, 2012<br>**Time:** 10:00 a.m.<br>**Place:**  Courtroom 10A, Santa Ana Courthouse<br><br>**Complaint Filed:**  February 17, 2010<br>**Trial Date:**  April 10, 2012<br>**Judge:** Hon. Josephine Staton Tucker |

1

# **TABLE OF CONTENTS**

2

3    NOTICE OF MOTION .................................................................................. v

4    FACTUAL AND PROCEDURAL BACKGROUND ...................................... 2

5       I.   Ms. Bella Borg-Brenner ................................................................ 5

6            A.   Affirmative Report ................................................................ 6

7            B.   Rebuttal Report ...................................................................... 8

8       II.  Professor Allen Ferrell .................................................................. 9

9            A.   Liability Assessment ............................................................. 9

10           B.   Damages Assessment ........................................................... 10

11   ARGUMENT ............................................................................................. 11

12      I.   Ms. Borg-Brenner's Opinions Should Be Excluded .................... 12

13           A.   Ms. Borg-Brenner Lacks Sufficiently Relevant Experience ........... 12

14           B    Ms. Borg-Brenner's Opinions Lack Reliable Basis ........................ 14

15           C    The Merits Opinions in Ms. Borg-Brenner's Rebuttal Report Must
                  Be Excluded for Non-Disclosure ...................................... 17

16      II.  Professor Ferrell's Opinions Should Be Excluded ...................... 20

17           A.   Professor Ferrell's Liability Opinions Lack Reliable Basis ............. 20

18           B.   Professor Ferrell's Damages Opinions Lack Reliable Basis ........... 22

19   CONCLUSION ........................................................................................... 25

20

21

22

23

24

25

26

27

28

i

1

## **TABLE OF AUTHORITIES**

2

3 **CASES**

4   *Alco Indus., Inc. v. Wachovia Corp.,*
5        527 F. Supp. 2d 399 (E.D. Pa. 2007) ................................................................17

6   *Avila v. Willits Envtl. Remediation Trust,*
        633 F.3d 828 (9th Cir. 2011)...............................................................12, 13

7   *Castaic Lake Water Agency v. Whittaker Corp.,*
8        No. CV00-12613, 2002 WL 34700741 (C.D. Cal. Oct. 25, 2002)...................14

9   *Daubert v. Merrell Dow Pharm., Inc.,*
        43 F.3d 1311 (9th Cir.1995)...............................................................11, 15, 23

10  *Daubert v. Merrell Dow Pharm., Inc.,*
11       509 U.S. 579 (1993) ................................................................................14, 20

12  *DeShazo v. Estate of Clayton,*
        No. CV05-2002, 2006 WL 1794735 (D. Idaho June 28, 2006) .......................20

13  *Diviero v. Uniroyal Goodrich Tire Co.,*
14       919 F. Supp. 1353 (D. Ariz. 1996)...................................................................13

15  *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,*
        285 F.3d 609 (7th Cir. 2002)...........................................................................14

16  *General Electric Co. v. Joiner,*
17       522 U.S. 136 (1997) ...................................................................................14, 23

18  *Guidroz-Brault v. Mo. Pac. R. Co.,*
        254 F.3d 825 (9th Cir. 2001).............................................................................25

19  *Henricksen v. ConocoPhillips Co.,*
20       605 F. Supp. 2d 1142 (E.D. Wash. 2009) ........................................................15

21  *Highland Capital Mgmt., L.P. v. Schneider,*
        379 F. Supp. 2d 461 (S.D.N.Y. 2005)................................................................17

22  *Hynix Semiconductor Inc. v. Rambus Inc.,*
23       No. 00-20905, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008)................................21

24  *IBM Corp. v. Fasco Indus., Inc.,*
        No. C–93–20326, 1995 WL 115421 (N.D. Cal. Mar.15, 1995) .......................18

25  *In re Apex Oil Co.,*
26       958 F.2d 243 (8th Cir. 1992).............................................................................18

27  *In re Auto. Lighting Prods. Antitrust Litig.,*
        276 F.R.D. 364 (C.D. Cal. 2011) ...............................................................14, 15

28

DEFENDANTS' MOTION TO EXCLUDE
BORG-BENNER AND FERRELL

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
No. 04–md–1628, 2009 WL 3241401 (Sept. 30, 2009)....................................22

*Kennedy v. Jackson Nat. Life Ins. Co.*,
No. C 07-0371 CW, 2010 WL 2524360 (N.D. Cal. June 23, 2010).................20

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).........................................12, 14

*Lust v. Merrell Dow Pharm., Inc.*,
89 F.3d 594 (9th Cir. 1996)...........................................................................11

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007).............................................................17

*Many Cultures, One Message v. Clements*,
No. 10-cv-05253, 2011 WL 5515515 (W.D. Wash. Nov. 8, 2011)..................14

*Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*,
877 F.2d 1333 (7th Cir. 1989)........................................................................21

*Morin v. McCulloch Corp.*,
No. CV 01-6431, 2002 WL 34357202 (C.D. Cal. Jul. 3, 2002) ......................16

*Musser v. Gentiva Health Servs.*,
356 F.3d 751 (7th Cir. 2004) ..........................................................................19

*Pacific Info. Res., Inc. v. Simple Comm'ns*,
No. C-07-4131, 2008 WL 5071110 (N.D. Cal. Nov. 26, 2008) .......................25

*Perry v. Schwarzenegger*,
704 F. Supp. 2d 921 (N.D. Cal. 2010) ...................................................15, 16, 17

*R & O Const. Co. v. Rox Pro Intern. Group, Ltd.*,
No. 01749, 2011 WL 2923703 (D. Nev. July 18, 2011)...................................18

*Salas v. Carpenter*,
980 F.2d 299 (5th Cir. 1992).........................................................................17

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*,
73 F.3d 546 (5th Cir. 1996)............................................................................18

*Sun-Mate Corp. v. Koolatron Corp.*,
No. 10-4735-JST (JCGx), 2011 WL 3322597 (Aug. 1, 2011) ........................13

*United States v. Decoud*, 456 F.3d 996 (9th Cir. 2006) ..................................12, 14

*United States v. Vistoso Partners, LLC*,
No. CV10-0444, 2010 WL 4855232 (D. Ariz. Nov. 23, 2010).......................20

*Vu v. McNeil-PPC, Inc.*,
No. 09-1656, 2010 WL 2179882 (C.D. Cal. May 7, 2010) .............................18

*Wong v. Regents of the Univ. of Cal.*,
410 F.3d 1052 (9th Cir. 2005).........................................................................19

iii

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
   259 F.3d 1101 (9th Cir. 2001).................................................................19

*Zahler v. Twin City Fire Ins. Co.,*
   No. 04 CV 10299, 2007 WL 4563417 (S.D.N.Y. Dec. 4, 2007).......................17

**RULES**

Fed. R. Civ. P. 26(a) ..........................................................................18

Fed. R. Civ. P. 26(d) ..........................................................................18

Fed. R. Civ. P. 37..........................................................................4, 12, 19

Fed. R. Ev. 402 ..............................................................................11

Fed. R. Ev. 403 ..............................................................................11

Fed. R. Ev. 702 ..........................................................................4, 11, 12

DEFENDANTS' MOTION TO EXCLUDE
BORG-BENNER AND FERRELL

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 9, 2012, at 10 a.m., or as soon thereafter as the matter can be heard in Courtroom 10A of the above-entitled court, defendants The Bank of New York Mellon and BNY Mellon, N.A., (collectively "BNY Mellon") will, and hereby do, move the Court *in limine* for exclusion of the Declarations and Expert Reports of Bella Borg-Brenner and Allen Ferrell and testimony from Ms. Borg-Brenner and Professor Ferrell at trial and in connection with summary judgment.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place by telephone conference on December 2, 2011.

