# EXHIBIT 2

# In The Matter Of:

*PACIFIC SELECT FUND*
*v.*
*THE BANK OF NEW YORK MELLON*

_____

*HUBBARD, ROBERT GLENN - Vol. I*

*September 24, 2011*

_____

**MERRILL CORPORATION**
LegaLink, Inc.
20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

Page 21

1   Robert Glenn Hubbard
2   A.   Yes.
3   Q.   Are you familiar with the
4   securities lending that MetLife participated in
5   in the 2007-2008 time frame?
6   A.   I am generally familiar with that,
7   yes.
8   Q.   [redacted]
9   [redacted]
10  [redacted]
11  [redacted]
12  Q.   Did MetLife realize principal
13  losses in its securities lending programs in
14  2008?
15       MR. GOLDFARB:  Object to the form.
16  A.   I really don't recall.  If there
17  were they were modest.  We had shrunk the size
18  of the sec lending program, all of this is
19  public information.  There may have been very
20  modest losses, so I don't recall.
21  Q.   Do you recall when MetLife shrunk
22  the size of its securities lending program?
23  A.   I really don't recall the exact
24  dates, but during that period there was constant
25  watching both by the board and by the

Page 22

1   Robert Glenn Hubbard
2   investments group of the company.
3   Q.   Just in terms of earnings or net
4   earnings of securities lending at MetLife, was
5   it profitable in 2008?
6   A.   I believe so, yes.  I would have to
7   go back and look.  You can look at the corporate
8   financials.
9   Q.   Can you state your opinions in this
10  case?
11  A.   Sure.  I had been asked to look at
12  two questions.  One about the foreseeability of
13  the Lehman Brothers' bankruptcy and then the
14  second, what were the effects of the Lehman
15  Brothers' bankruptcy on market conditions
16  generally.  So my opinions relate to those two
17  questions.
18       On the former, that the Lehman
19  bankruptcy was not reasonably foreseeable and
20  second, that that bankruptcy generated almost an
21  earthquake of repercussions in financial
22  markets.
23  Q.   Do you state any other opinions in
24  this report, other than what you just
25  summarized?

Page 23

1   Robert Glenn Hubbard
2   A.   Well, there are many opinions that
3   underlie those two primary ones, but those are
4   the two principal opinions in the report.
5   Q.   You used the term earthquake.  Do
6   you have any comparable description in this
7   opinion?
8   A.   I'm not sure that I used exactly
9   that language, I think I talked about enormous
10  shifts.  Just think sea changes in spreads, in
11  market conditions, in bankruptcy patterns,
12  that's why I use the earthquake metaphor like
13  plates moving.
14  Q.   Was 2007 characterized by a change
15  of events in the market?
16  A.   That's not how I would describe it.
17  The financial, crisis when I speak of it I
18  usually talk about it as a 2007-2009 crisis for
19  The United States.  2007 begins an onset of
20  worry beginning in money market funds in August
21  of 2007.
22       The thrust of the crisis, the bulk
23  of the crisis in spreads comes in the fall of
24  2008, following a whole series of events in
25  September of 2008 which Lehman obviously was the

Page 24

1   Robert Glenn Hubbard
2   most significant.
3   Q.   You would agree that the financial
4   crisis as you describe it was well under way or
5   in full swing in the middle of 2008, is that
6   right?
7        MR. GOLDFARB:  Objection to the
8   form.
9   A.   I wouldn't put it that way, no.
10  When I say I describe the 2007-2009 financial
11  crisis, there is a period of buildup of stress
12  and then a period in which the earth moved, to
13  go back to the other metaphor.  So certainly
14  over that whole period you're observing stresses
15  and watchfulness in financial markets, but it's
16  not really until September of 2008 that you see
17  the large blowouts in spreads, in haircuts, in
18  probabilities of default from financial
19  instruments.
20  Q.   So you wouldn't say that the
21  financial crisis was in full swing in 2008?
22       MR. GOLDFARB:  Objection to form.
23  A.   Full swing is not a term of art.  I
24  told you my view of the crisis is a 2007-2009
25  event for The United States.  There are

Page 37

Robert Glenn Hubbard

prices. I'm relying on prices, not opinions.
 Q. Have you considered that the prices or the consensus view that you're looking at could in some ways understate significant views in the marketplace that have been downplayed by the majority of the market?
   MR. GOLDFARB: Objection to form, incomplete hypothetical.
 A. You are mixing ex ante and ex post in your question. When you say downplay you've automatically included the in play. At any point in time all market participants or collectively market participants use the information available to them, of positive views, of negative views, those are all in the price.
 Q. The price is the best indicator to you of a market assessment of -- strike that. Price is the best indicator to you of the reasonable assessment of risk as to a security?
   MR. GOLDFARB: Objection as to form.
 A. In an efficient market that will be true. Your own experts have used that as the

Page 38

Robert Glenn Hubbard

cornerstone of their own testimony.
 Q. So in that regard you agree with our experts?
 A. No, your experts misused the term, but they actually pretend to use the word efficient market, so in that sense we agree; I disagree with its application.
 Q. In your opinion there is an efficient market for Lehman?
 A. I believe so, yes.
 Q. You in this case have not -- in your opinion in this case have not evaluated the market for Sigma medium-term notes?
   MR. GOLDFARB: Objection to form.
 A. Are you talking about market efficiency?
 Q. I'm not asking about market efficiency. I'm just asking you have not evaluated the market and prices for Sigma medium-term notes in this case?
 A. I was not asked to do that, no. I think it would be extremely difficult to do the last part of what you said; but no is the quick answer.

