BOIES, SCHILLER & FLEXNER LLP
Jonathan D. Schiller *(pro hac vice)*
jschiller@bsfllp.com
575 Lexington Ave., 7th Floor
New York, NY 10022
Telephone:  212.446.2300
Facsimile:   212.446.2350

David W. Shapiro (SBN 219265)
dshapiro@bsfllp.com
Kieran P. Ringgenberg (SBN 208600)
kringgenberg@bsfllp.com
1999 Harrison St., Suite 900
Oakland, CA 94612
Telephone:  510.874.1000
Facsimile:   510.874.1460

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC SELECT FUND, | Case No.  SACV 10-00198 JST (ANx) |
| Plaintiff, | |
| v. | **DEFENDANTS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE OPINIONS OF PLAINTIFF'S EXPERT ALLEN FERRELL** |
| THE BANK OF NEW YORK MELLON, a New York state chartered bank, and BNY MELLON, N.A., a nationally-chartered bank, | **FILED UNDER SEAL** APPLICATION TO SEAL FILED PURSUANT TO LOCAL RULE 79-5.1 |
| Defendants. | Date:  April 16, 2012 Time: 1:30 p.m. Dept.: 1:30 p.m. |
| | **Complaint Filed:**  February 17, 2010 **Trial Date:**  May 1, 2012 **Judge:**  Hon. Josephine Staton Tucker |

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

**<u>TABLE OF CONTENTS</u>**

NOTICE OF MOTION ...................................................................................1

I. INTRODUCTION ......................................................................................1

II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY ...................2

    A. Professor Allen Ferrell ......................................................................5

        1. ██████████████ ...........................................6

        2. ████████████████████████ .................7

        3. ██████████████████████ ...................7

III. ARGUMENT ..........................................................................................8

    A.   Professor Ferrell's Opinion that ██████████████
        ███████████s is Inadmissible ................................. 10

    B.   Professor Ferrell's Calculation ███████████████
        █████ Is Unreliable ...................................................... 13

        1.   Professor Ferrell's ██████████ Are Speculative ........... 13

            a.  The Market for Sigma MTNs in 2008 Was Illiquid............ 13

            b.  The Evidence and Economic Research Shows That
               Large Sales of Sigma in an Illiquid Markets Would
               Drive Down the Price....................................................... 15

            c.  Professor Ferrell's Opinion That ██████████ Is
               Without Support in Economic Methodology or
               Literature ...................................................................... 17

        2.  ██████████████████████████████ ........ 22

    C.  Professor Ferrell's ████████████████████
        ███████████ Are Inadmissible. .......................... 23

IV. CONCLUSION .....................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Baker v. IBP, Inc.,*
    357 F.3d 685 (7th Cir. 2004) ................................................................ 20

*Blue Dane Simmental Corp. v. American Simmental Ass'n,*
    178 F.3d 1035 (8th Cir. 1999) ........................................................ 10, 19

*By and Through Lust v. Merrell Dow Pharm., Inc.,*
    89 F.3d 594 (9th Cir. 1996) ................................................................ 10

*Claar v. Burlington Northern R. Co.,*
    29 F. 3d 499 (9th Cir. 1994) ........................................................ 24, 25

*Daubert v. Merrell Dow Pharm., Inc.,*
    43 F.3d 1311 (9th Cir. 1995) ........................................................ 10, 24

*General Electric Co. v. Joiner,*
    522 U.S. 136 (1997) ............................................................................ 19

*Henricksen v. ConocoPhillips Co.,*
    605 F. Supp. 2d 1142 (E.D. Wash. 2009) .......................................... 19

*Hynix Semiconductor Inc. v. Rambus Inc.,*
    No. 00-20905, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) .................. 13

*In re Fresh Del Monte Pineapples Antitrust Litig.,*
    No. 04–md–1628, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009) .......... 13

*Kennedy v. Jackson Nat. Life Ins. Co.,*
    No. C 07-0371 CW, 2010 WL 2524360 (N.D. Cal. June 23, 2010) ......... 10

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) .............................................................................. 9

*Many Cultures, One Message v. Clements,*
    No. 10-cv-05253, 2011 WL 5515515 (W.D. Wash. Nov. 8, 2011) ......... 19

*Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago,*
    877 F.2d 1333 (7th Cir. 1989) ............................................................ 13

*Natchitoches Parish Hosp. Service Dist. v. Tyco Intern., Ltd.,*
    No. 05-12024, 2009 WL 3053855 (D. Mass. Sept. 21, 2009) .............. 20

*United States v. Alatorre,*
    222 F.3d 1098 (9th Cir. 2000) ............................................................ 10

DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

*United States v. Decoud,*
  456 F.3d 996 (9th Cir. 2006) ............................................................................................9

**RULES**

Fed. R. Evid. 104(a) ...................................................................................................... 10

Fed. R. Evid. 403.................................................................................................... 10, 24

Fed. R. Evid. 702............................................................................................. 9, 10, 24

DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at the Final Pretrial Conference on April 16, 2012, at 1:30 p.m., defendants The Bank of New York Mellon and BNY Mellon, N.A., (collectively "BNY Mellon") will, and hereby do, move the Court *in limine* for exclusion of the opinions of Allen Ferrell.