This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Kieran Ringgenberg, all pleadings and paper on file in this action, and any other matter that may be presented to the Court at the hearing.

Dated: December 12, 2011          **BOIES, SCHILLER & FLEXNER LLP**

By     /s/ Kieran Ringgenberg
Kieran Ringgenberg (SBN 208600)
kringgenberg@bsfllp.com
1999 Harrison St., Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
*Attorneys for Defendants*

DEFENDANTS' MOTION TO EXCLUDE
BORG-BENNER AND FERRELL

## **INTRODUCTION**

As shown by the opposition to BNY Mellon's motion for summary judgment, Pacific Select Fund's ("PSF") case relies centrally and at many points exclusively on the opinions of its two experts, Ms. Bella Borg-Brenner (a former hedge-fund manager) and Professor Allen Ferrell (a law professor and economist).  After BNY Mellon objected to PSF's use of expert reports in opposition to summary judgment as unsworn and otherwise inadmissible, PSF submitted declarations from its experts.  PSF also argued that the objections must not be considered because PSF lacked "an adequate opportunity to respond." (Dckt. # 134 at 2.)  Two days later, the Court on its own motion reset the hearing date on summary judgment motions to January 9, 2012.  While BNY Mellon's evidentiary objections were entirely proper as filed, the schedule change affords sufficient time for a noticed motion on the admissibility of PSF's expert testimony, applicable to both summary judgment and trial (were there to be one).

A close inspection of the opinions of PSF's experts, as well as the basis for these opinions as disclosed by the reports, makes plain why PSF was so eager to avoid having the Court decide the reports' admissibility.

First, both experts offer opinions criticizing BNY Mellon's decision to hold medium-term notes ("MTNs") issued by Sigma, a structured investment vehicle ("SIV"), in connection with BNY Mellon's securities lending program.  But neither expert discloses any reliable basis for their conclusions.

Ms. Borg-Brenner's analysis is supposedly based on her professional experience, but she has no experience with securities lending or SIVs.  The "method" disclosed in Ms. Borg-Brenner's reports is merely to characterize documents produced in discovery and then assert conclusions, with no identified basis in her professional experience or any principle of her discipline.  Professor Ferrell's report likewise offers no basis in economics for his conclusions about BNY Mellon's investment decisions.  Instead, he simply offers spin on discovery

documents and cherry-picked credit rating and analyst reports, followed by bare conclusions.

The reports of both experts are in crucial respects nothing more than dressed-up legal briefs, and Ms. Borg-Brenner's affirmative report in particular is not dressed up very well. Indeed, that report contains pages of text that are nearly word-for-word identical to the brief PSF actually filed in opposition to BNY Mellon's motion for summary judgment. There is nothing reliable about an "expert opinion" that merely rubber-stamps the lawyers' arguments.

<u>Second</u>, while both experts offer opinions about the risks of *holding* Sigma notes, neither expert's affirmative report discloses adequate consideration of the risks of the alternative courses of action the experts assert BNY Mellon was negligent for failing to take, including: (1) the risks of selling notes at a loss that might have paid (and, in many cases, did pay) in full at maturity and (2) the risks of "ratio trades," which would have required giving up more than $1 billion in cash for a grab-bag of Sigma' underlying securities in the midst of a global liquidity crisis, i.e., when cash was king. Ms. Borg-Brenner finally addresses this issue in her rebuttal report. But it is too late for her to offer the core of her opinion on a key liability issue in a rebuttal report and, in any event, her report discloses no adequate basis for her conclusions.

<u>Third</u>, Professor Ferrell offers a damages opinion premised on the assumption that it was possible to sell more than $500 million in Sigma MTNs in a short time period for the price obtained in a handful of sales of a few million dollars worth of notes. This assumption is entirely unsupported by evidence or economic principles.

**FACTUAL AND PROCEDURAL BACKGROUND**

PSF participated in BNY Mellon's securities lending program, in which PSF loaned securities to qualified borrowers who provided cash collateral. That collateral was then invested in the Mellon GSL DBT II Collateral Fund ("DBT").

2

Because PSF typically paid borrowers a rebate, it had to earn a return in excess of the rebate or it would lose money. (PSFSGI[1] ¶¶ 36-37.) The agreement governing PSF's participation in securities lending, the Securities Lending Authorization Agreement ("SLAA"), provides for a specific standard of care:

> The Lending Agent shall perform its obligations under this Agreement with the care, skill, prudence, and diligence which, under the circumstances then prevailing, a professional securities lending agent acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aim." (PSFSGI ¶ 47.)

In this action, PSF claims, among other things, that BNY Mellon breached the SLAA and violated common-law duties to PSF by making imprudent investment decisions with regard to Sigma MTNs in DBT. BNY Mellon moved for summary judgment and, in opposition, PSF argued that BNY Mellon acted imprudently by (1) not selling the notes at a loss in or around January 2008 or (2) not engaging in additional "ratio trades" in which the MTNs and cash were exchanged for other securities held by Sigma. (Dckt. # 95 at 15-16.)

But those courses of action were not free of risk. As BNY Mellon has shown, selling Sigma notes guaranteed principal losses that might have been avoided by holding the securities, because Sigma MTNs continued to pay in full at maturity until after Lehman Brothers Holdings, Inc. filed for bankruptcy. (PSFSGI ¶ 100.) In fact, $185,400,000 in Sigma MTNs held in DBT matured and

---

[1] PSF's Statement of Genuine Issues and Additional Material Facts (Dckt. # 98) is cited as "PSFSGI." The affirmative and rebuttal reports of PSF's experts are attached as exhibits to Dckt. # 134-4 (Borg-Brenner) and 134-1 (Ferrell), and are cited as "Aff. Rep." and Reb. Rep." Exhibits to the Declaration of Kieran Ringgenberg in Support of Motion to Exclude, filed herewith, are cited as "Ringgenberg MTE Ex. ___." The exhibits to the Declarations of Kieran Ringgenberg in Support of Defendants' Motion for Summary Judgment (Dckt. # 71, 117-1) are cited as "Ringgenberg SJ Ex. ___." Exhibits the Declaration of Leeron Factor in Support of PSF's Opposition to Defendants' Motion for Summary Judgment (Dckt. # 97) are cited as "Factor Ex. ___."

paid in full between January 2008 (when PSF says BNY Mellon should have sold at a loss) and September 2008 (when Lehman failed).  (Factor Ex. 92 Sch. A-1 at 7.)  Had Sigma survived longer, even more notes would have paid in full.  Thus, selling risked taking principal losses that might have been avoided at maturity.