Page 39

Robert Glenn Hubbard

 Q. Not having done any such work, you don't have an opinion on the efficiency of the market for Sigma's MTNs, is that correct?
 A. I'm not testifying about the efficiency of Sigma's MTN notes.
 Q. What does reasonable mean?
   MR. GOLDFARB: Objection to form.
 A. What a reasonable -- in this context what a reasonable investor would consider.
 Q. What does foreseeable mean?
   MR. GOLDFARB: Same objection.
 A. I believe I answered that before. A prediction that an event will happen.
 Q. When you set out to write your opinion in this case, how did you go about determining what you would do to determine whether something was reasonably foreseeable?
 A. I wanted to know what information would a reasonable investor consider. So that would be information about the prices of the assets themselves. The prices of other assets and other claims on the company.
   The information from credit default

Page 40

Robert Glenn Hubbard

swaps, whether a company was able to raise new debt or equity capital, the view of analysts, the holdings by sophisticated investors, all of those things.
 Q. Have you ever before either this case or the case where you're opining about Bank of New York loans and Lehman investments, written any sort of paper or opinion or anything about whether something was reasonably foreseeable?
 A. All of my work in investments looks at foundations of valuation.
 Q. I'm asking you a specific question about whether outside of your opinions in this case or the case, I believe it's called IBEW, have you written anything specifically connecting up any of the factors that you discuss in this case to whether an event was reasonably foreseeable?
   MR. GOLDFARB: Objection to form.
 A. Certainly in the work that I did for the committee on capital markets regulation I looked at the unfolding of the crisis, what was known and what was knowable. The term

Page 41

Robert Glenn Hubbard

reasonably foreseeable in this context is a forensic one.  We're here to discuss a matter that happened, which would not typically be the subject of academic work.

Q. What do you mean by that this would be a forensic question?

A. A bankruptcy has happened and now we're going to see whether a reasonable person might have seen it coming.

Q. Where did you get the term reasonably foreseeable from?

A. It's my own expression.

Q. It's your own expression.  Where have you heard that term before?

A. I believe it is a plain English term that conveys the meaning that I'm trying to get.

Q. So normal people speak in terms of things being reasonably foreseeable?

A. I don't see why not; both of those words seem pretty plain to me.

Q. Is it an economic term?  Reasonably foreseeable, is that an economic term?

A. The economic term is about

Page 42

Robert Glenn Hubbard

forecast-ability; that is an economic concept, yes.

Q. I'm specifically asking about the term that you use here as a term of art, reasonably foreseeable.  Is that an economics term?

A. I think it's a very simple way of describing the economic concept of whether you could forecast an event using available information.

Q. You would agree that it's not a commonly used term in economics?

MR. GOLDFARB: Objection to form.

A. The word blue isn't either but it appears in my freshman textbook.  Economists are free to borrow from the English language.

Q. You're assigning meaning to the term reasonably foreseeable as relevant in this case and using economic factors to evaluate it, so I'm not asking about a term like blue or green, I'm asking you about a specific term here that you're giving economic meaning to.  So I think it's a fair question to ask you whether reasonably foreseeable is a term that's

Page 43

Robert Glenn Hubbard

discussed in economic textbooks or in economic literature?

A. I believe it definitely captures the simple concept of forecasting using available information.  Do the opinions rise or fall on those statistical tests and do they sum up to be reasonably foreseeable or not.

Q. You chose the term reasonably foreseeable, why did you choose that term?

A. It seemed to me to capture in plain English what I was trying to say.

Q. Did a lawyer give you that term?

A. No.

Q. You would agree that the term reasonably foreseeable itself, not as a proxy for something else that you felt is consistent now; that term, reasonably foreseeable, is not used generally in economic literature?

MR. GOLDFARB: Objection to form.

A. I wouldn't agree with that.  The term reasonable is frequently meant to mean the use of available information and foreseeable has a distinct statistical meaning that I use here.

Q. What's the distinct statistical

Page 44

Robert Glenn Hubbard

meaning for foreseeable?

A. Whether something is forecastable.

Q. Are there economic textbooks that will tell you that foreseeable means something that is forecastable?

A. Again, you're mixing plain English and economics.  I'm trying to translate the economics for you.  I try to write as often as I can in plain English, but if you have questions about the underlying economics.

Q. Do you think it's important for your economics terms to be precise?

A. I believe that term is precise.

Q. Do you think it could be misleading if you're using terms as appearing to be economic terms when they have specific terms of arts in other contexts?

A. I do not.

MR. GOLDFARB: Objection to form.