This Motion is made in compliance with the Court's Order on Jury Trial and the Court's December 13, 2011 Order (Dckt. # 141), and is made following the conference of counsel pursuant to L.R. 7-3, which took place by telephone conference on February 17, 2012.  It is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Kieran Ringgenberg, all pleadings and paper on file in this action, and any other matter that may be presented to the Court at the hearing.

Dated: March 19, 2012   **BOIES, SCHILLER & FLEXNER LLP**

By 

Kieran Ringgenberg (SBN 208600)
kringgenberg@bsfllp.com
1999 Harrison St., Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
*Attorneys for Defendants*

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

# I. __INTRODUCTION__

Pacific Select Fund ("PSF") engaged Professor Allen Ferrell – a law school professor with no firsthand experience in the financial services industry – to provide expert testimony in support of its prudence claims and to calculate damages.  However, Professor Ferrell's reports and testimony demonstrate that his opinions lack reliable bases or methods.

First, while the only proffered basis for Professor Ferrell's opinions is his training as an economist, he does not support his opinions with any economic principles, models or methodology.  Consequently, the only connection between the data cited and Professor Ferrell's opinions is pure *ipse dixit*.

Second, Professor Ferrell's ███████████████████████ ████████████ does not account for the extraordinary illiquidity afflicting financial markets in early 2008.  He asserts that ████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████ ████████████████████████████ This is supported by no economic methodology and is contradicted by the economic literature.  Accordingly, his opinion is, at best, inadmissible speculation.

Additionally, Professor Ferrell's calculations are premised entirely on hindsight.  For he asserts that ████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████ In fact, had BNY Mellon sold at a loss every comparable security in DBT – and not just the cherry-picked Sigma MTNs – during the financial crisis, PSF would have experienced far greater

1

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1   losses.  For virtually all of DBT's other assets paid in full at maturity.

2   <u>Third</u>, Professor Ferrell's █████████████████████

3   ████████████ does not "fit" this case.  PSF alleges that BNY Mellon's decision

4   to permit other clients to redeem units of the DBT fund in cash breached a fiduciary

5   duty that BNY Mellon owed to PSF.  Accordingly, damages should serve to

6   compensate PSF for the alleged harm it suffered as a result of those redemptions.

7   ███████████████████████████████████████████

8   ████████.  This is not what PSF has claimed.  As such, his calculations should

9   be excluded.

10   Because Professor Ferrell fails to provide a reliable basis for his opinions,

11   and also because his opinions do not fit PSF's case, he should be precluded from

12   offering them at trial.

13   **II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

14   PSF participated in BNY Mellon's securities lending program, whereby PSF

15   loaned securities to qualified borrowers who provided cash collateral.  The

16   collateral was then invested in DBT. The agreement governing PSF's participation

17   in securities lending, the Securities Lending Authorization Agreement ("SLAA"),

18   provides for a specific standard of care:

19   The Lending Agent shall perform its obligations under this Agreement

20   with the care, skill, prudence, and diligence which, under the

21   circumstances then prevailing, a professional securities lending agent

22   acting in a like capacity and familiar with such matters would use in

23   the conduct of an enterprise of a like character and with like aim."

24   (PSFSGI[1] ¶ 47.)

25

26   _____

27   [1]  PSF's Statement of Genuine Issues and Additional Material Facts in support of its
Motion for Partial Summary Judgment (Dckt. # 98) is cited as "PSFSGI."  Exhibits
to the Declaration of Kieran Ringgenberg in Support of Defendants' Motions in

28   Limine, filed herewith, are cited as "Ringgenberg MIL Decl. Ex. ___."

2

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1       In early 2007, BNY Mellon purchased Sigma MTNs to hold in DBT.  Like

2   other SIVs, Sigma issued short- and medium-term debt securities to fund its

3   purchase of longer-term, higher-yielding assets.  Sigma's asset portfolio held high

4   credit quality assets that were spread among different sectors and countries; as of

5   April 2008, more than 99 percent of Sigma's underlying assets were investment-

6   grade securities rated A or above.  (Ringgenberg MIL Decl. Ex. P (Sigma Finance

7   Consolidated Financial Statements for the Year Ended April 30, 2008,

8   BNYMSL03931018).)  As a result, Sigma's senior debt securities, including its

9   MTNs, were consistently given AAA or equivalent ratings by credit rating

10  agencies.  (*Id.*)  BNY Mellon's purchase of the Sigma MTNs met or exceeded all

11  the criteria specified in DBT's investment guidelines at the time of purchase.