Likewise, "ratio trades" were transactions in which a combination of cash and Sigma notes were exchanged for a bundle of securities from Sigma's portfolio.  PSF hypothesizes BNY Mellon should have undertaken a ratio trade in which at least $1.25 billion in cash, plus $575 million in Sigma notes, was transferred to Sigma for $1.725 billion in securities from Sigma's portfolio.  (PSFSGI ¶ 342-43.)  But the vast majority of the securities available in ratio trades were not compliant with the investment guidelines to which BNY Mellon's customers had agreed.  (Factor Ex. 161 at BNYM-SL01984640; Ex. 150-A at 358:25-360:4.)  Trading massive amounts of cash, in the middle of a global liquidity crisis, for new securities outside applicable investment guidelines obviously posed substantial risks.

In attempting to prove that BNY Mellon's real-time judgments about the right course of action in light of these conflicting risks were outside the range of reasonable choices for a securities lending professional, PSF's relies centrally on the opinions of Bella Borg-Brenner and Allen Ferrell.  Their reports were attached as exhibits to an attorney declaration in opposition BNY Mellon's summary judgment motion, filed on October 31, 2011.  On November 14, 2011, pursuant to the Court's standing order, BNY Mellon filed evidentiary objections to PSF's evidence in opposition to summary judgment, including to the expert reports.  (Dckt. # 118.)    BNY Mellon asserted in the objections that (1) Ms. Borg-Brenner's Rebuttal Report contained opinion required to be disclosed in her initial report, which should be excluded under Rule 37; (2) all the expert reports were unsworn and therefore inadmissible; and (3) the opinions offered in the reports were inadmissible under Fed. R. Ev. 702.

The hearing on the parties' motions for summary judgment was set for December 5, 2011.  On November 29, 2011, PSF filed with the Court affidavits from Ms. Borg-Brenner and Professor Ferrell as part of "Objection to Defendants' Improper Evidentiary Objections re: Plaintiff's Expert Reports," which also asserted that BNY Mellon's objections were improper because they left PSF without an "opportunity to respond" and then arguing, over five pages of briefing, that the objections should be not be considered.  (Dckt. # 134.)  PSF made no defense of the merits of admitting its expert reports.

On December 1, 2011, the Court on its own motion reset the hearing on the parties' motions for summary judgment for January 9, 2012.  This provided an opportunity for full briefing on the admissibility of PSF's expert opinions.

## I.    Ms. Bella Borg-Brenner

Ms. Borg-Brenner has absolutely no professional experience with securities lending or SIVs.   (Ringgenberg MTE Ex. A at 87:24-88:14, 94:18-94:21.) According to her report and testimony, her professional experience making investment decisions[2] is:  (1) From September 1991 to May 1994, Ms. Borg-Brenner worked as a trader at Merrill Lynch with responsibility for an average position of $300 million.  (Borg Brenner Aff. Rep. at 5.)  (2)  From June 1994 to June 1995, she was responsible for a $200 million position at Solomon Smith Barney.  (*Id.*)  (3) From 2003 to 2005, she was Director of Risk Management at PlusFunds, which had about $3 billion under management.  (*Id.*)  PlusFunds was a "fund of funds," meaning it invested in hedge funds managed by others.  (*Id.*; Ringgenberg MTE Ex. A at 48:24-49:12.)  Ms. Borg-Brenner did not make investment decisions at PlusFunds but made recommendations to the Chief Executive Officer and Chief Financial Officer.  (*Id.* at 48:24-50:11.)  (4)  From

---

[2] Ms. Borg-Brenner's other work includes preparing marketing materials and selling securitized tax credits.  (Borg-Brenner Aff. Rep. at 5.)

DEFENDANTS' MOTION TO EXCLUDE
BORG-BENNER AND FERRELL

2006 to 2009, she was Managing Director at Stillwater Capital, with responsibility for several "funds of funds" (again, investing in hedge funds managed by someone else) with a total of $600 million in assets. (Borg-Brenner Aff. Rep. at 5.)

As points of comparison, in 2008, PSF had more than $10 billion in investments, Pacific Life had $97 billion in assets, and BNY Mellon's securities lending program held as much as $4.9 billion just in Sigma MTNs. (PSFSGI ¶¶ 16, 21, 163.)

### A.    Affirmative Report

Ms. Borg-Brenner's opening report states that her opinions address three issues: (1) the "reasonableness" of BNY Mellon's holding of Sigma MTNs; (2) "whether BNY Mellon complied with investment objectives of" DBT; (3) whether BNY Mellon "sufficiently disclosed material information" to PSF. (Borg-Brenner Aff. Rep. at 2.)   Her affirmative report, rebuttal report, and affidavit submitted in connection with summary judgment each fail to identify any governing principles or methodologies applied in reaching opinions on those issues.  She cites no research or literature about how investment decisions are or should be made.  Nor do her reports identify any specific basis in her professional experience in reaching an opinion on those issues.

Instead, so far as her report reveals, there is nothing more to Ms. Borg-Brenner's "analysis" of the issues in the case than a one-sided recitation of cherry-picked discovery documents, followed by ultimate conclusions.  That makes her report very much like a legal brief.  Indeed, it is no accident that her report contains several pages of text that is nearly word-for-word the same as an *actual* legal brief filed by PSF in this case.  For example, on pages 19-20 of her report, Ms. Borg-Brenner characterizes, as a lawyer in a brief would, snippets from a chronology of seven internal BNY Mellon documents regarding Sigma in order to support an argument that BNY Mellon assessed the risk of Sigma

1   defaulting.  And, when it came time for the lawyers to write a brief making the

2   same argument, PSF's summary judgment opposition contains an identical list of

3   the same snippets from the same seven documents, characterized in the same

4   way, with no attribution to Ms. Borg-Brenner.  (Dckt. # 95 at 8-9; *compare also,*

5   *e.g.,* Borg-Brenner Aff. Rep. at 10-11 *with* Dckt. # 95 at 6-7, 13-14; Borg-

6   Brenner Aff. Rep. at 20-21 with Dckt. # 95 at 9.)

7          The absence of any specific analytical or experiential basis for her

8   conclusions is demonstrated by Ms. Borg-Brenner's crucial opinion that in

9   January 2008, "BNY Mellon should have taken immediate steps to eliminate

10  PSF's exposure to Sigma" and that the "failure to do so . . . put principal at risk in

11  violation of the investment guidelines."  (Borg-Brenner Aff. Rep. at 3.)  While the

12  report is long on citations to evidence that BNY Mellon carefully monitored the

13  risks that Sigma might default, there is nothing disclosed in the report providing a

14  link between that evidence and the conclusion Ms. Borg-Brenner offers – that is,

15  no methodology grounded in the disciplines of her field or research, and nothing

16  specific in her experience that leads her to reach her conclusions from the

17  evidence cited.  The report merely cites evidence and states conclusions

18  summarily, such as the assertions that the evidence (1) "support[s] the

19  conclusion" that BNY Mellon should have "eliminate[d] exposure to the Sigma

20  MTNs," (2) shows "it should have been apparent to BNY Mellon that Sigma

21  MTN holders were exposed to excessive risk," and (3) "provided further reason

22  for BNY Mellon to sell or otherwise reduce . . . exposure to Sigma MTNs."