A. I don't know whether they have a specific meaning somewhere else, I'm using it to mean what I mean.

Q. Does reasonably foreseeable have a meaning in a legal context?

Page 45

Robert Glenn Hubbard

      MR. GOLDFARB: Objection to norm,
lack of foundation.
   A.   I am not a lawyer, I can't help you
with that.
   Q.   You're not testifying as a lawyer
in this case?
   A.   No, because I'm not one.
   Q.   If reasonably foreseeable is a
legal term of art, do you think it's misleading
to use the term reasonably foreseeable as an
economic term in this case?
      MR. GOLDFARB: Objection to form,
argumentative.
   A.   No, I'm not testifying as a lawyer
and I've already told you what I mean by the
term.
   Q.   If the term as you use it is
different from the term of art in the legal
context, you would agree that it would affect
the relevance of your analysis?
      MR. GOLDFARB: Objection to form,
lack of foundation. He's not a lawyer, he says
he's not familiar with the term.
      MR. KELMAN: I just gave him a

Page 46

Robert Glenn Hubbard
hypothetical.
      MR. GOLDFARB: Objection to form,
lack of foundation.
   A.   I don't agree with that at all.
I'm testifying as an economic expert witness,
not as an attorney.
   Q.   If I were to look in an economics
dictionary would I find the term reasonably
foreseeable?
   A.   I doubt you would find reasonably
foreseeable.
   Q.   What is the closest comparable term
that I would find?
   A.   Forecastable probably instead of
foreseeable and the term reasonable man for
reasonable.
   Q.   Reasonable man would be in an
economics textbooks or dictionary?
   A.   It's in mine.
   Q.   Reasonable man is in your textbook?
   A.   Yes.
   Q.   What's the definition of it, if you
recall?
   A.   Basically, what a reasonable person

Page 47

Robert Glenn Hubbard
using information would do in a forecasting
situation.
   Q.   Your textbook specifically
describes reasonable person in the context of
forecasting?
   A.   I believe that's the example, it's
certainly there.
   Q.   What's the definition of
forecastable?
   A.   Using information available today I
could predict that an event will occur with a
very high probability. Literally foretelling
the future would predicting probability one.
   Q.   Predicting that it would occur or
could occur?
   A.   Well, anything could happen. To be
precise is what statistical significance would
it have.
   Q.   What's the threshold for
statistical significance in the context of
forecasting that you are discussing?
      MR. GOLDFARB: Objection to form,
incomplete hypothetical.
   A.   What I'm doing is looking at

Page 48

Robert Glenn Hubbard
individual pieces of data and then looking at
them as a case considered together. The
forecasting that's done here is literally by the
market itself because I said the market is
efficient, that information has already been
forecasted into the price.
   Q.   By forecasting are you talking
about a prediction about what will happen in the
future?
   A.   A market price in the official
market is the market's expectation of the
present value of cash flows on that security, it
is a prediction.
   Q.   Is it fair to say that the
prediction, to the extent there is a prediction
in a market price, you're not looking at a
prediction of a certain event or one type of
event; you're looking at a range of
possibilities or probabilities, is that right?
   A.   I'm not sure I understand the
question. Depending on the security the
information may be more or less related to the
discrete outcome. So to wit if you're try to
predict bankruptcy, information from particular

Page 49

Robert Glenn Hubbard

securities, particular debt securities may be the most useful.

Q. I guess what I'm asking about is what is actually being predicted. Is it that something will in fact occur or is it a range of different types of events that have their own probabilities of whether those events may or may not occur?

MR. GOLDFARB: Objection to form, incomplete hypothetical.

A. I have no idea what you're talking about. I can only tell you what I did which is when you're looking at things like Lehman notes, that's a question about whether Lehman is going to go bankrupt, full stop.

Q. When you're looking at Lehman notes, it's not a question of whether Sigma Finance is going to go bankrupt, is it?

A. That's not the question that I answered in looking at Lehman notes. When I looked at the market effects of Lehman, I do think those market effects contributed mightily to financial dislocations generally, including Sigma.

Page 50

Robert Glenn Hubbard

Q. Can you show me in your report where it says that the effects included Sigma?

A. If you turn with me to the last section of the report, I go through all of the effects post-Lehman on the so-called bank run phenomenon, and then I speak about Sigma's duress on pages 54 and 55 in the context of that bank run discussion.

Q. So you're referring to paragraph 111?

A. I'm referring to the whole section, but Sigma is in paragraph 111, yes.

Q. In preparing your report in this case you did not at all look into what Sigma's financial condition was prior to the Lehman Brothers' bankruptcy, did you?

A. I was not asked to assess Sigma's financial condition prior to the bankruptcy. I have looked at documents surrounding that, but that's not what my report was asked to do.

Q. If you're trying to show the effect of Lehman Brothers on the Sigma medium-term notes or the security, don't you need to connect the two points in the line before and after?

Page 51

Robert Glenn Hubbard

A. I believe that it's self-evident that the bank run phenomenon took place largely after Lehman Brothers. We know from S&P the Friday before Lehman that there had been scenario analysis of Sigma that indicated a likelihood of success.

Q. What S&P report are you referring to? Is it referenced in your report anywhere?

A. I don't recall the exact site, sorry.

Q. Why don't we turn to your appendix and look at the documents that you considered. Let me ask you this. The S&P report that you're referring to, when did you first review that report?