12  (Ringgenberg MIL Decl. Ex. G at 24-25 (Blount Aff. Rep.).)

13      However, in late 2007 market conditions began to darken as the worst

14  financial crisis since the Great Depression got under way.  By early 2008 the

15  market for commercial paper had dried up almost completely. (Ringgenberg MIL

16  Decl. Ex. G at 20 (Blount Aff. Rep.); Ex. F at 13-15 (Sundaresan Reb. Rep.).)

17  Without its funding source, Sigma had to turn to other methods to finance its debt

18  obligations as they came due. ██████████████████████

19  ████████████████████████████████████

20  ████████████████████████████████████

21  ████████████████████████ Moreover, with financial

22  markets paralyzed, the holders of Sigma MTNs strained to find buyers, and could

23  do so only at steep discounts.  (Ringgenberg MIL Decl. Ex. S at 27:23-28:7

24  (Rulong Dep. Tr.); Ex. F at 13-15 (Sundaresan Reb. Rep.).) ████████████

25  ████████████████████████████████████

26  ████████████████████████████████████

27  ██████████████████████████████████

28  ████████████████████ ██████████████████

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

BNY Mellon actively monitored Sigma throughout this period. (Ringgenberg MIL Decl. Ex. G at 19-21 (Blount Aff. Rep.).) And while BNY Mellon sold some Sigma MTNs and engaged in some ratio trades, it did not attempt a mass sell-off of all the Sigma MTNs it held for securities lending clients. For as BNY Mellon's investment professionals knew all too well, selling their inventory of Sigma MTNs in the midst of a once-in-a-generation liquidity crisis would have guaranteed massive losses. (*Id.* at 32-34.) What is more, there were strong indications that the crisis would eventually ease and that the Sigma MTNs would ultimately pay out at or near par. (*Id.* at 35-39.) Acutely aware of all of these factors, BNY Mellon – like a multitude of money market funds and other securities lending agents – decided to hold its Sigma positions and cautiously wait out the storm. (*Id.* at 43-45; Ringgenberg MIL Decl. Ex. S. at 44:13-47:23 (Rulong Dep. Tr.).)

Meanwhile, a range of financing strategies enabled Sigma to continue paying its maturing MTNs in full, including those held by DBT. Indeed, Sigma met is full payment obligations to DBT on a $60.4 million note on January 24, 2008; on a $50 million note on May 14, 2008; and on a $75 million note on June 12, 2008. (Ringgenberg MIL Decl. Ex. D at Ex. D (Ferrell Aff. Rep.).) However, on September 15, 2008, Lehman Brothers Holdings, Inc. ("Lehman") stunned financial markets by filing for bankruptcy. Lehman's bankruptcy was catastrophic for Sigma. In short order it caused the market-value of Sigma's underlying assets to plunge, leading its creditors to issue margin calls that Sigma ultimately could not meet. (Ringgenberg MIL Decl. Ex. U ¶ 111 (Hubbard Aff. Rep.).) Sigma collapsed barely two weeks after Lehman, on October 1, 2008. (Ringgenberg MIL

DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1    Decl. Ex. G at 45 (Blount Aff. Rep.).)

2         At the time Sigma collapsed, its MTNs represented only a small portion of

3    the assets held by DBT, and several of the Sigma MTNs previously held by DBT

4    had already paid in full. ████████████████████████████████

5    ████████████████████████████████████████████

6    ███████████████████████████████████████████████

7    ██████████████████████████████████████████

8         PSF filed this action in 2010, claiming, among other things, that BNY

9    Mellon breached the SLAA and violated common-law duties to PSF by making

10   imprudent investment decisions with regard to the Sigma MTNs in DBT.