23  (Borg-Brenner Aff. Rep. at 11-12, 17, 18-19.)

24         Also absent from the report is any disclosed consideration of why the

25  alternatives to holding Sigma MTNs were superior to selling, based on what was

26  then known or knowable.  Indeed, PSF has acknowledged that any sale of Sigma

27  MTNs would have been below par, meaning that any sale would result in a

28  principal loss.  (Dckt. # 95 at 6:8 ("Sigma MTNs consistently traded below par in

7

2008").)  Yet Ms. Borg-Brenner entirely fails to consider what price could have been obtained if the Sigma MTNs were sold, and thus how great the principal loss was likely to be.  She also fails to provide any analysis of whether it would have been better to accept the guaranteed principal losses those sales would represent or to hold the notes to maturity (when they could have, as many in fact did, pay in full with no loss of principal).  (Borg-Brenner Aff. Rep. at 20-21.)

Likewise, Ms. Borg-Brenner's report suggests that BNY Mellon should have engaged in additional ratio trades, in which a combination of cash and Sigma notes were traded for a mix of securities from Sigma's portfolio. (*Id.* at 21.)  But Ms. Borg-Brenner admitted that the vast majority of the securities offered in connection with ratio trades were not compliant with applicable investment guidelines (Ringgenberg SJ Ex. 150-A at 358:25-360:4; Factor Ex. 161 at BNYM-SL01984640), and thus presented their own risks.  Her report fails to provide any analysis of those risks.  Instead, she merely notes that of the $7.8 billion of Sigma's underlying securities that she "reviewed," $1.03 billion "in fact matured in par between 2008 and 2010."  (Borg-Brenner Aff. Rep. at 21.)   But this is pure hindsight; she does not suggest (nor could she) that BNY Mellon could have known at the time *which* securities would later pay in full.  Nor does she disclose any analysis of why it was better to engage in ratio trades – requiring giving up cash and obtaining other securities that violated investment guidelines – rather than hold the Sigma MTNs.

## B.    Rebuttal Report

Ms. Borg-Brenner also submitted a rebuttal report criticizing the work of two of BNY Mellon's experts, Professors Robert Glenn Hubbard and John W. Peavy III.  As with her affirmative report, Ms. Borg-Brenner's "methodology" consists of quoting from or characterizing discovery documents then makes assertions, with no connection to any stated principles or specific tie to any relevant experience.

Ms. Borg-Brenner's rebuttal report also addresses, for the first time, the *relative* risks of holding Sigma MTNs *as compared to* selling them or engaging in ratio trades. (Borg-Brenner Reb. Rep. at 5-9.) But like her opening report, it simply expresses conclusions, such as that "a reasonable professional manager would have sold or ratio traded the Sigma MTNs," and that it would have been better to take "reasonably quantifiable" losses in selling that Sigma MTNs than "uncertain recoveries and possible losses in the event of default." (*Id.* at 5.) The report identifies no methodology and no specific basis in Ms. Borg-Brenner's experience to reach those conclusions.

## II.    Professor Allen Ferrell

Professor Ferrell is a law professor and an economist. His professional work with respect to investment decisions is entirely academic; he has no professional experience of actually making investment decisions. (Ferrell Aff. Rep. Ex. A.) He has never done any professional work – academic or otherwise – with respect to securities lending. (Ringgenberg MTE Ex. B at 8:23-9:43.)

Professor Ferrell's affirmative report states that he was asked to consider the "economic evidence" and that he reached conclusions regarding liability and damages. His liability conclusion is that DBT's "position in Sigma was inconsistent with the objective of safeguarding principal by February 29, 2008." (Ferrell Aff. Rep. at 5.) He assesses damages on PSF's prudence claim at $62 to $67 million, based on calculations using assumed sale prices for Sigma notes. (*Id.* at 5, 22-25.) His rebuttal report attempts to defend his liability assertion. (Ferrell Reb. Rep. at 1-2.)

### A.    Liability Assessment

With respect to his liability opinions, Professor Ferrell's reports disclose no basis for their conclusions in any relevant principles derived from economics or law. Instead, it simply cites and characterizes a number of discovery documents, and a few other documents such as market analyst reports, and then asserts a

9

1   conclusion.  (Ferrell Aff. Rep. at 5-20; Ferrell Reb. Rep. at 4-12.)  Indeed, the

2   evidence cited is largely identical to the evidence referenced in Ms. Borg-

3   Brenner's report.

4         Professor Ferrell's affirmative report makes one additional observation en

5   route to its liability conclusion.  It notes the close relationship between the risks

6   of holding Sigma notes and the prices they would fetch if sold: "The price at

7   which Sigma MTNs were trading in the market is a direct market indicator of the

8   market's assessment of the riskiness of Sigma's MTNs.  A buyer will demand a

9   discount relative to par value in order to compensate for the risk they are bearing

10   as a result of purchasing Sigma MTNs."  (Ferrell Aff. Rep. at 10.)   The report

11   then cites evidence of certain sales prices over time (all at prices less than par)

12   and correlates those prices with market developments and analyst reports about

13   Sigma.  (*Id.* at 17.)

14         Based solely on that, and no other identified principle from economics or

15   any other discipline, Professor Ferrell concludes that by February 28, 2008

16   "continued holding of Sigma MTNs was inconsistent with the objective of

17   safeguarding principal." (*Id.* at 16.)  While the report acknowledges that any sale

18   would have a price that reflected the market's assessment of the risk that Sigma

19   would fail, it discloses no analysis of why it would be better to sell at that

20   discounted price than to hold.  Nor does the report disclose any consideration of

21   the risk that a discounted sale would generate greater principal losses than

22   holding if the notes paid in full at maturity (as Sigma notes in fact did until

23   Lehman failed).  (PSFGI ¶ 100.)

24         **B.     Damages Assessment**

25         Professor Ferrell offers a calculation of PSF's damages on its prudence

26   claims by figuring what PSF's losses would have been if BNY Mellon had sold

27   the Sigma MTNs in DBT on January 16, 2008 or February 29, 2008.  (Ferrell Aff.

28   Rep. at 22.)  To do so, he assumes the sales price for more than $500 million in

10

1    Sigma MTNs if sold around those dates have been 89.5% and 84% of par value,
2    respectively.  (*Id.* at 23 & Ex. D.)   Those are the sales price at which BNY
3    Mellon sold a handful of smaller notes, namely sales of $5 million and smaller
4    notes.  (*Id.* at 23 & Exs. B (listing actual sale prices), D (listing assumed sale
5    prices).)   Thus, he assumes that if BNY Mellon had dumped more than half a
6    billion dollars in Sigma notes on the market during a global liquidity crisis, the
7    price of Sigma notes would have been unaffected, and those notes would have
8    fetched exactly the same price that $5 million notes sold one at a time did.