A. I really don't recall.

Q. Did you refer to it for the first time in preparing for this deposition?

A. I don't recall, sorry.

Q. Other than the S&P report that you reviewed at some point in time, have you reviewed any other analyst reports in preparing for your opinion in this case or forming your opinion in this case with respect to Sigma MTNs?

Page 52

Robert Glenn Hubbard

A. Well, Professor Ferrell's own report has his set of transactions prices that give an assessment of the market's valuation of Sigma MTNs.

Q. Other than the S&P report, have you reviewed any other analyst reports in preparing for or forming your opinion in this case with respect to the Sigma MTNs?

A. I may have seen those, I don't recall.

Q. Can you take a look at Appendix C to your report?

A. Yes.

Q. I think it's about six pages or so. Can you flip through and see if you can find the S&P report that you just referenced?

A. I'm not sure. I don't remember the exact date. It's just before the bankruptcy filing or some of these are around that date, I don't know what is in these.

Q. In your view, would a single analyst report be sufficient to evaluate the financial condition of Sigma prior to Lehman's bankruptcy?

Page 65

Robert Glenn Hubbard

doesn't make something reasonably foreseeable. We know that that's not the facts in this case because of the market prices.

Q. I'm simply saying if you did the type of analysis that you would do to determine whether a particular security like Sigma was reasonably foreseeable to default, and the consensus in the market was that for any reason whatsoever that security would default by the summer of 2008, isn't it reasonably foreseeable at that time, given the market consensus, that the default event of that security, in this case Sigma, was reasonably foreseeable?

MR. GOLDFARB: Objection to form. Now we're back to the chronological question you've asked 15 or 20 times.

A. To try to be helpful. If the entire market viewed that, again completely unrelated to the facts in this case if that's helpful, you would have already observed a failure. You would have already observed the repo run, you would have already observed the collapse in prices, it's not even a meaningful question to ask that.

Page 66

Robert Glenn Hubbard

Q. When the market is giving you information that you're using to conclude that a firm is likely to go bankrupt, it doesn't tell you why it's going to go bankrupt, does it?

A. Now we're mixing and matching again. So in the case of Lehman the issue that I was asked to look at was about credit quality. In the case of Sigma we now have credit quality and the probability of a particular shadow banking model surviving.

So now these are two very different questions, two very different analytical frameworks and the latter doesn't rely on information about the firm alone to be able to answer. In fact, in Professor Gorton work we know it's principally other information that's relevant.

Q. What information in your view, other than looking at what the market believed about Sigma, would need to be looked at to decide if a Sigma default was reasonably foreseeable?

A. I think the market prices are a very good indication --

Page 67

Robert Glenn Hubbard

Q. Market prices of what?

MR. GOLDFARB: Excuse me, he wasn't done with his answer.

MR. KELMAN: That's fine. I have not been interrupting him, it was a natural break.

Q. Go ahead.

A. The market prices of the debt securities. Because this is not a very liquid market there's certainly a lot of noise around that, but there's certainly signal there as well about ongoing value, and market participants would be also pricing in the probability that shadow banking systems fail or sustain.

Q. So what you're saying is you would apply the type of analysis you did with respect to Lehman, but to Sigma, to determine whether Sigma's default was reasonably foreseeable?

MR. GOLDFARB: Objection to the form.

A. As I've told you a hundred times no, because you would also need to do a set of macro factors.

Q. Didn't you say that those macro

Page 68

Robert Glenn Hubbard

factors would be priced into the price of Sigma?

A. You would have market views of those macro factors, certainly. Your expert did none of those and of course market prices are completely unrelated to your question.

Q. I'm not asking you about what our expert did or whether you think what our expert did was sufficient. I'm simply asking you if you were able to get enough information from the market prices, from the commentary in the market, from all other factors that are relevant, the types of factors that you look at when looking at Lehman, that alone should be enough to determine whether a Sigma default was reasonably foreseeable; is that right?

A. No. I mean I think again, one it's a totology; two, these prices are being drawn from an illiquid market --

Q. You yourself --

MR. GOLDFARB: Excuse me, please don't interrupt.

A. I'm done.

Q. You yourself have already said that the market price would take into account

Page 121

Robert Glenn Hubbard

me to reach the conclusions that I reached.
Q. And you didn't rely on any other documents in forming your opinion?
A. As I understand the word rely to mean in your profession, no.
Q. How do you understand the term rely?
A. That I needed those to reach this conclusion.
Q. Do you understand that in your report you're supposed to disclose all of the bases of your opinions that you are going to use to support your opinions at trial?
MR. GOLDFARB: Objection to form.
A. I am not a lawyer. I only know that what I concluded in this report is based on what you see in this report.
Q. In forming your opinion in this case you did not look at the price of Sigma's medium-term notes, correct?
A. I did not need the price of Sigma's medium-term notes for the two conclusions that I reached. I have looked at those if that's your question, but I did not need to do so.