11   Specifically, PSF contends BNY Mellon acted imprudently by continuing to hold

12   the Sigma MTNs (i.e. not selling or trading them) in or around January 2008. (*See*

13   Dckt. # 95 at 15-16.)   PSF also claims that BNY Mellon breached a fiduciary duty

14   by allowing another client invested in the DBT fund to redeem its units in cash over

15   time. (*Id.* ¶16, ¶175(e); *see also* Ringgenberg MIL Decl. Ex. H at 22:18-20 (Pacific

16   Select Fund's Supplemental Responses and Objections to Defendants' First Set of

17   Interrogatories).)

18        PSF designated Professor Allen Ferrell as an expert witness and served his

19   affirmative report on August 10, 2011.  His rebuttal report was served on

20   September 2, 2011.[2]

21   **A. Professor Allen Ferrell**

22        Professor Ferrell is a law professor and an economist.  His professional work

23   with respect to investment decisions is entirely academic; he has no professional

24   experience actually making investment decisions.  (Ringgenberg MIL Decl. Ex. D

25   at Ex. A (Ferrell Aff. Rep.).)  He has never done any professional work – academic

---

[2] BNY Mellon previously filed a motion *in limine* challenging the admissibility of
PSF's expert reports (Dckt. # 140), which the Court denied without prejudice.
(Dckt. # 141).

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

or otherwise – with respect to securities lending.  (Ringgenberg MIL Decl. Ex. I at 8:23-9:43 (Ferrell Dep. Tr.).)



**1.**

With respect to his liability opinions, Professor Ferrell's reports disclose no basis for their conclusions in any relevant principles derived from economics or law.  Instead, Professor Ferrell simply cites and characterizes a number of discovery documents, and a few other documents such as market analyst reports, and then asserts a conclusion.  (Ringgenberg MIL Decl. Ex. D at 5-20 (Ferrell Aff. Rep.); Ex. E at 4-12 (Ferrell Reb. Rep.).)

In his deposition testimony, Professor Ferrell explains the factors that led him to conclude that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  He says:

DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

B O I E S ,  S C H I L L E R  &  F L E X N E R  L L P
O A K L A N D ,  C A L I F O R N I A

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1 ████████████████████████████████████

2 ██████

3      However, Professor Ferrell identifies no *link* between the factors he cites and

4 the conclusion he reaches.  In particular, he applied no economic model and

5 references no economic principles.

6     **2.** ██████████████████

7 ███████████████████████████████████

8 █████████████████████████████████████

9 █████████████████████████████████████

10 ███████████████████████████████████

11 █████████████████████████████

12 ████████████ █ ████████████

13 ██████████████████████████████

14 █████████████████████████████████████

15 █████████████████████████████████████

16 ██████████████████████████████████████

17 ████████████████████████████████████

18 ███████████████████████████

19 ██████████████████

20 █████████████████████████████

21 █████████████████████████████

22 ██████████████████████████████████████

23 █████████████████████████████████

24 ████████████████████

25 ████████████████████

26 PSF claims that BNY Mellon breached an alleged fiduciary duty by

27 █████████████████████████████████████

28 █████████████████████████████████████



### III. ARGUMENT

Expert opinion is admissible only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 subparts (b), (c), and (d) require that an expert's opinion be reliable, and Courts have a "basic gatekeeping obligation" to keep unreliable expert testimony from the jury. *United States v. Decoud*, 456 F.3d 996, 1012-13 (9th Cir. 2006) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999)).

In contrast to PSF's other expert, Bella Borg-Brenner, Professor Ferrell does not attempt to base his opinions on professional experience, but rather an economist's evaluation of the "economic evidence." (Ringgenberg MIL Decl. Ex. D at 5 (Ferrell Aff. Rep.).) As such, his opinions are only admissible if they are grounded in reliable economic principles, as determined by (i) whether the theory

DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

or technique applied can and has been tested; (ii) whether the theory or technique applied has been subjected to peer review and publication; (iii) the known or potential rate of error for the technique applied; and (iv) the theory or technique's general degree of acceptance in the economic community. *See Daubert,* 509 U.S. at 593-94; *see also Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1041-42 (8th Cir. 1999) (affirming exclusion of economist where proponent failed to prove his method was "typically used" by "other economists"); *Kennedy v. Jackson Nat. Life Ins. Co.*, No. C 07-0371 CW, 2010 WL 2524360 at *12 (N.D. Cal. June 23, 2010) (admitting economist opinion where expert cited "supporting literature, which indicates that his theory is accepted within the economics community.").

Rule 702 subpart (a) requires the testimony to "fit" the case. "The Supreme Court recognized that the 'fit' requirement 'goes primarily to relevance,'" but this "obviously" is not "merely a reiteration of the general relevancy requirement of Rule 402." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert II*"). Because "scientific expert testimony carries special dangers to the fact-finding process," "Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the Jury." *Id.*

The proponent of an expert "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 Advisory Committee Notes; *accord By and Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible."). The Court may make these determinations with or without an evidentiary hearing, in its discretion. *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000).