9    **ARGUMENT**

10   Expert opinion is admissible only if "(a) the expert's scientific, technical,
11   or other specialized knowledge will help the trier of fact to understand the
12   evidence or to determine a fact in issue; (b) the testimony is based on sufficient
13   facts or data; (c) the testimony is the product of reliable principles and methods;
14   and (d) the expert has reliably applied the principles and methods to the facts of
15   the case." Fed. R. Ev. 702.

16   The proponent of the expert has the burden of proving by a preponderance
17   of evidence that the expert's testimony is admissible.  *See Lust v. Merrell Dow*
18   *Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  The court has broad discretion in
19   deciding the admissibility of expert opinion, and the "abuse of discretion standard
20   applies to a Fed. R. Ev. 702 ruling even [if] . . . the ruling was dispositive of a
21   motion for summary judgment." *Id.* at 597.

22   Rule 702 subpart (a) requires the testimony to "fit" the case.  "The
23   Supreme Court recognized that the 'fit' requirement 'goes primarily to
24   relevance,'" but this "obviously" is not "merely a reiteration of the general
25   relevancy requirement of Rule 402." *Daubert v. Merrell Dow Pharm., Inc.*, 43
26   F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert II*").   Because "scientific expert
27   testimony carries special dangers to the fact-finding process," "Federal judges
28   must therefore exclude proffered scientific evidence under Rules 702 and 403

11

1    unless they are convinced that it speaks clearly and directly to an issue in dispute

2    in the case, and that it will not mislead the Jury." *Id.*

3        Rule 702 subparts (b), (c), and (d) require reliability.  The Ninth Circuit has

4    held that "the trial judge's responsibility to keep unreliable expert testimony from

5    the jury applies to all expert testimony, not only to 'scientific' testimony." *United*

6    *States v. Decoud*, 456 F.3d 996, 1012-13 (9th Cir. 2006) (quoting *Kumho Tire*

7    *Co. v. Carmichael*, 526 U.S. 137, 148 (1999)).

8    **I.    Ms. Borg-Brenner's Opinions Should Be Excluded**

9        Ms. Borg-Brenner's opinions should be excluded under Fed. R. Ev. 702.

10       <u>First</u>, she has no professional experience with securities lending or SIVs,

11   and thus her testimony is outside her area of expertise.

12       <u>Second</u>, even if her professional experience were adequate, PSF has shown

13   no reliable basis for her opinions in the methods or principles of her discipline,

14   nor anything specific about her professional experience.

15       <u>Third</u>, in opining that BNY Mellon should not have held Sigma MTNs, Ms.

16   Borg-Brenner fails to adequately address the risks of alternative courses of action.

17   Indeed, there was no disclosure of any opinion on the *relative* risks of these

18   courses of action at all until Ms. Borg-Brenner's rebuttal report, which is too late

19   and should be excluded under Rule 37 on that basis alone.

20       **A.    Ms. Borg-Brenner Lacks Sufficiently Relevant Experience**

21       Expert opinion is inadmissible if it is "outside the areas of [the expert's]

22   expertise." *Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 839 (9th Cir.

23   2011).  This case concerns an investment in notes issued by a SIV, namely Sigma.

24   That investment was made in the specific context of BNY Mellon's securities

25   lending program, and the SLAA specifically states the applicable duty of care as

26   "the care, skill, prudence, and diligence" of a "professional securities lending

27   agent."  (PSFSGI ¶ 47.)  Ms. Borg-Brenner has absolutely no professional

28   experience with SIVs or securities lending.  (Ringgenberg MTE Ex. A at 87:24-

12

88:14, 94:18-94:21.)

Ms. Borg-Brenner also has identified no experience in the last 15 years making (or even advising on) investments in individual securities like those at issue in this lawsuit. Instead she offers only a few years of recent work making or advising on investment decisions in the hedge "fund of funds context," that is, an investment by a hedge fund in other hedge funds (who, in turn, made their own investment decisions which might have included individual securities.) (*Id.* at 48:24-50:11; Borg-Brenner Aff. Rep. at 5.)

If this was a case about an investment by a hedge fund of funds, perhaps Ms. Borg-Brenner's experience would be helpful. But it is not. The core liability issue she addresses is the right course of action for a securities lending collateral reinvestment fund, something Ms. Borg-Brenner has no experience with, with respect to an investment in a security issued by a SIV, something else she has no experience with. Securities lending is a unique context because participants, like PSF, were required to pay rebates to securities borrowers, and thus collateral reinvestment had to earn a return in excess of the rebate or participants would lose principal. (PSFSGI ¶¶ 36-37.) Likewise, her remaining opinions – on how a securities lending collateral reinvestment fund should have been operated and what disclosures were required to securities lending participants – are equally "outside the areas of [her] expertise." *Avila*, 633 F.3d at 839.

The sole claimed basis for Ms. Borg-Brenner's opinions is her experience, which is simply not sufficiently related to the issues in this litigation, and her opinions should be excluded for this reason alone. *See id.* (affirming exclusion of expert opinion where expertise was not sufficiently related); *Sun-Mate Corp. v. Koolatron Corp.*, No. 10-4735, 2011 WL 3322597 at *5-6 (Aug. 1, 2011) (product designer lacked sufficiently relevant experience as to design of "1950s refrigerators and soda cans"); *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353, 1355 (D. Ariz. 1996) ("[The] court may exclude an expert who does

13

1  not have the appropriate experience, education or training to offer a helpful

2  opinion with regard to controverted issues.") *aff'd*, 114 F.3d 851 (9th Cir. 1997);

3  *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir.

4  2002) ("A theoretical economist, however able, would not be allowed to testify to

5  the findings of an econometric study conducted by another economist if he lacked

6  expertise in econometrics and the study raised questions that only an

7  econometrician could answer."); *Castaic Lake Water Agency v. Whittaker Corp.*,

8  No. CV00-12613, 2002 WL 34700741 at *5 (C.D. Cal. Oct. 25, 2002) (excluding

9  expert testimony of an environmental engineer who lacked training or experience

10  in chemical engineering).

11  **B**  **Ms. Borg-Brenner's Opinions Lack Reliable Basis**

12  Even non-scientific expert testimony must be reliable in order to be

13  admissible. *Kumho Tire*, 526 U.S. at 148. That is, the court's "'basic

14  gatekeeping obligation' applies with equal force in cases, such as this one, where

15  'non-scientific' experts wish to relate specialized observations derived from

16  knowledge and experience that is foreign to most jurors." *Decoud*, 456 F.3d at

17  1013 (quoting *Kumho Tire*, 526 U.S. at 148).

18  Thus, like testimony grounded in science, testimony grounded in

19  specialized knowledge and experience cannot be admitted without a finding that it

20  has a "reliable basis." *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,

21  276 F.R.D. 364, 370 (C.D. Cal. 2011). The concern is "not with 'what the experts

22  say,' but, rather 'what basis they have for saying it.'" *Id.* (citation omitted).

23  "Nothing in either *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)] or

24  the Federal Rules of Evidence requires a district court to admit opinion evidence

25  that is connected to existing data only by the ipse dixit of the expert." *General*

26  *Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Many Cultures, One*

27  *Message v. Clements*, No. 10-cv-05253, 2011 WL 5515515, *18 (W.D. Wash.