Page 122

Robert Glenn Hubbard

Q. Is it your opinion that if Lehman Brothers' bankruptcy was reasonably foreseeable then Sigma's default was reasonably foreseeable?
A. No.
Q. Is it your opinion that if Lehman's bankruptcy was not reasonably foreseeable, then therefore Sigma's default was not reasonably foreseeable?
MR. GOLDFARB: Objection to form.
A. Narrowly asked, no.
Q. How do you define narrowly asked?
A. Exactly as it sounds, Mr. Kelman. That's the correct answer to the question you asked. I'm not going to do your work for you on the question.
MR. GOLDFARB: Objection to the form of the question.
Q. I'm just asking the question. You said "narrowly asked," what does that mean to you, "narrowly asked"?
A. The question you asked I answered.
Q. So your answer to the question is it your opinion that if Lehman's bankruptcy was not -- strike that. So the answer to your

Page 123

Robert Glenn Hubbard

question -- strike that.
MR. GOLDFARB: His question?
MR. KELMAN: Let's go off the record.
THE VIDEOGRAPHER: Off the record, 2:27.
(Off the record.)
THE VIDEOGRAPHER: Back on the record, 2:28.
Q. So the answer to the question is it your opinion that if Lehman bankruptcy was not reasonably foreseeable, then therefore Sigma's default was not reasonably foreseeable is no?
MR. GOLDFARB: Objection to form, misstates his testimony.
A. The question literally as you asked is no. My story in the report is richer than that.
Q. Okay. Is it your understanding that there are circumstances in which Lehman's bankruptcy would not be reasonably foreseeable, yet at the same time Sigma, a Sigma default would be reasonably foreseeable?
MR. GOLDFARB: Objection to form,

Page 124

Robert Glenn Hubbard

incomplete hypothetical. Theoretically or in the actual world?
A. I'm taking it as theoretical because as you know that's not the facts in the actual world.
Q. You didn't evaluate the facts as to Sigma's financial condition in 2008?
A. You began your hypothetical with Lehman Brothers, which is the subject of my report.
Q. Correct. What I'm asking you is are there circumstances in which a Lehman bankruptcy would not be reasonably foreseeable, and yet a Sigma default would be reasonably foreseeable?
MR. GOLDFARB: Objection to form, incomplete hypothetical. Are you asking him about the actual world, theoretical, any companies?
A. It would have to be a question for a theoretical world. We know it couldn't be for the actual world because your expert has in an illiquid market a transactions price of 91 cents on the dollar at or around the time of the

Page 125

1  Robert Glenn Hubbard
2  Lehman bankruptcy.
3  Q. I don't think you're accurately
4  characterizing this report. Your report doesn't
5  address that, does it? Your report does not
6  address the liquidity of Sigma's MTNs in 2008,
7  does it?
8  MR. GOLDFARB: Objection to form.
9  Now you're asking him questions outside the
10 scope of his report, and when he answers
11 something outside the scope of his report you're
12 saying his report doesn't address that.
13 Either ask him questions about his
14 report and he'll answer based on his report, or
15 if you're going to ask him outside the scope of
16 his report then he's free to answer the question
17 as he sees fit.
18 MR. KELMAN: Are you done?
19 MR. GOLDFARB: Yes.
20 Q. Do you remember the question I just
21 asked?
22 A. I did, and of course as you know
23 it's false because I do specifically talk, and
24 you even asked me today about the analysis
25 linking the repo run to what happened in Sigma,

Page 126

1  Robert Glenn Hubbard
2  it's definitely in the report.
3  Q. The only thing in your report on a
4  connection between a repo run and Sigma is I
5  believe paragraph 111. Isn't that the only
6  paragraph that you specifically make any
7  connection to Sigma?
8  A. The entire section builds up to
9  that; but yes, that's the discussion of Sigma
10 and directly gets at that question.
11 Q. Did you evaluate anything about
12 Sigma specifically, other than what's in this
13 paragraph there?
14 A. Sir, what do you mean?
15 MR. GOLDFARB: Objection to form.
16 A. Are you asking me about liquidity
17 now?
18 Q. You're saying there's a connection
19 between the effects that Lehman Brothers may
20 have had and the Sigma situation.
21 Do you address anywhere what
22 happened to Sigma, what its condition was before
23 and after and the connection between those two
24 anywhere other than in this paragraph 111?
25 A. I view this entire section as doing

Page 127

1  Robert Glenn Hubbard
2  that; and of course I read Professor Ferrell's
3  work and have views on his notions of the
4  liquidity.
5  Q. Did you review Professor Ferrell's
6  report before you wrote this report?
7  A. No. We were simultaneously
8  exchanging reports.
9  Q. So is it correct that -- am I right
10 that the only place you specifically address
11 Sigma's financial situation specifically is in
12 paragraph 111 of your report?
13 MR. GOLDFARB: Objection to form.
14 A. I view the entire section as
15 leading up to that. As I said, I saw Professor
16 Ferrell's work after filing this report.
17 Q. You haven't evaluated how Sigma was
18 funding itself in 2008, have you?
19 A. I was not asked to do that. I have
20 certainly seen documents about its funding, but
21 I was not asked to do that.
22 Q. You have not evaluated what level
23 of repo Sigma was relying upon at any given
24 point in time, have you?
25 A. I have definitely seen those