As explained in detail below, Professor Ferrell's opinions are inadmissible.

**A.** ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

████ What Professor Ferrell does not do is identify on any economic principles, develop any economic model, nor cite any economic literature to link his claim that there were risks to holding the Sigma MTNs to his claim that it was imprudent to hold them.  Indeed, Professor Ferrell offers *no opinion at all* on even the most basic questions.  Specifically:

- ***How can one determine when a security too risky to hold?***

  Professor Ferrell does not say.  He cites no economic principles, creates no economic model, nor in any other way attempts to identify a threshold level of risk that would require a fund with similar guidelines to sell or trade a security.

- ***Were the alternatives to holding safer?***

  Professor Ferrell does not say.  He cites no economic principles, creates no economic model, nor employs any economic method at all for *weighing* the risks of holding the Sigma MTNs against the costs of selling or trading them. ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████ █ ██ In short, the market price is the point at which the market believes that the prospects of holding are *equal* to those of

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

selling.[3]  Thus, the fact that the Sigma MTNs were trading below par does not mean that holding was riskier than selling.  And Professor Ferrell has provided no grounds for thinking that it was – particularly during the global financial crisis when virtually all securities were selling at steep discounts. (Ringgenberg MIL Decl. Ex. G. at 32-34 (Blount Aff. Rep.); Ex. F at 13-15 (Sundaresan Reb. Rep.).)

In his deposition testimony, Professor Ferrell identified factors that led him to conclude that ████████████████████████████████████. He says:

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

███████████

But Professor Ferrell does not explain *how* the factors he identified were ██████████████████████████████████ He does not invoke any economic model nor cite any well-established (or new) risk analysis protocol. In fact, *he applies no economic methodology whatsoever*.  The truth is that his

---

[3] If anything, as discussed below, selling a longer-term asset for immediate cash during the liquidity crisis in 2008 would have required accepting an additional liquidity discount over and above the discount to reflect the risk that the security might fail.

[4] See also Ringgenberg MIL Decl. Ex. D at 16 (Ferrell Aff. Rep.):

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████

DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1   conclusion is based simply on his say so.  And not surprisingly, operating without

2   the constraint of any scientific method, model, or protocol, Professor Ferrell's

3   conclusion matches PSF's litigation position.

4          It is well-settled that this sort of report by an economist is inadmissible.  For

5   example, in *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333

6   (7th Cir. 1989), the Court considered an expert's affidavit stating he had reviewed

7   material produced in discovery and drawn inferences from it relating to the

8   plaintiff's claims.  The court explained that "nothing in the affidavit draws on the

9   skills of an economist." *Id.* at 1340.  There was "no hint of an inferential process,

10  no discussion of hypotheses considered and rejected." *Id.* at 1339.  The expert

11  "could have developed a model" to assess the issues or otherwise used the tools of

12  economics, but he "did none of these things.  Instead he examined materials

13  produced in discovery and drew inferences from the record, speaking in legal rather

14  than economic terms.  He gave a legal rather than an economic opinion." *Id.* at

15  1340.  As such, the expert "offered the court his CV rather than his economic

16  skills," and therefore his opinions were properly excluded. *Id.*

17         The same is true in this case.  Professor Ferrell did nothing relevant as an

18  economist.  He merely "interpreted" discovery evidence and related documents

19  regarding the risks that confronted Sigma in early 2008.  Therefore, his opinions

20  should be excluded. *See id.; Hynix Semiconductor Inc. v. Rambus Inc.*, No. 00-

21  20905, 2008 WL 73689 at *13  (N.D. Cal. Jan. 5, 2008) (excluding testimony

22  where, although the report was "rich in assumed facts, it lacks any expert analysis

23  of why those assumed facts lead to" the economist's conclusion; expert could not

24  turn "a paragraph of advocacy into 'economic analysis'"); *see also In re Fresh Del*

25  *Monte Pineapples Antitrust Litig.*, No. 04-md-1628, 2009 WL 3241401 at *16

26  (S.D.N.Y. Sept. 30, 2009) (excluding an economist opinion that merely "recite[d]

27  selective facts in the record and then offer[ed] his own legal conclusions").