28  Nov. 8, 2011) ("Something doesn't become [expert] knowledge just because it's

14

1  uttered by a[n expert]; nor can an expert's self-serving assertion that his

2  conclusions were derived by the [proper, reliable] method be deemed conclusive

3  . . . [T]he expert's bald assurance of validity is not enough.  Rather, the party

4  presenting the expert must show that the expert's findings [have a sound basis],

5  and this will require some objective, independent validation of the expert's

6  methodology.") (alterations in original) (quoting *Henricksen v. ConocoPhillips*

7  *Co.*, 605 F. Supp. 2d 1142, 1153-54 (E.D. Wash. 2009) (quoting *Daubert II*, 43

8  F.3d at 1319).)

9           The Court has "considerable leeway in deciding in a particular case how to

10  go about determining whether particular expert testimony is reliable." *Kumho*

11  *Tire*, 526 U.S. at 152.  Among the factors used to consider the reliability of non-

12  scientific testimony are  "(1) 'whether [a method] can be (and has been) tested';

13  (2) 'whether the [method] has been subjected to peer review and publication'; (3)

14  'the known or potential rate of error'; (4) 'the existence and maintenance of

15  standards controlling the [method's] operation'; (5) 'a degree of acceptance' of

16  the method within 'a relevant community'; (6) whether the expert is 'proposing to

17  testify about matters growing naturally and directly out of research they have

18  conducted independent of the litigation'; (7) whether the expert has unjustifiably

19  extrapolated from an accepted premise to an unfounded conclusion; (8) whether

20  the expert has adequately accounted for obvious alternative explanations; (9)

21  whether the expert 'employs in the courtroom the same level of intellectual rigor

22  that characterizes the practice of an expert in the relevant field'; and (10) whether

23  the field of expertise claimed by the expert is known to reach reliable results for

24  the type of opinion the expert would give." *Perry v. Schwarzenegger*, 704 F.

25  Supp. 2d 921, 946-47 (N.D. Cal. 2010) (applying standards to a purported expert

26  on marriage) (internal citations omitted) (other alterations in original); *accord In*

27  *re Aftermarket Auto. Lighting*, 276 F.R.D. at 370 (applying similar factors to non-

28

DEFENDANTS' MOTION TO EXCLUDE
BORG-BENNER AND FERRELL

1   scientific expert); *Morin v. McCulloch Corp.*, No. CV 01-6431, 2002 WL

2   34357202, *2 (C.D. Cal. Jul. 3, 2002) (same).

3        PSF has failed to meet its burden to show that there is an adequate basis for

4   Ms. Borg-Brenner's opinions.  To begin, Ms. Borg-Brenner discloses no

5   "method" from her discipline that shows it was unreasonable for BNY Mellon to

6   conclude that the risks of selling the Sigma MTNs or engaging in ratio trades

7   outweighed the risks of holding the Sigma MTNs.  Accordingly, the first five

8   *Perry* factors weigh against admissibility.  As to the sixth *Perry* factor, Ms. Borg-

9   Brenner's reports identify no way in which her opinions grew "naturally and

10  directly out of research" conducted outside the litigation.  As to the seventh *Perry*

11  factor, PSF has shown no "accepted premise" on which Ms. Borg-Brenner bases

12  any extrapolation.  Thus, these factors support exclusion.

13       As to the eighth *Perry* factor, Ms. Borg-Brenner importantly "fails to

14  account for obvious alternative explanations" for BNY Mellon's decisions.  She

15  fails to consider the substantial risks that attached to selling the Sigma MTNs –

16  including the fact that many of the notes she claims BNY Mellon should have

17  sold actually paid in full – as a possible explanation for why a reasonable

18  securities lending agent could have concluded that the prudent course at the time

19  was to hold rather than sell.  Moreover, Ms. Borg-Brenner opines that BNY

20  Mellon should have sold Sigma notes without considering what price could have

21  been obtained for them, let alone any consideration of whether the principal

22  losses that such sales would require were justified given that Sigma continued to

23  pay its notes in full at maturity.  (PSFSGI ¶ 100.)  Likewise, Ms. Borg-Brenner

24  opines that BNY Mellon should have engaged in additional ratio trades, but does

25  not analyze the risks that they would require accepting, including trading valuable

26  cash for new securities that did not meet applicable investment guidelines.

27  (PSFSGI ¶¶ 342-43; Factor Ex. 161 at BNYM-SL01984640; Ringgenberg SJ

28  Decl. Ex. 150-A at 358:25-360:4.)

DEFENDANTS' MOTION TO EXCLUDE
BORG-BENNER AND FERRELL

Finally, as to the ninth and tenth *Perry* factors, PSF fails to show how Ms. Brenner's summary of discovery documents, followed by her assertion of legal conclusions regarding BNY Mellon's liability, either (i) "employs [the] intellectual rigor that characterizes the practice of an expert in the relevant field,' or (ii) reaches reliable results. These factors too weigh in favor of exclusion.

In sum, there is no reliable basis for Ms. Borg-Brenner's opinions. Instead, each of Ms. Borg-Brenner's reports is nothing more than a "legal brief dressed up as expert opinion" which merely "marshals the evidence," and thus is "clearly impermissible." *Zahler v. Twin City Fire Ins. Co.*, No. 04 CV 10299, 2007 WL 4563417 at *2 (S.D.N.Y. Dec. 4, 2007); *accord Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (holding "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence").

Indeed, as discussed, her affirmative report is, in substantial part, nearly word-for-word the same as PSF's actual legal brief and marshals the same evidence in the same way as PSF's counsel. "But an expert is not supposed to be doing the work of counsel; an expert must 'bring to the jury more than the lawyers can offer in argument.'" *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 654 (S.D.N.Y. 2007) (quoting *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992)); *accord Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 409 (E.D. Pa. 2007) (excluding expert where report was "essentially a brief on the ultimate legal issues sans case citations").

Thus, PSF fails to meet its burden of showing reliability.

**C      The Merits Opinions in Ms. Borg-Brenner's Rebuttal Report Must Be Excluded for Non-Disclosure**

In addition to its other flaws, Ms. Borg-Brenner's rebuttal report contains key opinions as to PSF's liability claims, which were required to be disclosed in her affirmative report.

Rebuttal expert testimony is "*intended solely* to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(d)(ii) (emphasis added).   If the purpose of expert testimony is "to contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one." *In re Apex Oil Co.*, 958 F.2d 243, 245 (8th Cir. 1992); *accord R & O Const. Co. v. Rox Pro Int'l Group, Ltd.*, No. 01749, 2011 WL 2923703 *2 (D. Nev. July 18, 2011) (holding rebuttal reports are not "the proper place for presenting new arguments") (collecting cases); *Vu v. McNeil-PPC, Inc.*, No. 09-1656, 2010 WL 2179882, *2-3 (C.D. Cal. May 7, 2010) (excluding rebuttal opinion where rebuttal designation was "disingenuous"; "If the phrase 'same subject matter' is read broadly to encompass any possible topic that relates to the subject matter at issue, it will blur the distinction between 'affirmative expert' and 'rebuttal expert.'"); *IBM Corp. v. Fasco Indus., Inc.*, No. C–93–20326, 1995 WL 115421 at *3 (N.D. Cal. Mar. 15, 1995) ("[R]ebuttal experts cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts.").