Page 128

1  Robert Glenn Hubbard
2  numbers in documents, yes, but it was not what I
3  was asked to do here.
4  Q. You have not evaluated the types of
5  assets that Sigma had on repo and the types of
6  assets that it did not have on repo?
7  A. I have definitely seen those data,
8  yes.
9  Q. You did not rely on an analysis of
10 the types of assets on repo and the types not on
11 repo in forming your opinion in this report, did
12 you?
13 A. I did not need to, no. Your
14 question is had I seen this data.
15 Q. I'm just asking you the question,
16 that's all. You did not evaluate what Sigma's
17 initial margin as to its repo financing was at
18 any point in time in 2008, did you?
19 MR. GOLDFARB: Objection to form.
20 A. I have seen those data, yes.
21 Q. In forming your opinion here did
22 you take that into consideration, the margin
23 that Sigma had on its repo?
24 A. It wasn't necessary. It simply
25 corroborates the point I made in the paragraph

Page 129

1   Robert Glenn Hubbard
2   because of the very large margin shifts.
3   Q.   You didn't evaluate in forming your
4   opinion in this case the ability of Sigma to
5   fund itself going forward on assets that it had
6   not yet repo'd at any given point in time?
7       MR. GOLDFARB: Objection to form.
8   A.   I saw several documents on that,
9   both analyst commentary on it and the data
10  itself.
11  Q.   Are you aware that throughout 2008,
12  repo counterparties had a dispreference for
13  structured product assets that Sigma held in
14  providing repo financing?
15      MR. GOLDFARB: Objection to form,
16  assumes facts not in evidence, misstates the
17  record.
18  A.   What I am aware of is that in
19  general certain structured products were out of
20  favor with markets and the collateral for repo
21  transactions had to change.  I'm also aware that
22  Sigma had successfully delevered itself by
23  50 percent during that period.
24  Q.   Where is that in your report?
25  A.   It's not necessary for the

Page 130

1   Robert Glenn Hubbard
2   conclusions that I reach.  You simply asked me
3   about my understanding.
4   Q.   I'm asking you about what you took
5   into account in forming your opinion in this
6   case?
7   A.   I don't need that statement for the
8   opinion that I wrote in the case.
9   Q.   You did not perform any assessment
10  as to whether Sigma was money good at any point
11  in time in early 2008, did you?
12  A.   I don't even know exactly what you
13  mean by that.  In an illiquid market with very
14  few transactions prices I'm not quite sure what
15  you would do.  It's a business judgment call.
16  Q.   I'll ask the question again.  You
17  did not perform any assessment as to whether
18  Sigma was money good at any point in time in
19  early 2008, did you?
20      MR. GOLDFARB: Objection to form.
21  A.   As I understand your question that
22  is not an exercise that could be done, or that
23  your own experts even attempted to do.
24  Q.   All I'm asking about, I'm not
25  asking for your assessment of whether you agree

Page 131

1   Robert Glenn Hubbard
2   with our experts; I'm asking whether you
3   performed any analysis as to whether Sigma MTNs
4   were money good in early 2008?
5       MR. GOLDFARB: Objection to form,
6   asked and answered.
7   A.   I don't understand what you mean by
8   money good, but that's not an exercise that one
9   could do so easily as you could with some of the
10  notes and debt obligations in previous cases.
11  Q.   So it's fair to say that you did
12  not perform any assessment specifically as to
13  Sigma MTNs, as to whether they were money good
14  in early 2008?
15      MR. GOLDFARB: Objection to form.
16  A.   I don't think that's so easy to do.
17  I could use your own expert's 90 cent
18  observations I suppose.
19  Q.   Was Sigma 90 cents in the late
20  February 2008 time frame?
21  A.   I believe your expert would have it
22  somewhere in the '80s.  In a market that
23  illiquid those prices aren't particularly
24  meaningful.
25  Q.   I'm not asking your assessment of

Page 132

1   Robert Glenn Hubbard
2   what our experts did, I am asking you whether
3   you did anything to assess.  I'm not asking you
4   whether it was possible to do this assessment,
5   I'm asking whether you did anything to assess
6   whether Sigma MTNs were money good in early
7   2008?
8       MR. GOLDFARB: Objection to form.
9   A.   That's not a well posed question
10  and it's not an exercise that could be done so
11  easily. I think that's what I've answered
12  before.  You can ask me again and I'll answer
13  it.
14  Q.   You can't tell me whether you did
15  or not?
16  A.   You didn't ask me a well posed
17  question to even answer it.
18  Q.   Let me see if I can ask it slightly
19  differently.
20      You did not form any analysis of
21  the likelihood that Sigma MTNs would default as
22  of early 2008?
23      MR. GOLDFARB: Can you reread that
24  please.
25      (Question read.)

Page 133

Robert Glenn Hubbard

MR. GOLDFARB: Objection to form.

A. That's not a question I was asked to consider.

Q. You did not form any analysis of the likelihood that Sigma MTNs would pay out at maturity as of early 2008, correct?

A. That was not a question I was asked to consider.

Q. Your report mentions David Einhorn as an investor who is raising concerns about significant problems as to Lehman Brothers in 2008, right?

A. Yes.

Q. What was Einhorn's call as to Lehman?

A. He was not optimistic about the firm. He had concerns about, as I recall, the quality of the balance sheet.

Q. He had concerns also about the leverage and type of assets that Lehman held, is that correct?

A. Maybe, I really don't recall. Yes, he was concerned about Lehman specifically.

Q. Is it your assessment that Einhorn

Page 134

Robert Glenn Hubbard

basically got it right as to Lehman?