28

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

**B.** █████████████████████████████████████████████████████████

████████  Professor Ferrell claims ██████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████ █ ████████████████████

Professor Ferrell's calculation is unreliable for two reasons. First, he asserts, without any basis in economic analysis or methodology, and without regard to key considerations, that █████████████████████████████████████ Second, he fails to consider the losses that would have resulted from selling not just the Sigma MTNs, but also *every other* comparably distressed security at below par prices. This omission is based entirely on the hindsight observation that ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

**1.** ████████████████████████████████

Professor Ferrell's ████████████████████████

████████████████████████████████████████

█████████████████████. Moreover, even if such a sale was possible (and it likely was not), Professor Ferrell's analysis fails to adjust for the decline in prices that would inevitably accompany it.

### a. The Market for Sigma MTNs in 2008 Was Illiquid

Starting in the summer of 2007, financial conditions worldwide began to deteriorate. By the beginning of 2008, the market for commercial paper,



BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1  particularly that issued by SIVs, was at a standstill.  As a result, holders of SIV

2  issued debt, including Sigma's MTNs, struggled to find buyers.

3      There is no serious dispute as to the illiquidity of the financial markets in

4  2008.  As PSF's Annual Report for 2008 states, "The period was a difficult time for

5  virtually all equity styles and sectors, as problems in the subprime mortgage market

6  spread throughout the financial system, creating a fullblown liquidity/credit crisis

7  that agitated the global markets."  (Ringgenberg MIL Decl. Ex. EE at PSF00140791

8  (PSF 2008 Annual Report).)   Likewise, Pacific Life's Annual Report for 2008

9  explains, "We will long remember 2008 as a year when unprecedented mortgage

10  crisis created a credit crisis that challenged the nation's financial systems and led to

11  a sharp drop in investor confidence in stocks and bonds alike."  (Ringgenberg MIL

12  Decl. Ex. FF at 4 (Pacific Life Annual Report); *accord* Ringgenberg MIL Ex. S at

13  28:5-7 (Rulong Dep. Tr.)) ("The illiquidity in the markets [in early 2008] really was

14  affecting the ability to sell almost any security that we owned.")

15      Professor Ferrell himself wrote in an academic paper that, "The secondary

16  market for most structured products is highly illiquid."  (Ringgenberg MIL Decl.

17  Ex. GG at 22 (Bethel, J. & Ferrell, A., "Policy Issues Raised by Structured

18  Products," (2006) *Harvard Law and Economics Discussion Paper No. 560*.)

19  Unsurprisingly, the impact of the liquidity crisis on the market for Sigma MTNs

20  (and other SIVs) was acute. ████████████████████

21  ████████████████████████████████

22  ██████████████████████████████

23  ████████████████████████████████

24  ████████████████████████████

25  ██████████████████████████████████

26  ████████████████████████████████

27  ████████████████████

28      ████████████████████████████

DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

1 ███████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████████

BNY Mellon's rebuttal expert, Columbia Business School Professor Suresh Sundaresan, who also has real-life experience in the financial markets, considered the available evidence and concluded that, "The evidence presented . . . strongly suggests that markets were in such turmoil and that liquidity was so scarce that it would be difficult to transact a reasonable size in many markets." (Ringgenberg MIL Decl. Ex. F ¶ 40 (Sundaresan Reb. Rep.).) In particular, Professor Sundaresan explained:

> The lack of liquidity of the Sigma Notes during the first half of 2008 can reasonably be inferred from the fact that in 2007 and 2008, several money market funds sought 'no action' letters from the SEC in connection with their decisions to hold the Sigma Notes rather than sell them in the face of illiquid markets. In each instance, the SEC agreed that it would not recommend enforcement action." (*Id.* ¶ 41.)

**b. The Evidence and Economic Research Shows That Large Sales of Sigma in an Illiquid Markets Would Drive Down the Price**

It is axiomatic that in an illiquid market, it is difficult to convert a longer-term asset (like the Sigma MTNs) to cash. In 2008, cash was scare, and to sell assets to obtain cash, sellers had to accept liquidity discounts. ██████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████  ███████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA



1

2

3

4

5

6

7

8

9

10                                   As Professor

11 Sundaresan explains, "there is voluminous academic literature that documents the

12 empirical stylized fact that discounts will have to be offered to execute transactions

13 in illiquid securities [such as the Sigma MTNs], and that such discounts tend to

14 increase in a market where liquidity is scarce – as was the case in 2008."

15 (Ringgenberg MIL Decl. Ex. F ¶ 41 (Sundaresan Reb. Rep.), citing Hibbert, J., A.