Here, Ms. Borg-Brenner's rebuttal report contains the first and only references to any consideration of the risks of the alternative courses of action – selling the Sigma MTNs or engaging in ratio trades – which she and PSF claim BNY Mellon imprudently failed to undertake.  (Borg-Brenner Reb. Rep. at 5-9). Ms. Borg-Brenner's reasons for asserting it would have been better to sell or engage in ratio trades are a crucial component of PSF's prima facie case.  As such, it was required that her affirmative report contain "a complete statement of all opinions" and "the basis and reasons" for them. Fed. R. Civ. P. 26(a)(2)(B); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 571 (5th Cir. 1996) (affirming exclusion of opinion from rebuttal report where affirmative report from same expert failed to make adequate disclosure); *see also R & O Const.*, 2011 WL 2923703 at *2.  By identifying specifics of its expert's

18

1   analysis only in its rebuttal report, PSF has improperly deprived BNY Mellon's

2   experts of the opportunity to rebut important aspects of PSF's expert testimony.

3        Rule 37 provides for the automatic and mandatory exclusion of expert

4   opinions not properly disclosed unless the failure is "substantially justified or

5   harmless." Fed. R. Civ. P. 37(c)(1); *accord Yeti by Molly, Ltd. v. Deckers*

6   *Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth

7   to these requirements by forbidding the use at trial of any information required to

8   be disclosed by Rule 26(a) that is not properly disclosed."); *Musser v. Gentiva*

9   *Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) ("The exclusion of non-

10  disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-

11  disclosure was justified or harmless.").

12       There is no substantial justification for PSF's failure to disclose the true

13  and complete basis for Ms. Borg-Brenner's opinion that BNY Mellon allegedly

14  erred in failing to undertake sales and ratio trade transactions.  Nor is the failure

15  harmless.  By the time Ms. Borg-Brenner's opinions were fully disclosed,

16  discovery was nearly over and BNY Mellon's experts had no opportunity to

17  consider them in their rebuttal reports in advance of summary judgment briefing.[3]

18  Courts have routinely excluded expert reports in similar circumstances. *See*

19  *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005)

20  (holding the introduction of new expert testimony is not harmless, "even though

21  the ultimate trial date was still some months away," where the deadlines for

22  completing discovery and for filing motions for summary judgment had expired);

23  *United States v. Vistoso Partners, LLC*, No. CV10-0444, 2010 WL 4855232 at *1

24  _____

25  [3] Due to the incapacitation of one of BNY Mellon's expert, a replacement expert
    report will be submitted, but it will come too late for use at summary judgment.

26  Moreover, the evidence considered by the replacement expert will be limited to
    that considered by the prior expert.  (Dckt. # 124 at 1).  Should PSF's expert

27  testimony not be excluded, BNY Mellon requests the Court permit the
    replacement expert to consider new material as necessary to respond to the

28  affirmative opinions in Ms. Borg-Brenner's rebuttal report.

DEFENDANTS' MOTION TO EXCLUDE
BORG-BENNER AND FERRELL

(D. Ariz. Nov. 23, 2010) (finding no harmless error where the case is less than four weeks from the close of discovery and the deadlines for both expert disclosures and rebuttal experts had passed); *DeShazo v. Estate of Clayton*, No. CV05-2002, 2006 WL 1794735, *13 (D. Idaho June 28, 2006) (holding that, "[a]lthough Defendants had information about Plaintiffs' experts before the discovery completion and pretrial motion deadlines," the failure to disclose "the specifics of the experts' opinions" until after the deadline to submit rebuttal expert reports was not harmless).

## II.   Professor Ferrell's Opinions Should Be Excluded

In contrast to Ms. Borg-Brenner, Professor Ferrell does not attempt to base his opinions on professional experience, but rather an economist's evaluation of the "economic evidence." (Ferrell Aff. Rep. at 5.)  As such, his opinions are only admissible if they are reliably grounded in principles of economics, as revealed by (a) whether the theory or technique applied can and has been tested; (b) whether the theory or technique applied has been subjected to peer review and publication; (c) the known or potential rate of error for the technique applied; and (d) the theory or technique's general degree of acceptance in the economic community.  *See Daubert,* 509 U.S. at 593-94; *see also Kennedy v. Jackson Nat. Life Ins. Co.*, No. C 07-0371 CW, 2010 WL 2524360 at *12 (N.D. Cal. June 23, 2010) (admitting economist opinion where expert cited "supporting literature, which indicates that his theory is accepted within the economics community").

### A.   Professor Ferrell's Liability Opinions Lack Reliable Basis

Professor Ferrell conclusion that DBT's "position in Sigma was inconsistent with the objective of safeguarding principal by February 29, 2008" (Ferrell Aff. Rep. at 5) has no reliable basis in the principles or methodologies of economics.  Indeed, Professor Ferrell's reports link no stated principle of economics to that conclusion *at all*.  In support of this conclusion, Professor Ferrell constructed no economic model; he performed no quantitative analysis;

20

1   and he cited no economic research or literature.  Nor did Professor Ferrell

2   consider what decisions other professional securities lending agents made in the

3   marketplace.  Instead, his "methodology" was exactly the same as Ms. Borg-

4   Brenner's:  he characterized, as an advocate would, certain documents produced

5   in discovery, along with some public investor and credit rating reports, and then

6   asserted an ultimate conclusion.  (*Id.* at 5-21.)

7         It is well-settled that this sort of report by an economist is inadmissible.

8   For example, in *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d

9   1333 (7th Cir. 1989), the Court considered an expert affidavit submitted in

10   opposition to summary judgment, which stated he had reviewed material

11   produced in discovery and drawn inferences from it relating to the plaintiff's

12   claims.  The court explained that "nothing in the affidavit draws on the skills of

13   an economist."  *Id.* at 1340.  There was "no hint of an inferential process, no

14   discussion of hypotheses considered and rejected."  *Id.* at 1339.  The expert

15   "could have developed a model" to assess the issues or otherwise used the tools

16   of economics, but he "did none of these things.  Instead he examined materials

17   produced in discovery and drew inferences from the record, speaking in legal

18   rather than economic terms.  He gave a legal rather than an economic opinion."

19   *Id.* at 1340.  As such, the expert "offered the court his CV rather than his

20   economic skills," and therefore his opinions were properly excluded.  *Id.*

21         The same is true in this case.  Professor Ferrell's reports are more artfully

22   constructed than the report in *Mid-State Fertilizer* in that they quote from and

23   characterize the evidence.  But the substance is the same: Professor Ferrell did

24   nothing relevant as an economist but merely "interpreted" discovery evidence and

25   related documents.  Therefore, his opinions should be excluded.  *See Hynix*

26   *Semiconductor Inc. v. Rambus Inc.*, No. 00-20905, 2008 WL 73689 at *13  (N.D.