MR. GOLDFARB: Objection to form.

A. I'm not sure what it means to get it right. We know that Lehman failed and we know that he didn't like Lehman, so I suppose in that sense yes, ex post.

Q. Mr. Einhorn was not secretive about his views as to Lehman, correct?

A. No, not at all.

Q. So the market was well aware of his concerns as to Lehman, correct?

A. That's correct.

Q. Mr. Einhorn would be considered a sophisticated investor, right?

A. I would say so, yes.

Q. Is it your understanding that in 2008 BNY Mellon was reducing exposure to broker/dealers?

A. I don't really know.

MR. GOLDFARB: Objection to form, lack of foundation.

A. You mean lending to, managing, repo?

Q. Let me rephrase that. Is it your

Page 135

Robert Glenn Hubbard

understanding that BNY Mellon or its affiliates were reducing exposure to broker/dealers in any situation where BNY would be a counterparty to Lehman?

MR. GOLDFARB: Objection to form.

A. So your question is about Lehman?

Q. Actually I was referring to any broker/dealer.

A. I really don't know.

Q. Do you have any sort of threshold for likelihood of default that you would look to in determining whether a bankruptcy is reasonably foreseeable in the case of Lehman?

MR. GOLDFARB: Objection to form, asked and answered.

A. You asked me that question earlier, but I'll repeat the answer that I gave you, or the reporter can give you the record. Basically there's no single thing that you would look at. The top of the list would be prices, which were at or near par for most notes until the very end.

You would look at whether the firm could raise capital of various types, you would

Page 136

Robert Glenn Hubbard

look at equity prices, you would look at analyst commentary, you would look at credit default spreads, you would look at all of those things. Ultimately it is a judgment, it's not that there is a single number.

Q. Are you aware that as of late August 2008, Sigma in order to fund the post-October 2008 maturities needed to not only role a portion of its existing repo, but also had to raise additional capital in order to pay out those maturities?

A. I don't think that's a fair characterization because you also have the freedom to shrink your balance sheet which was also doing it; those would have been among the choices that Sigma faced.

Q. So it would be a fair characterization of the financial situation as of late August 2008, if I add that Sigma not only needed to roll the repo that was due in late 2008, but it also had to either obtain financing through repo and/or asset sales or ratio trades?

MR. GOLDFARB: Objection to form.

Page 165

1    Robert Glenn Hubbard
2  ex ante factors, all of which pointed in the
3  same direction, a very low probability of
4  default and ex post I told you about very large
5  market reactions which means by the efficient
6  markets I thought, this is your expert's phrase,
7  it must be a surprise.
8      Q.   Can low probability events be
9  reasonably foreseeable?
10     MR. GOLDFARB:  Objection to form,
11 incomplete hypothetical.
12     A.   I don't know what you mean by that.
13 Does an outcome -- can I tell you what the
14 outcome is even if it has a low probability, is
15 that your question?
16     Q.   For example, if I tell you that in
17 this neighborhood there's a 10 percent chance of
18 theft in the next six months, is theft
19 reasonably foreseeable?
20     A.   By the way in which I've used it I
21 would say no.
22     Q.   If I said that there was a
23 20 percent chance of robbery in this
24 neighborhood within the next six months, is that
25 reasonably foreseeable?

Page 166

1    Robert Glenn Hubbard
2      MR. GOLDFARB:  Objection to form,
3  vague.
4      A.   You're picking things that have a
5  single attribute.  I have already told you, and
6  I have told you repeatedly so it is getting
7  mildly annoying, but there are multiple
8  attributes.  We can stay here all afternoon, but
9  that will remain my answer.
10     Q.   I'm not trying to annoy you, sir.
11 I'm just trying to get a clear answer on how
12 we're supposed to understand what your analysis,
13 which you've given no threshold for, would
14 contemplate in terms of likelihood in order to
15 determine reasonably foreseeable, that's all I'm
16 trying to do.
17     MR. GOLDFARB:  Objection;
18 mis-describes his testimony, he's answered this
19 question repeatedly.
20     Q.   Let me give you another
21 hypothetical.  If, and I'm expecting counsel to
22 laugh now, this usually happens when I get into
23 convoluted hypotheticals but I'll give it a
24 shot.
25     MR. SIRES:  I've never heard this

Page 167

1    Robert Glenn Hubbard
2  Jeremiah, laughing before you ask the question.
3      MR. KELMAN:  I see the smirks and I
4  know how this usually works.  We'll start over.
5  Strike the last preface.
6      Q.   If you're on a boat and it's a
7  fishing boat, and the experts on the
8  seaworthiness of the boat are deeming that it's
9  very likely that given the storm conditions that
10 they're experiencing currently, that if it
11 continues to go out to sea it will go under very
12 likely.  The boat nevertheless decides not to
13 head back to water -- back to shore, and keeps
14 going.
15     If the storm increases greater than
16 even the expert in the seaworthiness had
17 considered to be a likely event, but certainly
18 up to the point that they did see it likely as
19 putting the boat under, and the boat in fact
20 goes under, was it reasonably foreseeable that
21 the boat would sink?
22     MR. GOLDFARB:  Objection to form.
23     A.   Your hypothetical mixes and matches
24 somewhat arbitrarily between the two things that
25 we're talking about here.  Seaworthiness itself