16 Kirchner, G. Kretzschmar, R. Li, and A. McNeil, "Liquidity Premium: Literature

17 review of theoretical and empirical evidence," September 2009)).  Likewise,

18 Edmond Blount, a leading expert on securities lending, explains that "The credit

19 markets during 2008 were characterized by a severe shortage of liquidity and

20 volume discounts can be substantially greater in illiquid markets" (Ringgenberg

21 MIL Decl. Ex. G ¶ 85 (Blount Aff. Rep.), citing Coval, J., and E. Stafford, "Asset

22 Fire Sales (and Purchases) in Equity Markets," *Journal of Financial Economics* 86

23 (2007), pp. 510-11 and Pedersen, L.H., "When Everyone Runs for the Exit,"

24 *International Journal of Central Banking* 5 (December 2009), pp. 195-196).

25        Finally, after reviewing the evidence about market conditions and the

26 economic literature, both of BNY Mellon's experts independently concluded that

27 given the severe illiquidity afflicting the financial markets in 2008, a mass sell-off

28 of BNY Mellon's Sigma holdings would have required steep discounts, resulting in

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

1   massive losses for DBT's participants like PSF.  (Ringgenberg MIL Decl. Ex. F at

2   15-17 (Sundaresan Reb. Rep.); Ex. G at 32-35 (Blount Aff. Rep.).)

3       **c.**   ███████████████████████████████████

4   ████████████████████████████████

5       It is not surprising that a litigation expert like Professor Ferrell would say

6   that ███████████████████████████████████

7   ████████████████████████   What is surprising,

8   however, is that Professor Ferrell's opinion finds no basis in economic theory,

9   methodology, or models.

10  ███████████████████████████████

11  ████████████████████████████████

12  █████████████████████████████████

13  █████████████████████████████████

14  ████████████████████████████████

15  ███████████████████████████████

16  ███████████████████████████████

17  █████████████████  █  ████████████

18  ██████████████████████████████████

19  ████████████████████████████████

20  █████████████████████████████████

21  ████████████████████████████████

22  █████████████████████████████████

23  ████████████████████████████████

24  ██████████████████████████   As a result, his damages

25  calculation is pure speculation.

26      Indeed, Professor Sundaresean reviewed the market data, economic

27  literature, and Professor Ferrell's report and concluded:

28

BOIES,  SCHILLER  &  FLEXNER  LLP
OAKLAND,  CALIFORNIA

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

As the discussion [of market illiquidity] makes clear, 

(Ringgenberg MIL Decl. Ex. F ¶ 42 (Sundaresan Reb. Rep.); *see also id.* at 15-17; Ringgenberg MIL Decl. Ex. G at 32-34 (Blount Aff. Rep.).)

But adding a few more data points does not address the fundamental flaw that Professor Ferrell's opinion finds no basis in economic theory, economic models, or economic literature.   The only link between the observations Professor Ferrell cites and the conclusion he reaches is his say so, and that makes his opinion inadmissible as a matter of law.  *See, e.g., General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."); *Many Cultures, One Message v. Clements*, No. 10-cv-05253, 2011 WL 5515515 *18 (W.D. Wash. Nov. 8, 2011) ("[T]he party presenting the expert must show that the expert's findings have a sound basis, and this will require some objective, independent validation of the expert's methodology.") (quoting *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1153-54 (E.D. Wash. 2009).  This is as true for economists as for any other expert.  *See Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1041-42 (8th Cir. 1999) (affirming exclusion of economist where proponent failed to prove his

1  method was "typically used" by "other economists" and failed to "cite to any

2  articles or papers that would support [the economist's] approach"); *Natchitoches*

3  *Parish Hosp. Service Dist. v. Tyco Intern., Ltd.*, No. 05-12024, 2009 WL 3053855,

4  *3 (D. Mass. Sept. 21, 2009) ("An economist's opinion must be based on justified

5  and reasonable assumptions" and the economist "must utilize well-established and

6  reliable methodologies in the preparation of his opinion.").

7        Even if the Court were to examine the data that Professor Ferrell relies upon,

8  such examination would further confirm that his opinions are unreliable.

9      First, ███████████████████████████████████████

10  ████████████████████████████████  Basic economic theory

11  holds that "[w]hen supply rises and demand is constant, price falls." *Baker v. IBP,*

12  *Inc.*, 357 F.3d 685, 690 (7th Cir. 2004). ███████████████████████

13  ████████████████████████████  says nothing about

14  what prices would be if BNY Mellon dumped half a billion dollars of notes into an

15  illiquid market in a short period of time.  (Ringgenberg MIL Decl. Ex. F at 16-18

16  (Sundaresan Reb. Rep.))