27   Cal. Jan. 5, 2008) (excluding testimony where, although the report was "rich in

28   assumed facts, it lacks any expert analysis of why those assumed facts lead to"

21

the economist's conclusion; expert could not turn "a paragraph of advocacy into 'economic analysis'"); *see also In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04–md–1628, 2009 WL 3241401 at *16 (S.D.N.Y. Sept. 30, 2009) (excluding an economist opinion that merely "recite[d] selective facts in the record and then offer[ed] his own legal conclusions").

There is one point – and only one – at which Professor Ferrell discusses what might be described as an economic principle in connection with his liability opinion.  He makes an uncontroversial point:  that the sale price of Sigma MTNs in the market reflected the market's assessment of the risk of those notes.  (Ferrell Aff. Rep. at 10.)  But Professor Ferrell identifies no connection between that principle and the assertion that the notes must have been sold.  To the contrary, the economic principle identified provides a sound reason not to sell: selling Sigma notes at a price reflecting their risk would not *avoid* those risks but would *guarantee* an immediate loss of principal based on the market's assessment of them.  Put another way, it makes no sense to claim BNY Mellon was required to *sell* notes because of risk when buyers in the marketplace assessed those very risks and concluded it was prudent to buy Sigma MTNs at that price.  To say that BNY Mellon *must* have sold at that price is to say either that the buyers were all fools or that BNY Mellon was required to outsmart the market.[4]

There is no reliable basis in economics for Professor Ferrell's liability opinions, and they should be excluded.

### B.   Professor Ferrell's Damages Opinions Lack Reliable Basis

Professor Ferrell also offers an opinion as to damages from BNY Mellon's decision to hold Sigma MTNs, a key component of which is the assumed price which could have been obtained if the notes were sold.  (Ferrell Aff. Rep. at 22-

---

[4] That is confirmed by the undisputed fact that other sophisticated investors, including several major securities lending agents and participants, also concluded it was prudent to hold Sigma MTNs.  (Ringgenberg SJ Ex. 136 at 75.)

22

25.) Professor Ferrell assumed that if BNY Mellon had sold all of the Sigma MTNs in DBT, it would have received the same prices as a few small sales of Sigma notes in the same time period. (*Id.* at 24.)  For example, he assumed that BNY Mellon could have sold the $589.9 million in Sigma notes on or around January 16, 2008 for 89.5% of par value because on January 17, 2008, BNY Mellon sold $5.75 million in Sigma notes for that price. (*Id.* at Ex. B (showing actual sales) & Ex. D (showing assumed sale prices).)  His sole grounds for that assumption were (1) a list of prices from a small number of sales of Sigma MTNs by BNY Mellon and (2) a list of "bids and quotes" for Sigma MTNs that BNY Mellon received. (*Id.* at 23-24.)  He identifies no other data, and no economic principle or methodology that allowed him to reach his conclusions from the two lists of prices.  That alone is reason enough to exclude his opinions, because they simply lack any reliable basis. *See, e.g., General Elec.*, 522 U.S. at 146 ("Nothing . . . requires a district court to admit opinion evidence that is connected to the existing data only by the ipse dixit of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Daubert II*, 43 F.3d at 1319 ("While these materials indicate that plaintiffs' experts have relied on [various data], they neither explain the methodology the experts followed to reach their conclusions nor point to any external source to validate that methodology. We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.")

Moreover, the evidence shows that Professor Ferrell's assumptions are unreliable and wrong.  BNY Mellon's damages expert, Suresh Sundaresan (the Professor of Finance and Economics at Columbia University who teaches graduate courses in Debt Markets and Advanced Derivatives, and who also has substantial experience in the private sector) analyzed market data including interest rate spreads, the actions of central banks, and volatility levels, and

23

1   concluded that the financial markets were in a highly stressed period, and that the

2   markets for many securities had become highly illiquid.  (Ringgenberg SJ Ex. 138

3   at 1, 13-14.)   He also relied on a series of "no action" letters to the Securities

4   Exchange Commission from sophisticated money market managers about Sigma

5   MTNs, which provided a reasonable basis to infer that the market for Sigma notes

6   in particular was highly illiquid.  (*Id.* at 15 & n.32.)  He also noted the extensive

7   academic literature showing that, in times of illiquidity, securities receive

8   discounted prices relative to their worth.  (*Id.* at 15 & n.33.)

9        Professor Sundaresan also compared the volume of actual sales on which

10   Professor Ferrell relies for prices with the volume of Sigma notes that Professor

11   Ferrell believes could have been sold at those prices, and shows that the actual

12   sales volumes are a tiny faction of the volumes Professor Ferrell asserts could

13   have been sold at the same price.  (*Id.* at 15-17, Ex. 10.)  In light of the data of

14   showing illiquidity and well-established economic literature on liquidity

15   discounts, Professor Sundaresan shows that it was entirely unreliable for

16   Professor Ferrell to assume that more than $500 million in Sigma notes could be

17   sold at the same prices as the very small transactions on which Professor Ferrell

18   bases his price.  (*Id.*)

19        Professor Ferrell's assumptions are likewise belied by documents produced

20   by PSF.  For example, Wachovia Global Securities Lending explained to PSF that

21   "the market for SIVs has dried up since last Summer, with virtually all trading

22   activities coming to a halt," and that when a seller decided to sell less than $70

23   million in Sigma notes, it received only two bids and obtained a price of only

24   68% of par.  (Ringgenberg SJ Ex. 106.)  Wachovia concluded that this was an

25   "artificial pricing environment" due to the needs of the seller, and that "the prices

26   at which the transactions were executed did not reflect the intrinsic value of

27   Sigma Finance."  (*Id.*)   This stands entirely contrary to Professor Ferrell's

28

1   unjustified assumption that a substantial volume of additional Sigma notes could

2   have been sold without any further discount to price.

3        Professor Ferrell's key premise that, notwithstanding the illiquidity in the

4   markets, the sale of more half a billion dollars of Sigma notes would fetch the

5   same price as sales of such small amounts as $5 million is without reliable basis.

6   Accordingly, it should be excluded. *See, e.g., Guidroz-Brault v. Mo. Pac. R. Co.*,

7   254 F.3d 825, 829-32 (9th Cir. 2001) (affirming exclusion of expert opinions not

8   grounded in facts and based on assumptions contrary to the evidence); *Pacific*

9   *Info. Res., Inc. v. Simple Comm'n*, No. C-07-4131, 2008 WL 5071110, *1 (N.D.

10  Cal. Nov. 26, 2008) ("Because [the expert's] opinion is dependent on the above-

11  referenced assumptions, and there is no evidence in the record to support them,

12  [the expert's] opinion is inadmissible.")

## CONCLUSION

14       For the foregoing reasons, BNY Mellon respectfully requests the Court

15  exclude the opinions of Ms. Bella Borg-Brenner and Professor Allen Ferrell.

16  Dated: December 12, 2011          **BOIES, SCHILLER & FLEXNER LLP**

18                          By      /s/ Kieran Ringgenberg
19                                  Kieran Ringgenberg (SBN 208600)
                                    kringgenberg@bsfllp.com
20                                  1999 Harrison St., Suite 900
21                                  Oakland, CA 94612
                                    Telephone: (510) 874-1000
22                                  Facsimile: (510) 874-1460
23                                  *Attorneys for Defendants*

25