Page 168

1    Robert Glenn Hubbard
2  may be a characteristic, much like credit
3  quality, that would be ascertainable for
4  something that in normal times this is a
5  seaworthy vessel.  Storm forecasts may be
6  interesting whether a vessel is very strong or
7  very weak.
8      Indeed, to take your literal
9  example, the stronger the storm virtually all
10 vessels would be capsized.  The examples you
11 spoke of does comprise the two things that I was
12 trying to do but it completes them in asking a
13 question, so I don't know how I would answer
14 that.
15     Q.   In my hypothetical the
16 seaworthiness experts were saying that given the
17 storm conditions currently prevailing, if the
18 boat continued to sail outward it was very
19 likely to collapse, and then the storm increased
20 and it collapsed; was the collapse of the boat
21 foreseeable?
22     MR. GOLDFARB:  Objection to form,
23 incomplete and confusing hypothetical.
24     Q.   In my hypothetical?
25     A.   I don't really understand the

Page 173

1      Robert Glenn Hubbard
2  that selling into that market a significant -- a
3  block of midterm notes would lead to a blockage
4  discount?
5           MR. KELMAN: Objection to the form,
6  outside the scope of his report, irrelevant.
7      A.  Yes, the size of the transactions
8  that we actually observed were quite small. The
9  size of the holdings as I understand it from
10 Bank of New York Mellon were very large, both
11 scaled by the size of transactions we actually
12 observed and as a fraction of the MTNs
13 themselves.
14     Q.  What do you think would have
15 happened if the bank tried to sell a large
16 position of notes into that illiquid market in
17 2008?
18          MR. KELMAN: Objection, lacks
19 foundation, outside the scope of his report.
20     A.  All else equal the price will
21 decline.
22     Q.  How would you determine whether or
23 not a position was large, relative to what would
24 you make that determination?
25          MR. KELMAN: Objection to form,

Page 174

1      Robert Glenn Hubbard
2  vague and ambiguous, outside the scope of his
3  report, lacks foundation.
4      A.  Typically it would be compared to
5  regular or normal transaction volumes, and
6  weekly volume and monthly volume in the
7  security.
8      Q.  Would it make a difference if a
9  bank was trying to sell a large position over a
10 couple of weeks or a month in terms of whether
11 or not there would be a blockage discount for
12 such a sale?
13          MR. KELMAN: Objection, lacks
14 foundation, vague and ambiguous, outside the
15 scope of his report, objection to form.
16     A.  It would depend on the size of
17 course. For the size of the positions we're
18 talking about here almost surely, because they
19 were tens of times the size of typical
20 transactions.
21     Q.  Is it your position that when
22 spacing out a sale of that magnitude over a
23 month or two there would still be a significant
24 blockage discount?
25          MR. KELMAN: Objection, lacks

Page 175

1      Robert Glenn Hubbard
2  foundation, vague, outside the scope of his
3  report, objection to form.
4      A.  Yes, given my understanding of the
5  size of the position.
6      Q.  You mentioned in response to a
7  question from plaintiff's counsel that you
8  looked at an S&P analyst report that I believe
9  you said was dated September 2008, but you
10 weren't sure when you first looked at that
11 report.
12          Regardless of when you first looked
13 at that report, did you look at it in connection
14 with the preparation of your deposition
15 testimony here today?
16     A.  I did.
17     Q.  Did that report change your
18 opinion?
19     A.  No.
20          MR. KELMAN: Objection.
21     A.  It corroborated it, but it did not
22 change it.
23     Q.  In preparation for your testimony
24 here today did you look at an August 1st
25 Citibank report on Sigma?

Page 176

1      Robert Glenn Hubbard
2      A.  I did.
3      Q.  Did that change your opinion?
4      A.  No. It was more negative, to be
5  candid, than the S&P report but it did not
6  change my opinion.
7      Q.  You said in response to a question
8  if Lehman was not reasonably foreseeable does
9  that mean Sigma's bankruptcy was not reasonably
10 foreseeable, your answer in response to that
11 question was in a narrow sense no.
12          Can you explain what you meant by
13 in a narrow sense no?
14     A.  What I meant was the events, the
15 post-September 15th events were again a shock to
16 markets and the so-called run on the repo. It
17 might have been that some other financial
18 institution failed first; it happened to be
19 Lehman, it could have been something else.
20          What is important is that there is
21 a surprise failure that causes the run. It
22 happened to be them, but it didn't necessarily
23 have to be them.
24          MR. GOLDFARB: Can we go off the
25 record.

1               C E R T I F I C A T E

2

3          I, Roberta Caiola, a Shorthand

4     Reporter and Notary Public within and

5     for the State of New York, do hereby

6     certify:

7

8          That the statements, colloquy

9     and testimony contained herein is a

10    true record of the proceedings in this

11    matter.

12

13         I further certify that I am

14    not related to any of the parties

15    involved in this proceeding, and that

16    I am in no way interested in the

17    outcome of this matter.

18

19

20            *Roberta Caiola*
              ---------------------------
21                 ROBERTA CAIOLA

22

23

24

25