17      Second, ██████████████████████████████████████

18  ████████████████████████████████████████

19  ██████████████████████████████████████████

20  ██████████████████████████████████████████

21  ██████████████████████████████████████████

22  ██████████████████████████████████████████

23  ████████████████████████████████████████████

24  ██████████████████████████████████

25      Third, ███████████████████████████████████████

26  ███████████████████████████████████████████████

27  ─────────────────────

28  5 ████████████████████████████████████████████

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1    Ex. E (Ferrell Aff. Rep.).)  Yet, as PSF has itself argued, in early to mid 2008

2    Sigma was struggling to find sufficient cash to meet its ongoing maturities.  Thus,

3    Sigma's one-off bids for its own notes are hardly evidence of "depth" in the market

4    for Sigma MTNs.  ████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ██████████ ████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████

9        Fourth, ████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████  Thus, for all Professor

12   Ferrell knows, ██████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████ ████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ██████████████████████████████████████████████████  As

19   Professor Sundaresan explained after his review of the same documents, "based on

20   my understanding of these markets, these are not firm bids and firm asks in the

21   sense that they are not live bids and live asks, which could be acted upon by

22   portfolio managers. These are indications of interest."  (Ringgenberg MIL Decl. Ex.

23   X at 69: 12-17 (Sundaresan Dep. Tr.)[6]

24

25   [6] Numerous documents on which Professor Ferrell relies show that ██████████████

26   ██████████████████████████  For example:

27   • ████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████



DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

In sum, Professor Ferrell employs no reliable economic principles and methods, and the data he purports to rely on provides no reliable basis to determine the price that could have been obtained for a massive sale of the Sigma MTNs held in DBT.  As Professor Sundaresan, explains:

Professor Ferrell . . . fails to set out any reliable economic methodology to determine 



21

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA



BNY Mellon's rebuttal expert, Professor Sundaresan, demonstrates that this error makes Professor Ferrell's calculation unreliable.  Using objective third-party pricing data, Professor Sundaresan identified other securities in DBT that – based on that data – presented similar levels of risk as Sigma MTNs.  (Ringgenberg MIL Decl. Ex. F at 18-19 (Sundaresan Reb. Rep.).)  He then shows that if all of those securities were sold, consistent with PSF's contentions about Sigma, substantial losses would have been incurred.  (*Id.*)  Because the vast majority of those securities paid in full at maturity, BNY Mellon's decision to hold them rather than sell them avoided those losses.  (*Id.*)  By failing entirely to take into account the

impact that these sales would have, Professor Ferrell yet again ignores a key consideration, leaving his opinions unreliable and inadmissible. *See, e.g., Claar v. Burlington Northern R. Co.*, 29 F. 3d 499, 502-03 (9th Cir. 1994) (affirming exclusion of experts who failed to take important considerations into account).

**C.** ████████████████████████████████████████
████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████

████████████████ Professor Ferrell's calculation of PSF's damages simply does not "fit" the facts of the case and thus it is inadmissible. See *Daubert II,* 43 F.3d at 1321 n.17 ("Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury.")

In fact, Professor Ferrell implicitly acknowledges that ████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████



DEFS' MIL NO. 2 TO EXCLUDE ALLEN FERRELL

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1 ███████████████████████████████████████

2 ██████████████████████████ For PSF's increased ownership

3 interest in DBT did not just increase its exposure to Sigma, which suffered losses.

4 But by PSF's own admission, it also had increased exposure to **"other investment**

5 **risks"** in DBT, namely every other security in the fund, virtually all of which paid

6 in full. (Ringgenberg MIL Decl. Ex. S. at 266:16-267:14, 277:6-278:2 (Rulong

7 Dep. Tr.).) Indeed, it is undisputed that PSF's total return from DBT was positive,

8 even after accounting for its Sigma losses. (PSFSGI ¶ 120.) Professor Ferrell's

9 failure to take the investment gains from its increased ownership into account

10 plainly makes ████████████ unreliable. *See, e.g.*, *Claar*, 29 F.3d at 503-

11 054.

12 ████████████████████████████████████████

13 ████████████ is unrelated to the nature of the claim itself, and ignores

14 critical facts, it should be excluded.

### IV. CONCLUSION

16      For the foregoing reasons, BNY Mellon respectfully requests the Court

17 exclude the opinions of Allen Ferrell.

18                          Respectfully submitted,

19

20 Dated:  March 19, 2012      **BOIES, SCHILLER & FLEXNER LLP**

21

22                          By

23                              Kieran Ringgenberg (SBN 208600)
                               kringgenberg@bsfllp.com
24                              1999 Harrison St., Suite 900
                               Oakland, CA 94612
25                              Telephone: (510) 874-1000
26                              Facsimile: (510) 874-1460
                               *Attorneys for Defendants*

27

28

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA