1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   CENTRAL DISTRICT OF CALIFORNIA
10                        SOUTHERN DIVISION
11

12 PACIFIC SELECT FUND                  )   Case No. SACV 10-198 JST (ANx)
                                        )
13              Plaintiff,              )   **FINAL PRETRIAL**
                                        )   **CONFERENCE ORDER**
14        vs.                           )
                                        )
15                                      )
                                        )
16 THE BANK OF NEW YORK                 )
   MELLON, a New York state chartered   )
17 bank, and BNY MELLON, N.A., a        )
   nationally-chartered bank,           )
18                                      )
                Defendants.             )
19                                      )
                                        )
20                                      )
                                        )
21 _____  )

22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

1.    THE PARTIES ...................................................................................1

2.    JURISDICTION AND VENUE .........................................................1

3.    LENGTH OF TRIAL .........................................................................2

4.    JURY TRIAL ......................................................................................2

5.    ADMITTED FACTS ..........................................................................3

6.    STIPULATED FACTS SUBJECT TO OBJECTIONS .........................16

7.    CLAIMS AND AFFIRMATIVE DEFENSES .....................................16

Plaintiff's Claims: ......................................................................................16

Defendants' Affirmative Defenses: ...........................................................35

8.    ULTIMATE ISSUES REMAINING TO BE TRIED ............................43

9.    STATUS OF DISCOVERY ................................................................48

10.   F.R.CIV.P.26(a)(3) DISCLOSURES ................................................48

11.   WITNESSES ......................................................................................50

12.   LAW AND MOTION MATTERS ......................................................53

13.   BIFURCATION OF ISSUES .............................................................54

14.   CONCLUSION ..................................................................................54

Following pretrial proceedings, pursuant to Rule 16, Fed. R. Civ. P. and L.R. 16, IT IS ORDERED:

## 1.   THE PARTIES

The parties are: Plaintiff Pacific Select Fund ("PSF") and Defendants The Bank of New York Mellon and BNY Mellon, N.A. (collectively, "BNY Mellon").[1]

Each of these parties has been served and has appeared. No other parties were identified in the pleadings.

The pleadings that raise the issues are Plaintiff's Complaint (Docket No. 1) and Defendants' Answer and Affirmative Defenses (Docket No. 42).

## 2.   JURISDICTION AND VENUE

Federal jurisdiction is invoked pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiff and Defendants. The parties agree that this Court has jurisdiction over the claims as alleged in the Complaint.

Venue is invoked pursuant to 28 U.S.C. § 1391(a). A substantial part of the events giving rise to the claims occurred in this judicial district, including but not limited to the execution of the Securities Lending Agreement (and subsequent amendments thereto). Plaintiffs also contend that venue is proper based on alleged representations made by Defendants to Pacific Life Financial Advisors LLC and PSF's Board of Trustees. The parties agree that venue is appropriate in this federal judicial district.

---

[1] Defendants contend they are separate legal entities and that PSF must prove its claims at trial against each separately. PSF contends it will do so to the extent Defendants have not waived their ability to argue that separate proof as to each is necessary through their statements in discovery responses, court filings, and pleadings.

1

2
**3.     LENGTH OF TRIAL**

3
        PSF estimates its case in chief will take 9 trial days.

4
        BNY Mellon estimates its case in chief will take 5 trial days.

5
        However, the Court notes that, prior to the elimination of a claim by summary

6
judgment, the parties estimated a 10-day trial in their joint Rule 26(f) Report, and

7
the Court scheduled trial time based on that representation.  Therefore, counsel were

8
advised at the Final Pretrial Conference that this will be a timed 10-day trial in

9
which each side will share the available time equally.  Assuming 5.5 hours of

10
evidence presentation per day, each side will have approximately 27.5 hours for

11
examination, cross-examination, opening statement and closing argument.  Only

12
upon a showing of good cause will that time be extended.  Good cause requires a

13
showing that the party seeking the additional time has presented its case efficiently.

14

15
**4.     JURY TRIAL**

16
        Plaintiff timely requested a jury trial pursuant to Rule 38 of the Federal Rules

17
of Civil Procedure. The trial is to be a jury trial, except as to PSF's claim for

18
violation of California's Unfair Competition Law ("UCL"). The UCL claim is an

19
equitable claim under California law and does not provide for a jury trial.

20
        Pursuant to this Court's Order on Jury Trial (Docket No. 39) and Order on

21
Civil Trial (Court's website), the parties will file proposed jury instructions and any

22
special questions requested to be put to prospective jurors on voir dire five (5) days

23
prior to the Final Pretrial Conference.

24
        With respect to PSF's UCL claim, at least seven (7) days prior to the trial date

25
each party shall lodge and serve by e-mail, fax, or personal delivery the findings of

26
fact and conclusions of law the party expects the Court to make upon proof at the

27
time of trial as required by L.R. 52-1, unless the Court orders otherwise.[2]

28

_____

[2] The parties expect that the Court will rule on the UCL claim after trial on
PSF's negligence and breach of fiduciary claims.  The parties anticipate discussing

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**5.    ADMITTED FACTS**

The parties dispute which facts are admitted and require no proof.

**A.    Plaintiff's Position**

PSF contends that the following facts are admitted and require no proof.  The admissions are taken directly from BNY Mellon's Answer, the parties' uncontested undisputed facts from the summary judgment filings, BNY Mellon's responses to Requests for Admission, and BNY Mellon's interrogatory responses.  Although PSF asked BNY Mellon over two months ago to stipulate to such facts for the purpose of this filing and trial, BNY Mellon has refused.  To date, BNY Mellon has not identified for PSF a single fact with which it now disagrees despite previously admitting it or offering it as undisputed in court filings.  Rather, BNY Mellon responded by sending a laundry list of its own proposed stipulations two months after receiving PSF's proposed stipulations, most of which are not direct quotes taken from PSF's discovery responses, court filings, or pleadings, but were taken from varied sources such as deposition testimony or documents and modified to incorporate BNY Mellon's spin.  While PSF will check each of the facts to determine whether stipulation is warranted, it will take some time to do so.  BNY Mellon could have sent such proposed stipulations months ago.  BNY Mellon simply refuses to stipulate in good faith.  Thus, the following facts should be deemed admitted.  *See, e.g.*, *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 557 (9th Cir. 2003) (holding that statements in briefs may be considered binding judicial admissions in the discretion of the court) (citing *United States v. Bentson*, 947 F.2d 1353, 1356 (9th Cir.1991)); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir.1988) (stating that factual assertions or failures to deny

_____

the Court's expectations regarding required filings and deadlines relating to this claim at the Final Pretrial Conference.

allegations in an Answer are conclusively binding judicial admissions and holding that statements of facts in a brief may also be considered binding judicial admissions).

### 1.    Admitted in Answer

- Pursuant to a Third Party Securities Lending Authorization Agreement ("Securities Lending Agreement" or "Agreement") executed in January 2007 between Mellon Bank, N.A. and PSF, Mellon Bank contracted to act as PSF's lending agent and to establish, manage and administer a Securities Lending Program with respect to the lendable securities of PSF's portfolios. (Answer ¶ 4)

- On July 1, 2007, The Bank of New York Company, Inc. and Mellon Financial Corporation merged into The Bank of New York Mellon Corporation, with The Bank of New York Mellon Corporation being the surviving entity. (Answer ¶ 36)

- Defendant BNY Mellon is a nationally-chartered bank.  BNY Mellon's principal place of business is in Pittsburgh, PA. (Answer ¶ 37)

- Since at least July 2008, Defendant The Bank of New York Mellon has housed BNY Mellon Asset Servicing, the business through which The Bank of New York Mellon Corporation offers its securities lending programs. Accordingly, the Bank acted as the securities lending agent for PSF under the Securities Lending Agreement and managed the investment of cash collateral at issue in this case.  The Bank executed an amendment to the Third Party Securities Lending Authorization Agreement with Pacific Select Fund.  The Bank is a New York state chartered bank.  The Bank's principal place of business is in New York, NY. (Answer ¶ 38)

- The Bank of New York Mellon is successor to Mellon Bank, N.A. with respect to the Third Party Securities Lending Authorization Agreement with Pacific Select Fund. (Answer ¶¶ 28, 36)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Mellon Bank, N.A. and The Bank of New York Mellon, as successor to Mellon Bank, N.A., facilitated the loan of securities owned by PSF to third-party borrowers in return for cash collateral pursuant to the terms of the Securities Lending Agreement. (Answer ¶ 5)

- Pursuant to the Third Party Securities Lending Authorization Agreement, cash collateral held for Pacific Select Fund was placed in the Mellon GSL DBT II Collateral Fund. (Answer ¶ 44)

- Defendants invested the cash collateral in the Collateral Fund.  Defendants or their affiliates acted as the investment manager and Trustee for the Collateral Fund. (Answer ¶ 53)

- The Third Party Securities Lending Authorization Agreement included Investment Guidelines. (Answer ¶¶ 47, 48)

- Since January 2007, Mellon Bank, N.A. and The Bank of New York Mellon have invested a substantial amount of Pacific Select Fund's assets. (Answer ¶ 52)

- Cash collateral held in the Mellon GSL DBT II Collateral Fund was used to purchase medium-term notes issued by Sigma Finance, Inc. (Answer ¶ 54)

- Sigma Finance, Inc. is or was a Delaware corporation and Sigma Finance Corporation is or was organized under the laws of the Cayman Islands. (Answer ¶¶ 8, 55)

- Sigma Finance Corporation is or was a structured investment vehicle managed by the British firm Gordian Knot Limited. (Answer ¶ 56)

- Sigma Finance Corporation used repurchase transactions for financing during certain time periods. (Answer ¶ 64)

- There were sales of Sigma medium-term notes other than by Sigma Finance, Inc. or Sigma Finance Corporation at various times. (Answer ¶ 79)

1

2    • On or about September 29, 2008, JP Morgan provided a notice of default to
3      Sigma Finance Corporation pursuant to repurchase agreements and
4      terminated those agreements. (Answer ¶ 101)
5    • Sigma Finance Corporation announced on or about October 1, 2008 that it
6      had or would cease trading, and expected to appoint a receiver. (Answer
7      ¶ 106)
8    • On or about October 1, 2008, Pacific Select Fund was notified of Sigma
9      Finance Corporation's default and that Sigma medium-term notes would be
10     transferred into a newly-created Mellon GSL Reinvestment Trust II. (Answer
11     ¶ 107)
12   • On or about October 6, 2008, Sigma Finance Corporation was in receivership
13     and three receivers were appointed. (Answer ¶ 108)
14   • On September 30, 2008, Mellon GSL DBT II Collateral Fund held
15     approximately $381.1 million of principal of Sigma medium-term notes.
16     Thereafter the Mellon GSL DBT II Collateral Fund calculated a realized loss
17     of $324.1 million. (Answer ¶ 109)
18   • On or about December 2, 2008, the receivers of Sigma Finance Corporation
19     held an auction of certain assets of Sigma Finance Corporation and reportedly
20     sold those assets for approximately $306 million. (Answer ¶ 110)
21   • Each of the Sigma MTNs held in the Collateral Fund as of September 30,
22     2008 matured after October 23, 2008. (Answer ¶ 111)
23   • The Bank of New York Mellon entered into an agreement with entities
24     associated with The Hartford on or about December 22, 2007. (Answer ¶ 72)
25   • Hartford's investment in the Collateral Fund represented approximately
26     $2.6B, or 9% of the total outstanding units, at December 31, 2007. (Answer
27     ¶¶ 16, 120, 133)

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**2.    Admitted in BNYM Responses to PSF RFAs**

- Subject to the terms and conditions of the Investment Management Agreement dated October 28, 1998, Mellon Bank, N.A. was appointed as Investment Manager to the Mellon GSL Investment Trust, and BNY Mellon, N.A. is successor-in-interest to Mellon Bank, N.A. in that regard. (BNYM Resp. to PSF RFA No. 3)

- Pursuant to Second Amendment to Mellon GSL Reinvestment Trust Declaration of Trust dated October 1, 1999, the Mellon GSL DBT II Collateral Fund was created as a Series of the Mellon GSL Reinvestment Trust. (BNYM Resp. to PSF RFA No. 3)

- BNY Mellon Trust of Delaware, The Bank of New York Mellon, and BNY Mellon, N.A. are each direct or indirect subsidiaries of The Bank of New York Mellon Corporation. (BNYM Resp. to PSF RFA No. 8)

- Hartford Series Fund, Inc., Hartford HLS Series Fund II, Inc., The Hartford Mutual Funds, Inc., and The Hartford Mutual Funds II, Inc. redeemed their interests in the Mellon GSL DBT II Collateral Fund over time (during which time they retained any risk affecting the Collateral Fund to the extent of any unredeemed portion of their interest), pursuant to a written agreement on the terms and conditions stated therein, and in connection with that redemption six monthly cash payments were made starting January 15, 2008. (BNYM Resp. to PSF RFA No. 42)

- At least one employee communicated to Pacific Select Fund that Pacific Select Fund would be notified when the in-kind redemption restrictions applicable to the Mellon GSL DBT II Collateral Fund were no longer in force. (BNYM Resp. to PSF RFA No. 44)

- At least one BNYM employee told Pacific Select Fund on January 15, 2008 that all structured investment vehicles in the Mellon GSL DBT II Collateral Fund continued to perform as expected. (BNYM Resp. to PSF RFA No. 51)

- Juliette Saisselin of Sigma communicated to Lawrence Mannix on April 3, 2008 the view that ratio trades should be strongly considered and that Sigma's ability to issue new notes had declined over time. (BNYM Resp. to PSF RFA No. 35)

- Tom Ford and Kathy Rulong presented to the BNYM Collective Investments Committee on April 22, 2008. The document "Securities Lending — Sigma Investment Alternatives" as identified by Bates range BNYM-SL0024518 – 24 was prepared for that meeting, and the discussion at the meeting covered the subjects that document. (BNYM Resp. to PSF RFA No. 19)

- As least one BNYM employee believed, as of April 22, 2008, that Sigma might default on some notes before July 2008 or earlier if funding was not obtained. (BNYM Resp. to PSF RFA No. 20)

- As of April 22, 2008, at least one BNYM employee believed that if Sigma defaulted on notes, then it was possible that Sigma's assets could be sold for less than 100% of the value that might be obtained if those assets were held to maturity. (BNYM Resp. to PSF RFA No. 21)

- Kathy Rulong was acting within the course and scope of her employment on April 21, 2008 when she sent the email identified by Bates range BNYM-SL00224516 — 17 attaching the presentation identified by Bates range BNYM-SL00224518 — 24. (BNYM Resp. to PSF RFA No. 22)

- To the best of information available, no changes were made to the written document identified by bates range BNYM-SL00224518 — 24 between April 21, 2008 and April 22, 2008. (BNYM Resp. to PSF RFA No. 23)

- Robert Fort was acting within the scope of his employment when he sent an email to Pacific Select Fund identified by Bates number PSF00028805. That email states "all assets are performing and expect to be paid as expected at maturity." (BNYM Resp. to PSF RFA No. 52)

1

2
3
4

- By May 8, 2008, at least one member of BNYM's Collective Funds Committee had notice of at least one sale of a Sigma MTN by Standish. (BNYM Resp. to PSF RFA No. 57)

5
6

- By May 8, 2008, at least one BNYM employee or executive had notice of at least one Sigma MTN sold by Standish. (BNYM Resp. to PSF RFA No. 58)

7
8
9

- A single ratio trade with Sigma was completed for the Mellon GSL DBT II Collateral Fund, which occurred on May 14, 2008. (BNYM Resp. to PSF RFA No. 24)

10
11
12
13

- As of May 19, 2008, at least one employee believed that there was a risk that, at some point in the future, Sigma would not be able to pay in full all of its outstanding notes, and that one characterization of the level or risk was "significant likelihood." (BNYM Resp. to PSF RFA No. 15)

14
15
16
17

- As of May 29, 2008, at least one BNYM employee believed that there was a risk that, at some point in the future, Sigma would not be able to pay in full all of its outstanding notes, and that one characterization of the level of risk was a "significant likelihood." (BNYM Resp. to PSF RFA No. 13)

18
19
20

- Robert Fort was acting within the scope of his employment when he signed the letter to SWIB identified by Bates range BNYM-SL03412531 — 33. (BNYM Resp. to PSF RFA No. 16; BNYM Resp. to PSF RFA No. 17)

21
22
23

- Renee Rawls was acting within the scope of her employment when she distributed the letter to KPERS identified by Bates range BNYM-SL02865304 — 05. (BNYM Resp. to PSF RFA No. 18)

24
25

- BNYM never requested that PSF change its Investment Guidelines. (BNYM Resp. to PSF RFA No. 27)

26
27

- BNYM did not seek consent from clients in the DBT II Collateral Fund to modify their investment guidelines. (BNYM Resp. to PSF RFA No. 32)

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- At one time Pacific Select Fund owned 81,057,461.92 units of the Mellon GSL Reinvestment Trust II, which corresponded to $81,057,461.92 in par value of Sigma MTNs. (BNYM Resp. to PSF RFA No. 63)

### 3. Admitted in BNYM Responses to PSF Interrogatories

- The requirements for changes to the Investment Policies of the Mellon GSL DBT II Collateral Fund Series of the Mellon GSL Reinvestment Trust are set out in Section 8.2 of the Mellon GSL Reinvestment Trust Declaration of Trust. (BNYM Resp. to PSF Interrogatory No. 15)

- BNYM did not amend the Investment Guidelines for the DBT II Fund to accept assets from Sigma pursuant to ratio trades. (BNYM Resp. to PSF Interrogatory No. 16)

- BNYM exchanged certain Sigma MTNs for other assets in ratio trade transactions. BNYM sold certain Sigma MTNs for securities lending collateral reinvestment accounts and for other accounts. (BNYM Resp. to PSF Interrogatory No. 17)

### 4. Admitted in Defendants' Statement of Undisputed Facts In Support of Its Motion for Summary Judgment

- Robert Fort oversaw collateral reinvestment for the Mellon GSL DBT Collateral Fund at BNY Mellon. (BNY SUF ISO MSJ ¶ 4)

- Michael McDermott managed the "Client Service Group" within BNY Mellon's securities lending program. He also served as the contact person for some of BNY Mellon's securities lending clients, including PSF. (BNY SUF ISO MSJ ¶ 7)

- In a securities lending transaction, securities are transferred from the lender to the borrower. Many borrowers and lenders conduct securities-lending transactions through an intermediary, in this case BNY Mellon: the lenders give the intermediary the right to lend the securities to approved borrowers. At the inception of the transaction, the borrower agrees to return the securities

to the lender via the intermediary, either on demand or at the end of an agreed upon term. In exchange for the securities, the borrower must provide collateral, usually in the form of cash. Collateral from multiple lenders will sometimes, as was the case here, be pooled in a "commingled fund." (BNY SUF ISO MSJ ¶ 34)

- Generally, the collateral provided in securities lending is 102 percent of the value of the domestic securities and 105 percent of the value of non-U.S. securities. Collateral mitigates default risk or the failure to return the borrowed securities. Each day, the value of the lent shares is marked to market (that is, increased or decreased to reflect current market value), and the collateral is adjusted accordingly. (BNY SUF ISO MSJ ¶ 35)

- The securities lending intermediary, in this case, BNY Mellon, reinvests the collateral to generate a return. The return on the collateral reinvestment is divided among all three participants. The borrower's share—known as the "rebate"—compensates the borrower for interest that could have been earned on the cash collateral. The rebate rate differs by type of security; borrowers of securities in high demand typically accept a lower rebate rate. The balance of the reinvestment revenue (net of the rebate) is divided between the lender (PSF) and the intermediary (BNY Mellon) according to pre-determined contractual terms. At the end of the loan period, the borrower returns the securities to the lender (through the intermediary) and the lender returns the cash collateral to the borrower. (BNY SUF ISO MSJ ¶ 36)

- Among the assets held in the DBT II Fund were medium term notes issued by Sigma Finance, Inc. (BNY SUF ISO MSJ ¶ 60)

- SIVs finance long-term assets by selling a series of short and medium-term notes. (BNY SUF ISO MSJ ¶ 62)

- In 2007 and into 2008, press and analyst reports raised concerns about SIVs including Sigma. Specifically, reports indicated that, in light of the lack of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

liquidity in the marketplace, Sigma was no longer able to sell new notes and was using alternate means, including "repo" transactions, to pay its maturities coming due. (BNY SUF ISO MSJ ¶ 64)

- On December 7, 2007, PSF was advised by BNY Mellon that PSF could exit from the DBT fund by taking a vertical slice of its proportionate share of assets in DBT. (BNY SUF ISO MSJ ¶ 67)

- PSF notified BNY Mellon of its intent to exit the securities lending program on June 9, 2009. (BNY SUF ISO MSJ ¶ 117)

- The Hartford funds negotiated a staged cash exit from the DBT II fund over six months, beginning on January 15, 2008. (BNY SUF ISO MSJ ¶ 132)

    **5.    Admitted in Defendants' Statement of Genuine Issues in Opposition to Plaintiff's Motion for Partial Summary Judgment**

- The Mellon GSL DBT II Collateral Fund commenced operations on October 24, 1999 for the purpose of investing cash collateral received for securities loaned by The Bank of New York Mellon and BNY Mellon, N.A. (collectively, "BNYM") in connection with its securities lending program. (BNY SGI in Opp to PSF MSJ ¶ 3)

- In January 2007, Pacific Select Fund ("PSF") entered into a securities lending agreement with Mellon Bank, N.A., predecessor to The Bank of New York Mellon and BNY Mellon, N.A. (collectively, "BNYM").  (BNY SGI in Opp to PSF MSJ ¶ 4); (*see also* BNY SGI in Opp to PSF MSJ ¶ 5) (The Bank of New York Mellon is successor to Mellon Bank, N.A. with respect to the Third Party Securities Lending Authorization Agreement with Pacific Select Fund).

- Pursuant to the Securities Lending Authorization Agreement, BNYM loaned securities owned by PSF to third-party borrowers in return for cash collateral,

which was invested by BNYM in the Mellon GSL DBT II Collateral Fund. (BNY SGI in Opp to PSF MSJ ¶ 6)

- Upon the termination of a loan made pursuant to the Securities Lending Authorization Agreement, the borrower would return the securities and BNYM would return the collateral plus an additional amount of cash called the "rebate" on behalf of PSF. (BNY SGI in Opp to PSF MSJ ¶ 7)

- Pursuant to Second Amendment to Mellon GSL Reinvestment Trust Declaration of Trust dated October 1, 1999, the Mellon GSL DBT II Collateral Fund was created as a Series of the Mellon GSL Reinvestment Trust. (BNYM Resp. to PSF RFA No. 3; BNY SGI in Opp to PSF MSJ ¶ 9)

- The Mellon GSL Reinvestment Trust is a Delaware Statutory Trust created on October 28, 1998. (BNY SGI in Opp to PSF MSJ ¶ 10)

- Multiple series of the Mellon GSL Reinvestment Trust have been created. (BNY SGI in Opp to PSF MSJ ¶ 11)

- Each series of the Mellon GSL Reinvestment Trust has separate investment objectives and policies. (BNY SGI in Opp to PSF MSJ ¶ 12)

- Among the assets held in the DBT II Fund were medium term notes issued by Sigma Finance, Inc. (BNY SGI in Opp to PSF MSJ ¶ 19)

- Sigma was considered a structured investment vehicle ("SIV"). (BNY SGI in Opp to PSF MSJ ¶ 20)

- The Bank of New York Mellon and PSF entered into an Amendment to the Securities Lending Authorization Agreement. (BNYM SGI in Opp to PSF MSJ ¶ 24)

- The Amendment to the Securities Lending Authorization Agreement was made effective September 1, 2008. (BNYM SGI in Opp to PSF MSJ ¶ 25)

- As of October 1, 2008, the date of the transfer of the Sigma securities, PSF held approximately 21.14% of the assets in the DBT II Fund. (BNY SGI in Opp to PSF MSJ ¶ 36)

- PSF's share of the defaulted Sigma notes from the DBT II Fund was
  $81,057,461.92. (BNY SGI in Opp to PSF MSJ ¶ 49)

- The DBT II Fund held a total par value of $383,400,000 in Sigma notes when
  Sigma defaulted. (BNY SGI in Opp to PSF MSJ ¶ 50)

- In a letter to DBT II Fund investors accompanying the 2008 financial
  statements, Kathy Rulong explained that the reason behind the transfer of the
  impaired Sigma securities was "to continue to operate the Fund at a constant
  $1.00 NAV." (BNYM SGI in Opp to PSF MSJ ¶ 69)

### 6. Admitted in BNYM's Statement of Additional Facts in Opposition to PSF's Motion for Partial Summary Judgment

- In connection with PSF's participation in BNY Mellon's securities lending
  program, cash collateral was invested in the BNY Mellon GSL DBT
  Collateral Fund, which is a series of the Mellon GSL Reinvestment Trust.
  (BNY SAF in Opp to PSF MSJ ¶ 2)

- Other securities lending participants also had collateral invested in the DBT
  fund. (BNY SAF in Opp to PSF MSJ ¶ 3)

- PSF and the other participants held "units" of DBT in proportion with its
  ownership of the fund, and its ownership varied as collateral was added and
  removed in connection with securities lending activity. (BNY SAF in Opp to
  PSF MSJ ¶ 4)

- DBT used an amortized cost method of valuing units, and each unit was
  normally valued at $1. Accordingly, as PSF (or others) put cash collateral in
  the fund, they received one unit for every dollar in cash collateral. (BNY SAF
  in Opp to PSF MSJ ¶ 5)

- On October 1, 2008 Sigma ceased trading. So that the DBT fund could
  continue to operate using the $1 per unit valuation – i.e., so that the DBT fund
  would not break the buck – BNY Mellon transferred the Sigma MTNs into a

separate series of trust on the same day. (BNYM SAF in Opp to PSF MSJ ¶ 30)

**B.    Defendants' Position**

Defendants object, and do not agree, to PSF's apparent attempt to try its case not with evidence but through one-sided characterization of alleged admissions that PSF asserts "require no proof."  PSF's pages-long jumble contains both misstatements of fact and assertions that, because they are presented without context, would be highly misleading if presented to the jury in this way or individually.

Among other things, PSF's list of alleged admissions makes a confusing mess of the legally separate entities involved, referring to the Defendants by overlapping and inconsistent names (as well as other entities who are not defendants, further confusing matters).  For example, the list refers variously to "BNYM" and "BNY Mellon," in some cases apparently referring to the two Defendants collectively (and perhaps other entities) and in other cases apparently referring only to defendant BNY Mellon, N.A.

Furthermore, the alleged admissions contain matters that are subject to relevance, unfair prejudice, and other objections.   For example, the list refers to several alleged facts regarding transactions on behalf of Standish Mellon clients, and Defendants' Motion *in Limine* No.3 asks the Court to exclude evidence as irrelevant and unfairly prejudicial.  (Dckt. No. 251.)  If PSF believes there are material facts that can be proved at trial using the sources it cites, it may seek to admit them as evidence at trial subject to appropriate evidentiary objections.

Defendants are prepared to discuss further stipulations beyond those already agreed in Section 6, if it can productively focus the trial in a fair and neutral way. Of course, such stipulations would need to involve facts proposed by both parties, and to date, PSF has failed to respond at all to the proposed factual stipulations to which Defendants have asked PSF to agree.

1
2
3   **6.    STIPULATED FACTS**

4        The parties stipulate to the following facts:

5   •  Pacific Select Fund and Mellon Bank, N.A. entered into a contract, titled

6      "Third Party Securities Lending Authorization Agreement" ("SLAA"),

7      effective January 1, 2007.  The SLAA is Exhibit 233 on the Joint Exhibit List.

8   •  The Bank of New York Mellon is the successor-in-interest to Mellon Bank,

9      N.A.'s rights and obligations under the SLAA.

10  •  Effective September 1, 2008, The Bank of New York Mellon and Pacific

11     Select Fund entered into an Amendment to the SLAA.  The Amendment is

12     Exhibit 234 on the Joint Exhibit List.

13
14  **7.    CLAIMS AND AFFIRMATIVE DEFENSES**[3]

15  **Plaintiff's Claims:**

16      **(a)    Plaintiff plans to pursue the following claims against the following**

17  **defendants:**[4]

18  *Claim 1*:      The Bank of New York Mellon and BNY Mellon, N.A. breached the

19                  Securities Lending Authorization Agreement.

20  _____

21      [3] Appendix A to the Civil Local Rules specifies that the Plaintiff is to provide

22  a brief summary of the key evidence on which Plaintiff relies on for its claims, and
    that Defendants are to do the same for affirmative defenses.  Accordingly, the

23  parties have not included summaries of the evidence in opposition on these points,
    though they are set out in the parties' respective Memoranda of Contentions of Law

24  and Fact.  The parties' statements as to the factual and legal support for their claims

25  and defenses are solely those of the individual parties and are not necessarily
    accepted or agreed to by the other parties.

26
    [4] PSF withdraws its claim that BNYM breached the covenant of good faith

27  and fair dealing in connection with the Negative Earnings Guarantee without

28  prejudice.  Since PSF prevailed on its contract claim with respect to the Negative
    Earnings Guarantee, this claim is moot.  PSF reserves its right to reinstate this claim,
    however, if the Court's order granting PSF's Partial Motion For Summary Judgment
    is reversed.

1

2   *Claim 2*:     The Bank of New York Mellon and BNY Mellon, N.A. breached

3                  fiduciary duties to PSF.

4   *Claim 3*:     The Bank of New York Mellon and BNY Mellon, N.A. are liable for

5                  professional negligence.

6   *Claim 4*:     The Bank of New York Mellon and BNY Mellon, N.A. violated the

7                  California Unfair Competition Law ("UCL").

8          **(b)      The elements required to establish Plaintiff's claims are:**

9   **Claim 1: Defendants breached the Securities Lending Authorization**

10  **Agreement.**

11  Plaintiff's Position

12         To recover damages from Defendants for breach of the Securities Lending

13  Authorization Agreement ("SLAA"), Pacific Select Fund must prove:

14         (1) PSF and Defendants entered into a contract;

15         (2) PSF did all, or substantially all, of the significant things that the contract

16  required it to do;

17         (3) Conditions requiring Defendants' performance of the contract occurred;

18         (4) Defendants failed to do something that the contract required them to do, or

19  Defendants did something that the contract prohibited them from doing;

20         (5) PSF was harmed by that failure.

21  CACI 303.

22         Defendants' Position

23         Plaintiff's recitation of the elements omits the essential requirement of

24  proximate causation.  Cal. Civ. Code § 3300.

25  **Claim 2: Defendants breached fiduciary duties to PSF.**

26  Plaintiff's Position

27         To establish a claim for breach of fiduciary duty, PSF must prove:

28         (1) Defendants were in a fiduciary relationship with PSF;

1

2   (2) Defendants acted on PSF's behalf within the scope of that fiduciary

3   relationship;

4   (3) Defendants breached fiduciary duties owed to PSF;

5   (3) PSF was harmed; and

6   (4) Defendants' breach of fiduciary duties was a substantial factor in bringing

7   about PSF's harm.

8   PSF seeks punitive damages in connection with this claim.  To establish a

9   claim for punitive damages, PSF must prove by clear and convincing evidence that

10  Defendants engaged in the conduct that caused PSF's harm with oppression, fraud,

11  or malice.  Cal. Civ. Code § 3294.  In the context of Section 3294, "'malice' means

12  conduct that is intended by the defendant to cause injury to the plaintiff or

13  despicable conduct which is carried on by the defendant with a willful and knowing

14  disregard of the rights or safety of others."  *Id.* § 3294(c)(1).  "'Oppression' means

15  despicable conduct that subjects a person to cruel and unjust hardship in conscious

16  disregard of that person's rights."  *Id.* § 3294(c)(2).

17  A person acts with knowing disregard when he or she is aware of the probable

18  dangerous consequences of his or her conduct and deliberately fails to avoid those

19  consequences.  "Despicable conduct" is conduct that is so vile, base, or

20  contemptible that it would be looked down on and despised by reasonable people.

21  *Id.* § 3294(c)(3).

22  <u>Defendants' Position</u>

23  First, PSF's recitation of the elements omits that a defendant can only breach

24  a fiduciary duty when acting within the scope of a fiduciary obligation.  *See, e.g.*,

25  Restatement (Second) of Torts 874 cmt. a ("A fiduciary relation exists between two

26  persons when one of them is under a duty to act for or to give advice for the benefit

27  of another *upon matters within the scope of the relation*.") (emphasis added).

28  Second, as set out in Defendants' Motion *in Limine* No. 5 (Dckt. # 253),

punitive damages are not available in this case.

**Claim 3: Defendants are liable for professional negligence.**

To establish a claim for professional negligence, PSF must prove:

(1)  Defendants were negligent (*i.e.*, failed to meet the applicable standard of care).

(2)  That Pacific Select Fund was harmed; and

(3)  That Defendants' negligence was a substantial factor in causing Pacific Select Fund's harm.

CACI 400, 600.

**Claim 4: Defendants violated the California Unfair Competition Law ("UCL").**

To establish a claim for violation of the California Unfair Competition Law, PSF will have to prove that Defendants performed a business act or practice that was unlawful, unfair, or fraudulent.  Cal. Bus. & Prof. Code § 17200.

PSF asserts its breach of fiduciary duty and professional negligence claims are sufficient predicates for its Unfair Competition Law ("UCL") claim.  Therefore, PSF will have to establish the elements for either breach of fiduciary duty or professional negligence to establish its UCL claim.

**(c)  Evidence**

In brief, the key evidence Plaintiff relies on for each of the claims is:

**Claim 1: Defendants breached the Securities Lending Authorization Agreement.**

*Element:*

PSF and Defendants entered into a contract.

*PSF's Statement of the Evidence:*

- Evidence establishing that pursuant to a Third Party Securities Lending Authorization Agreement ("Securities Lending Agreement" or "Agreement" or "SLAA") executed in January 2007 between Mellon Bank, N.A. and PSF, Mellon Bank contracted to act as PSF's lending agent and to establish,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

manage and administer a Securities Lending Program with respect to the lendable securities of PSF's portfolios; and

- Evidence establishing that BNYM, as successor to Mellon Bank, N.A., assumed all rights and duties of Mellon Bank, N.A. under the SLAA.

- Evidence establishing that BNYM and PSF entered into an Amendment to the SLAA, effective September 1, 2008.

*Element:*

PSF did all, or substantially all, of the significant things that the contract required it to do.

*PSF's Statement of the Evidence:*

- Evidence establishing that PSF paid BNYM the fees it owed under the SLAA, fulfilling its obligations to BNYM under the SLAA.

*Element:*

Conditions requiring Defendants' performance of the contract occurred.

*PSF's Statement of the Evidence:*

- Evidence establishing that all conditions, if any, requiring Defendants' performance of the contract occurred, including but not limited to the SLAA and testimony of witnesses.

- Evidencing establishing that Defendants' undertook to perform pursuant to the SLAA, indicating that any such conditions had occurred.

*Element:*

Defendants failed to do something that the contract required them to do, or did something that the contract prohibited them from doing.

*PSF's Statement of the Evidence:*

- The SLAA (including the Amendment thereto), which expressly allocates the risk of loss to BNYM, states to the extent "any Negative Earnings, Principal Losses or Collateral Insufficiency result from the negligence, willful misconduct, recklessness, bad faith, malfeasance or misfeasance of the

Lending Agent, or the failure of the Lending Agent to comply with the
provisions of the Agreement, including the Investment Guidelines, or this
Amendment, then Lending Agent shall be fully responsible for such Negative
Earnings, Principal Losses and/or Collateral Insufficiency";

• The SLAA, which obligates BNYM to indemnify PSF for "any and all . . .
losses and damages of any kind whatsoever arising from or resulting from the
negligence, willful misconduct, recklessness, bad faith, malfeasance or
misfeasance of the Lending Agent in its administration of the Program or the
failure of the Lending Agent to comply with the provisions of this Agreement
including, the Investment Guidelines";

• The SLAA, which holds BNYM liable for any losses to PSF resulting from
BNYM's negligence, willful misconduct, recklessness, bad faith, malfeasance
or misfeasance in its administration of the Program, or BNYM's failure to
comply with the provisions of the Agreement, including the Investment
Guidelines;

• The SLAA, which obligates BNYM to comply with the Investment
Guidelines, chief of which was the obligation to preserve principal;

• The SLAA, which obligates BNYM to perform "with the care, skill,
prudence, and diligence which, under the circumstances then prevailing, a
professional securities lending agent acting in a like capacity [] would use in
the conduct of [a like] enterprise . . .";

• The SLAA, which obligates BNYM, as custodian, to exercise the same care
and diligence that it would devote to its own property in like circumstances;

• Evidence demonstrating that BNYM failed to indemnify PSF for "any and all
. . . losses and damages of any kind whatsoever arising from or resulting from
the negligence, willful misconduct, recklessness, bad faith, malfeasance or
misfeasance of the Lending Agent in its administration of the Program or the

failure to comply with the provisions of this Agreement, including the Investment Guidelines";

- Evidence demonstrating that DBT II was supposed to be a very conservative, "2a7-like" fund, and its most important investment goal was to <u>preserve principal</u>;

- Evidence of red flags present in 2007 and 2008 that informed or should have informed BNYM that Sigma was an imprudent investment for DBT II, and holding it was inconsistent with the Investment Guidelines, including but not limited to:

  o Analyst reports and ratings agency publications from 2007 and 2008 questioning Sigma's ability to raise liquidity and warning about its inevitable collapse;

  o Evidence demonstrating that BNYM was uniquely privy to red flags regarding Sigma's viability and inability to secure funding from ongoing calls and emails with Gordian Knot Ltd ("Gordian Knot"), Sigma's asset manager.  For example:

    ▪ In mid-January 2008, Gordian Knot informed BNYM that, because its attempts to finalize a permanent liquidity facility to meet all or most of Sigma's funding needs had failed, Sigma needed to secure counterparties for liquidity on a weekly or daily basis in a difficult market backdrop;

    ▪ On a January 15, 2008 call, when asked whether March 2009 maturities would be repaid, Gordian Knot responded, "Your guess is as good as mine";

    ▪ David Tant, BNYM's Chief Reinvestment Credit Officer, was not on this call because he was meeting with PSF's Board of Trustees, providing reassurances that Sigma was "best in class" and performing as expected. On January 16, 2008 Mr. Tant had

another call with Gordian Knot.  On that call, Gordian Knot "let
the air out of the balloon in terms of potential fixes near term
[and] indicated they are casting far and wide to look for more
repo ability . . . but are not seeing any meaningful movement."
Mr. Tant "suggested [repo] is not a long term fix" and asked
"what is plan B if markets don't normalize." Gordian Knot gave
no answer;

▪ Prior to February 1, 2008, Gordian Knot acknowledged to
BNYM that Sigma had $10 billion in repo, but that this amount
was "only sufficient to allow [Sigma] to continue to repay
scheduled maturities through roughly the first quarter of 2008."
Gordian Knot also informed BNYM that "second quarter
maturities are heavier and current liquidity resources will not
permit repayment of all debt maturing through that quarter."
Gordian Knot stated that liquidity counterparties were reducing
the term of their repos;

▪ On February 4, 2008, Gordian Knot declared "that instability and
fragility of the markets has made it more difficult to know
anything anymore." Gordian Knot added it was "worried about
the financial collapse around us" and "the horizon is
unpredictable." Gordian Knot warned, the "cost of funding has
increased," meaning Sigma would have more liquidity problems;

▪ On April 3, 2008, Gordian Knot called BNYM and explained
"that essentially, things are getting worse for them, not better,
with the passage of time. They can not access funding, and
maturities continue to drain liquidity."  Gordian Knot "strongly"
advised BNYM to reduce its Sigma exposure.  Mr. Fort
described this news as "disturbing";

1

2      o Communications between BNYM and Standard & Poor's ("S&P"),

3         including a February 13, 2008 communication in which BNYM

4         consulted with S&P about BNYM engaging in a repo deal with Sigma

5         and S&P informed BNYM that it was "inappropriate to increase

6         exposure to a distressed issuer" and that "[Sigma] would be considered

7         distressed";

8      o Evidence demonstrating that Standish Mellon, whose representatives

9         also participated on the calls with Gordian Knot, sold or ratio traded

10        almost all of their clients' Sigma exposure;

11     o Evidence demonstrating that Sigma MTNs were consistently trading in

12        the secondary market at prices below par value in 2008, which

13        indicated the market's assessment of Sigma's riskiness;

14   • BNYM internal emails, meeting presentations, and letters to select clients (not

15     PSF) revealing that BNYM leadership was panicking internally about Sigma,

16     and concluding that there was a significant likelihood that Sigma would

17     collapse and noteholders would suffer losses:

18     o On February 1, 2008, Tom Ford (BNYM's head of securities lending)

19        indicated he wanted to "<u>find something we can actively due [sic] to</u>

20        <u>reduce our Sigma exposure</u>." On February 4, 2008, a securities lending

21        presentation to senior BNYM executives noted that, "[m]arket

22        illiquidity and avoidance of SIV's by traditional buyers due to sector

23        fallout have created <u>potential for liquidity issue in late 2Q '08 for</u>

24        <u>Sigma that could result in an Enforcement Event</u>";

25     o On April 4, 2008, Mr. Ford emailed Kathy Rulong (BNYM's deputy

26        head of securities lending) that, "<u>I think we should be doing everything</u>

27        <u>we can to dramatically reduce our client risk to Sigma and our</u>

28        <u>franchise risk (including that risk as it is presented to legacy [M]ellon</u>

clients and commingled funds)." Ms. Rulong agreed: "No one would like to reduce our exposure to Sigma more than I would";

  o On April 18, 2008, William Kelly (BNYM's director of client management for securities lending) emailed a BNYM separate account holder indicating that reducing Sigma risk "is a particularly desirable option for senior note holders whose maturity is beyond the second quarter of this year as Sigma's liquidity is less certain beyond that point";

  o On April 22, 2008, Ms. Rulong gave a presentation that predicted: "Without additional funding, Sigma will likely default before July, 2008 and a much sooner default is possible." The presentation further stated that a "default would expose BNYM and its clients to the risks of the Trustee liquidating SIGMA's portfolio at a fraction of its realizable value if held to maturity";

  o On May 29, 2008, Mr. Fort sent a letter to a BNYM separate account client stating: "Based upon our continuing consideration of the recent market events and the liquidity challenges and related financial difficulties Sigma is experiencing, and with no certainty of relief being realized in the near term, we believe there is a significant likelihood that Sigma will not be able to continue to meet its commitments in respect of the Sigma Notes in the medium term. A default in its obligations under the Sigma Notes will cause an enforcement event which will likely result in a prolonged liquidation period as well as diminished principal repayment";

• Evidence demonstrating that BNYM actively reduced its own exposure to Sigma by engaging in ratio trades on its own behalf or executing sales on behalf of itself or its subsidiaries;

1

2 • Evidence demonstrating that BNYM concluded that it should actively reduce

3 its clients' Sigma exposure;

4 • Evidence demonstrating that between November 2007 and August 2008,

5 Standish Mellon sold over $320.811 million of Sigma MTNs on behalf of its

6 clients;

7 • Evidence demonstrating that BNYM sold $186 million of Sigma MTNs

8 during the same time period on behalf of its other clients, including its other

9 securities lending clients;

10 • Evidence demonstrating that BNYM never executed a single sale of Sigma

11 for DBT II;

12 • Evidence demonstrating that BNYM waited until April 2008 – after Sigma

13 relayed that things were getting worse and "strongly" encouraged BNYM to

14 reduce exposure – to engage in ratio trades on other clients' behalf even

15 though Sigma approached BNYM about engaging in ratio trades as early as

16 September 2007;

17 • Evidence demonstrating that starting in early April 2008, BNYM executed

18 ratio trades for itself and certain other securities lending clients, retiring

19 Sigma notes with a face value of $675 million, but only executed one trade

20 totaling $21.1 million for DBT II, less than 4% of DBT II's total Sigma

21 holdings at the time;

22 • Evidence demonstrating that BNYM never asked PSF to waive any

23 investment policies to permit BNYM to complete additional ratio trades with

24 Sigma to reduce the exposure of DBT II;

25 • Evidence demonstrating that BNYM performed no pricing or recovery

26 analysis that would have enabled it to conclude with any confidence that the

27 fair market prices for Sigma did not reflect Sigma's true value and that the

28 safer course was to hold Sigma until maturity rather than sell them for a loss;

- Evidence demonstrating that BNYM made no reasonable effort to reliably determine the likely proceeds from selling the Sigma MTNs;

- Evidence demonstrating that to the extent BNYM engaged in superficial assessments of Sigma's expected losses, it assessed likely recovery to be far below par;

- Evidence demonstrating that BNYM allowed other DBT II participants to redeem their units in cash, while restricting PSF to in-kind redemptions and telling PSF that other participants were subject to similar restrictions;

- Evidence demonstrating that BNYM failed to inform PSF that it had concerns about Sigma, or that Sigma was likely to default and that such a default would result in losses to noteholders;

- Evidence demonstrating that BNYM repeatedly assured PSF that it expected all assets in the DBT II Fund to pay in full at maturity;

- Evidence demonstrating that BNYM's ratio trades on behalf of its others clients depleted Sigma of the higher quality assets in its underlying portfolio;

- Evidence demonstrating that BNYM published purported market prices from pricing services to PSF that it had no reasonable basis to believe were accurate;

- BNYM documents and testimony stating that Sigma's collapse caused losses so significant that they "broke the buck," and that if the Sigma notes had not been transferred out of DBT II when Sigma collapsed, the entire Fund would have ceased operating;

- Evidence demonstrating that BNYM appreciated the risks associated with holding Lehman Brothers securities, and took steps to reduce its exposure to Lehman before Sigma's collapse; and

- Evidence demonstrating that BNYM indemnified or otherwise provided capital support to certain other clients for their Lehman losses.

*Element:*

PSF was harmed by that failure.

*PSF's Statement of Evidence:*

- Evidence showing PSF's net losses; and

- Evidence establishing the amount of PSF's losses arising from or as a result of BNYM's negligence, willful misconduct, recklessness, bad faith, malfeasance or misfeasance in its administration of the Program, or BNYM's failure to comply with the provisions of the SLAA, including the Investment Guidelines.

## **Claim 2: Defendants breached fiduciary duties to PSF.**

*Element:*

Defendants were in a fiduciary relationship with PSF.

*PSF's Statement of the Evidence:*

- Evidence, including BNYM admissions, demonstrating that BNYM was PSF's securities lending agent, investment manager, custodian, and trustee;

- Evidence, including BNYM admissions, demonstrating that BNYM exercised full discretion and authority to manage the investments in the DBT II Fund, including the discretion and authority to purchase, hold, or sell securities in the DBT II Fund, subject only to the Investment Guidelines and its fiduciary duties to act with due care, utmost good faith, loyalty, honesty, candor, and impartiality;

- Evidence, including BNYM admissions, demonstrating that BNYM had custody and control over PSF's cash collateral;

- Evidence, including BNYM admissions, demonstrating that BNYM managed PSF's investments or made investment decisions on behalf of PSF;

- Evidence, including BNYM admissions, demonstrating that BNYM was PSF's agent;

- Evidence, including BNYM admissions, demonstrating that BNYM acted as trustee of the DBT II Fund or that the trustee delegated its investment authority to BNYM; and

- Evidence demonstrating that PSF placed its trust and confidence in the integrity and fidelity of BNYM when it entrusted its securities lending cash collateral to BNYM.

*Element:*

Defendants acted on PSF's behalf within the scope of that fiduciary relationship.

*PSF's Statement of the Evidence:*

- Evidence establishing Defendants' obligations to PSF and their authority to act on PSF's behalf as PSF's securities lending agent, investment manager, and as trustee of the DBT II Fund.

- Evidence establishing invested and managed PSF's cash collateral received in connection with Defendants' securities lending program;

- Evidence establishing Defendants had discretionary investment decision-making authority to act on PSF's behalf subject to Investment Guidelines and Defendants' fiduciary obligations;

*Element:*

Defendants breached fiduciary duties owed to PSF.

*PSF's Statement of the Evidence*:

- Evidence demonstrating that BNYM acted on PSF's behalf when it decided to hold the Sigma medium-term notes in the DBT II Fund;

- Evidence demonstrating that BNYM failed to act as a reasonably careful fiduciary would have acted under the same or similar circumstances;

- Evidence demonstrating that BNYM failed to exercise due care in the management of PSF's cash collateral, as described above in the evidence supporting PSF's breach of contract action;

- Evidence demonstrating that BNYM knowingly acted against PSF's interests in connection with its administration or management of the DBT II Fund;

- Evidence demonstrating that BNYM put its own interests ahead of PSF's by refusing to honor its obligations under the Negative Earnings Guarantee, despite initial assurances to PSF that it would do so;

- Evidence demonstrating that BNYM acted disloyally and impartially, including but not limited to:

  o Evidence demonstrating that BNYM actively reduced its own exposure to Sigma by engaging in ratio trades on its own behalf or executing sales on behalf of itself or its subsidiaries;

  o Evidence demonstrating that BNYM gave other clients special treatment by allowing them to exit the DBT II Fund by redeeming their units in cash, but imposed an in-kind redemption restriction on PSF (telling PSF that the in-kind redemption restriction applied to all participants in the DBT II Fund), including but not limited to:

    ▪ The agreement entered into by BNYM and Hartford which allowed Hartford to redeem all of its DBT II shares in cash over six installments from January 15, 2008 to June 15, 2008, and testimony confirming that the redemptions occurred;

    ▪ Evidence demonstrating that BNYM understood that the purpose of an in-kind redemption restriction was to ensure that all participants in the DBT II Fund were being treated impartially and fairly;

    ▪ Documents and testimony demonstrating that BNYM never offered PSF the opportunity to exit the DBT II Fund by redeeming its units in cash;

    ▪ Testimony that Hartford suffered no losses as a result of Sigma's collapse due to the cash redemptions BNYM granted;

- Testimony that other clients' cash redemptions from the DBT II Fund increased PSF's share of the DBT II Fund and therefore its exposure to the Sigma notes;

- Evidence establishing the amount that PSF's proportionate share of the Sigma notes increased due to the cash redemptions;

- Evidence demonstrating that PSF would have avoided all of its Sigma losses had PSF received the same deal given to Hartford;

o Evidence demonstrating that BNYM indemnified or otherwise provided capital support to certain other clients for their Lehman losses;

o Evidence demonstrating that BNYM favored other clients by disclosing material information to them regarding Sigma's deteriorating condition and likelihood of collapse, all the while assuring PSF that Sigma was "money good" and would pay in full at maturity;

o Evidence demonstrating that BNYM favored other clients by executing sales and ratio trades on their behalf while failing to do so for PSF;

o Evidence demonstrating that by executing ratio trades on behalf of its other clients, BNYM increased PSF's risk exposure by draining Sigma of its higher-quality assets;

• Evidence demonstrating that BNYM possessed information material to PSF's interest;

• Evidence demonstrating that BNYM knew or should have known that this information was material to PSF's interest;

• Evidence demonstrating that BNYM failed to disclose to PSF information material to PSF's investment interests with respect to Sigma's deteriorating condition, and that BNYM's omissions and false assurances convinced PSF to remain in DBT II, where it suffered losses when Sigma defaulted.  The evidence includes, but is not limited to, the following:

- o Evidence demonstrating that BNYM was aware of red flags as to Sigma's deteriorating condition, as described in the evidence supporting PSF's breach of contract claim, yet never disclosed such red flags to PSF;

- o Evidence demonstrating that BNYM had unique and non-public information as to Sigma's deteriorating condition, including information learned through calls directly with Gordian Knot, as described in the evidence supporting PSF's breach of contract claim;

- o Evidence demonstrating that BNYM never shared with PSF the information it knew about Sigma's deteriorating condition or its conclusions that Sigma was likely to default and fail to meet its payment obligations, all the while informing its other clients of such information and conclusions and advising them to engage in ratio trades to reduce their exposure to Sigma;

- o Evidence demonstrating that BNYM was assuring PSF that the investments in the DBT II Fund were "money good" and would pay in full at maturity, all the while concluding internally that Sigma was likely to default and would be unable to meet its payment obligations;

- o Testimony from PSF witnesses that had BNYM disclosed what it knew about Sigma's deteriorating condition and its conclusions or concerns regarding the same, PSF would have exited the DBT II Fund or taken other measures to protect itself; and

- o Evidence demonstrating that BNYM appreciated the risks associated with holding Lehman Brothers securities, and took steps to reduce its exposure to Lehman before Sigma's collapse.

- • Evidence demonstrating that PSF did not give informed consent to BNYM's conduct.

*Element:*

1

2 PSF was harmed.

3 *PSF's Statement of the Evidence:*

4 • Evidence showing PSF's net losses and fees paid to Defendants; and

5 • Evidence establishing amount of losses that could have been avoided had

6 Defendants not breached their fiduciary duties.

7 *Element:*

8 Defendants' breach of its fiduciary duties was a substantial factor in causing

9 PSF's harm.

10 *PSF's Statement of the Evidence:*

11 • Evidence establishing that PSF would not have suffered losses or would have

12 suffered significantly reduced losses if BNYM had not breached its fiduciary

13 duties (e.g., if BNYM had permitted PSF to redeem its units in cash, sold

14 Sigma before it collapsed, or engaged in ratio trades before Sigma collapsed)

15 • Evidence establishing PSF's harm; and

16 • Evidence showing the amount of fees paid by PSF to BNYM for its services,

17 which are subject to disgorgement and restitution as a result of BNYM's

18 breach of its fiduciary duties.

19 *Element (for punitive damages):*

20 BNYM engaged in the conduct that caused PSF's harm with oppression,

21 fraud, or malice.

22 *PSF's Statement of the Evidence:*

23 • Evidence showing a pattern by BNYM of despicable conduct and willful and

24 conscious disregard for PSF's rights, including its failure to pay its

25 obligations under the Negative Earnings Guarantee, its disloyalty in favoring

26 other clients, including the cash redemptions of Hartford and other DBT II

27 participants, its execution of sales and ratio trades for itself and for other

28 clients (without offering the same to PSF), and its disclosure to other clients

of material information relating to Sigma not so disclosed to PSF; and

- Evidence that would assist the jury in measuring punitive damages, including but not limited to information relating to BNYM's net worth.

**Claim 3: Defendants are liable for professional negligence.**

*Element:*

Defendants were negligent.

*PSF's Statement of the Evidence:*

- The SLAA (and amendment thereto);
- BNYM marketing materials;
- Evidence substantially similar to the evidence that the parties will use in relation to PSF's breach of contract and fiduciary duty claims.

*Element:*

PSF was harmed.

*PSF's Statement of the Evidence:*

- Evidence substantially similar to the evidence PSF identified for its breach of contract and fiduciary duty claims.

*Element:*

Defendants' negligence was a substantial factor in causing Pacific Select Fund's harm.

*PSF's Statement of the Evidence:*

- Evidence substantially similar to the evidence PSF identified for its breach of contract and fiduciary duty claims.

**Claim 4: Defendants violated the California Unfair Competition Law ("UCL").**

PSF's breach of fiduciary claims and professional negligence claims are sufficient predicates for PSF's UCL claim. As such, the evidence PSF will use in support of its UCL claim is the same as the evidence set forth for PSF's claims for breach of fiduciary duty and professional negligence.  In addition, PSF will show

1

2   evidence establishing the amount of fees PSF paid to BNYM while it was serving as

3   PSF's securities lending agent.

4   **Defendants' Affirmative Defenses:**

5         **(a)**    **Defendants plan to pursue the following affirmative defenses:**

6   *Sixth Affirmative Defense* (Contract Allocated Principal Loss to Plaintiffs)

7   *Thirteenth and Fifteenth Affirmative Defenses* (Assumption of the Risk and

8   Contributory Negligence)

9   *Fourteenth Affirmative Defense* (Failure to Mitigate Damages)

10  *Superseding Causation* (to the extent the Court holds that it is an affirmative

11  defense)

12        **(b)**    **The elements required to establish the affirmative defenses are:**

13        **Sixth Affirmative Defense: Contract Allocated Principal Loss to**

14  **Plaintiffs.**

15        Defendants' Position

16        The sole element of this defense is that the plaintiff agreed before the incident

17  that it would not hold Defendants responsible for any damages in the circumstances

18  of this case.  CACI 451.

19        Plaintiffs' argument that the defense is not available is wrong.  The SLAA

20  provides that "The Client [PSF] acknowledged and agrees that any losses of

21  principal realized upon the liquidation of any investment of the cash Collateral

22  authorized pursuant to this Agreement (i.e., "Principal Losses") shall be at the risk

23  and for the account of the Effected Portfolio except to the extent, if any, that any

24  such Principal Losses result from the negligence, willful misconduct, recklessness,

25  bad faith, malfeasance or misfeasance of the Lending Agent, or the failure of the

26  Lending Agent to comply with the provisions of this Agreement including the

27  Investment Guidelines."  Accordingly, even if PSF prevailed on its affirmative

28  claims, it may recover nothing so long as Defendants show this provision applies to

the losses in this case, *i.e.*, that the losses did not result from the listed types of conduct.

Plaintiff's Position

This is not a proper affirmative defense.  An affirmative defense concerns matters that would defeat Plaintiff's claim even if Plaintiff established the elements of the claim.  The provision here unambiguously fully shifts the risk of loss to Defendants should Pacific Select Fund succeed on its claims.  The SLAA provides:

> [T]o the extent, if any, that any Negative Earnings, Principal Losses or Collateral Insufficiency result from the negligence, willful misconduct, recklessness, bad faith, malfeasance or misfeasance of the Lending Agent, or the failure of the Lending Agent to comply with the provisions of the Agreement, including the Investment Guidelines, or this Amendment, then Lending Agent shall be ***fully responsible*** for such Negative Earnings, Principal Losses and/or Collateral Insufficiency.

As described above, PSF will show that its losses resulted from BNYM's breach of the SLAA, breach of its fiduciary duties, bad faith, willful misconduct, and professional negligence.  Accordingly, if PSF proves its claims at trial, BNYM is "fully responsible" for PSF's "Principal Losses."  Thus, this is an improper affirmative defense.

**Thirteenth Affirmative Defense (Assumption of the Risk) and Fifteenth Affirmative Defense (Contributory Negligence)**

Defendants' Position:

To establish their affirmative defenses, Defendants would need to prove:

(1) PSF was negligent; and

(2) PSF's negligence was a substantial factor in causing its harm.

PSF's assertion that these defenses are unavailable as a matter of law is incorrect.  First, both the SLAA and the Amendment thereto limit liability to the

1

2   extent of principal losses caused by Defendants' own negligence, willful

3   misconduct, etc.  Accordingly, to the extent that damages are caused by *PSF's*

4   negligence, willful misconduct, etc., Defendants are not liable.

5        Second, the contract language on which PSF relies was added as an

6   amendment to the SLAA which the parties agreed was effective September 1, 2008.

7   But the actions of which PSF complains were investment decisions made months

8   earlier, including from December 2007 through May 2008.  PSF is simply wrong to

9   assert that the Amendment would retroactively apply prior to the date the parties

10  agreed it would be effective.

11       Third, PSF's negligence contributed to its own injury.  Thus, PSF cannot

12  recover under the alleged indemnity provision that it refers to.  *MacDonald &*

13  *Kruse, Inc. v. San Jose Steel Co.* 29 Cal. App. 3d 413, 420 (1972); *E. L. White, Inc.*

14  *v. City of Huntington Beach,* 21 Cal. 3d 497, 507 n.6 (1978).

15       Plaintiff's Position

16       Both contributory negligence and assumption of the risk defenses have been

17  subsumed by the comparative fault scheme.  Defendants should be barred from

18  asserting a comparative fault affirmative defense because the SLAA and the

19  amendment thereto expressly state that Defendants agreed to indemnify and to be

20  "fully responsible" for "any and all" losses suffered by PSF if Defendants acted with

21  negligence, willful misconduct, recklessness, bad faith, malfeasance or misfeasance,

22  or failed to comply with the provisions of the Agreement, including the Investment

23  Guidelines.  In fact, the SLAA was specifically amended to make absolutely clear

24  that Defendants would be fully responsible for PSF's losses in the event of

25  Defendants' negligence, breach of contract, or other misconduct.  Thus, if PSF is

26  successful on its claims, Defendants are fully responsible for PSF's losses, and

27  comparative fault principles should not apply.

28       BNYM misapplies the case law cited in *Kruse* in that the indemnification

clause and the "fully responsible" language in the amendment to the SLAA sets

forth a specific indemnification that fully shifts responsibility to BNYM for all of PSF's losses, and at a minimum, provide for a general indemnity, regardless of fault, that covers passive negligence.

To the extent a comparative fault affirmative defense is permitted to go to the jury in this case despite the contract language to the contrary, Defendants must prove:

(1) That PSF was actively negligent; and

(2) That PSF's active negligence was a substantial factor in causing its harm.

The comparative fault instruction should not be given absent substantial evidence that plaintiff was negligent. CACI (citing *Drust v. Drust,* 113 Cal.App.3d 1, 6 (1980)). Moreover, the comparative fault doctrine applies only, if at all, to PSF's tort claims.

**Fourteenth Affirmative Defense: Failure to Mitigate Damages.**

Defendants' Position

The elements required to establish the Fourteenth Affirmative Defense are:

(1) That PSF failed to use reasonable efforts to mitigate damages; and

(2) the amount by which damages would have been mitigated.

Once again, PSF's argument that this defense is not available is wrong. PSF has a duty to mitigate its reasonably anticipated losses, as the doctrine of mitigation is concerned not just with plaintiff's actions after an injury, but also plaintiff's actions in anticipation of an injury. *CUNA Mutual Life Ins. Co. v. Los Angeles County Metropolitan Transportation Authority*, 108 Cal.App.4th 382, 399 (2003) (noting "that reasonable, good faith mitigation that avoids future harm is just as important to the public good as are actions taken to lessen the impact of previous damage.")

Plaintiff's Position

Defendants should be barred from asserting this defense because the SLAA and the amendment thereto expressly state that BNYM agrees to indemnify and is

"fully responsible" for "any and all" losses suffered by PSF if Defendants acted with negligence, willful misconduct, recklessness, bad faith, malfeasance or misfeasance, or failed to comply with the provisions of the Agreement, including the Investment Guidelines.  Thus, if PSF is successful on its claims, Defendants are fully responsible for PSF's losses, and mitigation of damages and other comparative fault principles should not apply.

The mitigation of damages doctrine has been subsumed by the comparative fault doctrine.  *See* CA BAJI 14.67, Comments.  The comparative fault doctrine applies only, if at all, to PSF's tort claims.

To the extent this Court finds that failure to mitigate of damages remains an independent affirmative defense and this affirmative defense is not barred by the SLAA, Defendants must show:

> (4)    After PSF suffered Sigma losses, PSF failed to take reasonable steps to mitigate those losses; and
>
> (2)    The amount by which those losses would have been mitigated.

The doctrine of mitigation of damages is concerned with plaintiff's lack of due care *after* the injury, not before.  *See LeMons v. Regents of University of California*, 21 Cal. 3d 869, 874-75 (1978) (citations omitted); *Pool v. City of Oakland*, 42 Cal.3d 1051, 1066 (1986) (same) (citations omitted).  The duty to mitigate arises when the injured party has an opportunity to prevent continuation or enhancement of the injury.  *Valle De Oro Bank v. Gamboa*, 26 Cal.App.4th 1686, 1691 (Cal. Ct. App. 1994).

The duty to mitigate damages, however, does not require an injured party to do what is unreasonable or impracticable.  *Id.* (internal quotations omitted).  The rule of mitigation of damages also has no application where its effect would be to require the innocent party "to sacrifice and surrender important and valuable rights."  *Id.*  Nor does the doctrine require the injured party to take measures that would involve expenditures disproportionate to the loss sought to be avoided or which may

1

2  be beyond his financial means.  *Green v. Smith*, 261 Cal. App. 2d 392, 396-97 (Cal.

3  Ct. App. 1968) (citations omitted).  The reasonableness of the efforts of the injured

4  party must be judged in the light of the situation confronting him at the time the loss

5  was threatened and not by the judgment of hindsight.  *Id.*  Finally, the standard by

6  which the reasonableness of the injured party's efforts is to be measured is not as

7  high as the standard required in other areas of law.  *Id.*  It is sufficient if he acts

8  reasonably and with due diligence, in good faith.  *Id.*

9  **Superseding Causation**

10  Defendants' Position:

11  PSF has contended that the issue of superseding causation is an affirmative

12  defense.  As set out in Defendants' Opposition to PSF's Motion *in Limine* No. 1 at

13  17 (Dckt. # 234), that issue merely negates PSF's essential element of proximate

14  causation, as the Ninth Circuit held in *Corales v. Bennett*, 567 F.3d 554, 573 (9th

15  Cir. 2009).  However, should the Court hold that superseding causation is an

16  affirmative defense, then the sole element is that an independent event intervened in

17  causing Plaintiffs' harm, producing a harm of a kind and degree far beyond the risk

18  Defendants should have foreseen.  *See id; Perez v. VAS S.p.a.*, 188 Cal. App. 4th

19  658, 680 (2010).

20  Plaintiff's Position:

21  Superseding causation is an affirmative defense.  Defendants did not include

22  this affirmative defense in their Answer.  Accordingly, Defendants are barred from

23  asserting this affirmative defense at trial.  Plaintiff's position is more fully explained

24  in its Motion *in Limine* No. 1 (Dckt. #234) and in its Reply in Support of its Motion

25  *in Limine* No. 1 (Dckt. # 309).  Should the Court permit this affirmative defense to

26  go forward, Defendants must prove:

27

28

(1)     The Lehman Brothers' bankruptcy was unforeseeable;

(2)     The Lehman Brothers' bankruptcy caused PSF's injury;

(3)     The general risk of harm to PSF was unforeseeable; and

(4)     The harm to PSF was of a kind that was different from the kind of harm that could have been reasonably expected from Defendants' conduct.

**(c)     In brief, the key evidence Defendants rely on for each affirmative defense is:**

**<u>Sixth Affirmative Defense: Contract Allocated Principal Loss to Plaintiffs.</u>**

*Element:*

PSF agreed it would not hold Defendants responsible for losses of principal under the circumstances of this case.[5]

*Defendants' Statement of the Evidence:*

- The terms of the SLAA, which provides that:

  o Principal Losses The Client acknowledges and agrees that any losses of principal realized upon the liquidation of any investment of the cash Collateral authorized pursuant to this Agreement (i.e. "Principal Losses") shall be at the risk and for the account of the Effected Portfolio except to the extent, if any, that any such Principal Losses result from the negligence, willful misconduct, recklessness, bad faith, malfeasance or misfeasance of the Lending Agent, or the failure of the Lending Agent to comply with the provisions of this Agreement including the Investment Guidelines.

- Evidence which establishes that PSF's Sigma losses did not result from the negligence, willful misconduct, recklessness, bad faith, malfeasance or

---

[5] As described above, PSF does not necessarily adopt Defendants' description of the required elements and does not agree that Defendants are entitled to pursue their affirmative defenses.

misfeasance of BNY Mellon, or failure to comply with the SLAA including the Investment Guidelines, including but not limited to:

- o   Testimony from BNY Mellon's and PSF's witnesses;
- o   Sigma's monthly business reports;
- o   communications and statements by BNY Mellon, PSF, and Gordian Knot;
- o   reports and analyses by credit rating agencies.

**Thirteenth Affirmative Defense (Assumption of the Risk) and Fifteenth Affirmative Defense (Contributory Negligence):**

*Element:*

That PSF was negligent.

*Defendants' Statement of the Evidence:*

- Testimony from BNY Mellon's and PSF's witnesses, Minutes of PSF Board meetings, communications and statements by BNY Mellon and PSF, and other evidence produced in this matter, which establish that securities lending is an inherently risky activity, that PSF closely monitored the DBT investments including Sigma, concluded DBT was a prudence investment and the risk was not excessive, concluded after testing that Sigma MTNs would pay in full at maturity, and took actions that caused its Sigma losses in whole or part, including deciding not to pursue a cash exit from DBT, decided not to take and in-kind exit from DBT, and lifting a cap on PSF's proportionate ownership of DBT.

*Element:*

That PSF's negligence was a substantial factor in causing its Sigma losses.

*Defendants' Statement of the Evidence:*

- To the extent PSF's evidence shows BNY Mellon's actions were a substantial factor in PSF's losses, it likewise shows that PSF's actions were also a substantial factor.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Fourteenth Affirmative Defense: Failure to Mitigate Damages.**

*Element:*

That PSF failed to use reasonable efforts to mitigate damages.

*Defendants' Statement of the Evidence:*

- Presentations to PSF's Board of Trustees; testimony from BNY Mellon's and PSF's witnesses, communications and statements by BNY Mellon and PSF which establish that PSF failed to use reasonable efforts to mitigate its damages, including to withdraw from the securities lending program, maintain a cap on PSF's proportionate ownership of DBT, or otherwise limit its participation in securities lending.

*Element:*

The amount by which damages would have been mitigated.

*Defendants' Statement of the Evidence:*

- Testimony from BNY Mellon's and PSF's fact witnesses and BNY Mellon's expert witnesses, communications and statements by BNY Mellon and PSF that show the amount by which PSF's damages would have been mitigated had it withdrawn from the securities lending program and sold or traded its Sigma holdings at the same time that PSF claims that BNY Mellon should have sold or traded DBT's Sigma holdings, and that limits on PSF's ownership interest in DBT would have limited PSF's Sigma losses.

## **Superseding Causation**

To the extent the Court holds that superseding causation is an affirmative defense, Defendants' statement of the evidence is as follows:

- Fact and expert witness testimony, PSF Board minutes, and other PSF documents, which show that the Lehman bankruptcy was not reasonably foreseeable, prevented Sigma's orderly wind-down, and caused PSF's losses in a way and to a degree that was not foreseeable.

**8.     ULTIMATE ISSUES REMAINING TO BE TRIED**

In view of the admitted facts and the elements required to establish the claims and affirmative defenses, the following issues remain to be tried:

**Claim 1: Defendants breached the Securities Lending Authorization Agreement.**

(1) Whether PSF did all, or substantially all, of the significant things that the Securities Lending Agreement required it to do;

(2) Whether Defendants failed to do something that the Agreement required them to do, or did something that the contract prohibited them from doing;

(3) Whether PSF was harmed.

**Claim 2: Defendants breached fiduciary duties to PSF.**

(1) Whether Defendants were in a fiduciary relationship with PSF;

(2) Whether Defendants acted on PSF's behalf within the scope of that fiduciary relationship;

(3) Whether Defendants breached fiduciary duties owed to PSF;

(4) Whether PSF was harmed; and

(5) Whether Defendants' breach of its fiduciary duties was a substantial factor in causing PSF's harm.

**Claim 4: Defendants are liable for professional negligence.**

(1) Whether Defendants were negligent;

(2) Whether Pacific Select Fund was harmed; and

(3) Whether Defendants' negligence was a substantial factor in causing Pacific Select Fund's harm.

**Claim 4: Defendants violated the California Unfair Competition Law ("UCL").**

Whether PSF has established a breach of fiduciary duty or professional negligence on the part of Defendants.

**Sixth Affirmative Defense: Contract Allocated Principal Loss to Plaintiffs.**

Defendants' Position:

Whether PSF agreed it would not hold Defendants responsible for losses of principal under the circumstances of this case.

Plaintiff's Position:

As described above, this is not a proper affirmative defense.  An affirmative defense concerns matters that would defeat Plaintiff's claim even if Plaintiff established the elements of the claim.  The provision here unambiguously fully shifts the risk of loss to Defendants should Pacific Select Fund succeed on its claims.

**Thirteenth Affirmative Defense (Assumption of the Risk) and Fifteenth Affirmative Defense (Contributory Negligence):**

Defendants' Position:

The issues to be tried are:

(1) Whether PSF was negligent; and

(2) Whether PSF's negligence was a substantial factor in causing its harm.

Plaintiff's Position

PSF contends that Defendants should be barred from asserting these defenses at trial because the SLAA and the amendment thereto expressly state that BNYM agrees to indemnify and is "fully responsible" for "any and all" losses suffered by PSF resulting from the negligence, willful misconduct, recklessness, bad faith, malfeasance or misfeasance of BNYM, or the failure of BNYM to comply with the provisions of the Agreement, including the Investment Guidelines.  Thus, if PSF prevails on its claims, BNYM is fully responsible for PSF's losses, and comparative fault principles should not apply.  PSF contends that these affirmative defenses have been subsumed by the comparative fault doctrine.  Thus, PSF contends there are no issues to be tried with respect to these purported affirmative defenses.

If these defenses are permitted to go forward under comparative fault principles, Plaintiff asserts that the issues that remain to be tried are:

(1) Whether PSF was negligent;

(2) If so, whether PSF was actively or passively negligent;

(3) Whether PSF's negligence was a substantial factor in causing its harm.

Absent substantial evidence that PSF was negligent, a comparative fault jury instruction should not be given.  CACI 405 (citing *Drust v. Drust*, 113 Cal.App.3d 1, 6 (1980)).

## **Fourteenth Affirmative Defense: Failure to Mitigate Damages.**

Defendants' Position:

The issues to be tried are:

(1) Whether PSF failed to use reasonable efforts to mitigate damages; and

(2) the amount by which damages would have been mitigated.

Plaintiff's Position

PSF contends that BNYM should be barred from asserting this defense because the SLAA and the amendment thereto expressly state that BNYM agrees to indemnify and is "fully responsible" for "any and all" losses suffered by PSF resulting from the negligence, willful misconduct, recklessness, bad faith, malfeasance or misfeasance of BNYM, or the failure of the BNYM to comply with the provisions of the Agreement, including the Investment Guidelines.  Thus, if PSF prevails on its claims, BNYM is fully responsible for PSF's losses, and mitigation of damages and other comparative fault principles should not apply.  PSF also contends that this doctrine has been subsumed by the comparative fault doctrine. Thus, PSF contends there are no issues left to be tried with respect to this affirmative defense.

If this defense is permitted to go forward as an independent, affirmative defense, Plaintiff asserts that the issues that remain to be tried are:

(1) Whether PSF acted with due care after the injury occurred;

(2) If not, whether PSF was actively or passively negligent;

(3) Whether PSF had an opportunity to prevent continuation or enhancement of the injury;

(4) Whether mitigation of damages would have required PSF to sacrifice and surrender important and valuable rights;

(5) Whether mitigation of damages would have required PSF to take measures that would involve expenditures disproportionate to the loss sought to be avoided or which may be beyond its financial means; and

(6) Whether PSF's efforts were reasonable in the light of the situation at the time the loss was threatened and not by the judgment of hindsight.

**Superseding Causation**

Defendants' Position

To the extent the Court holds that superseding causation is an affirmative defense, the issue on that defense is whether the Lehman Brothers bankruptcy was an independent event intervening in causing Plaintiffs' harm, producing a harm of a kind and degree far beyond the risk Defendants should have foreseen.

Plaintiff's Position

Defendants did not allege superseding cause in their Answer as an affirmative defense as required, and are therefore foreclosed from presenting evidence relating to such a defense at trial.  There are no issues left to be tried on this issue. Plaintiff's arguments on this issue are set forth more fully in its motion *in limine*. Should the Court permit Defendants to present evidence on superseding cause, the issues to be tried are:

(1)   The Lehman Brothers' bankruptcy was unforeseeable;

(2)   The Lehman Brothers' bankruptcy caused PSF's injury;

(3)   The general risk of harm to PSF was unforeseeable; and

(4)   The harm to PSF was of a kind that was different from the kind of harm that could have been reasonably expected from Defendants' conduct.

**9.     STATUS OF DISCOVERY**

All discovery is complete.

**10.    F.R.CIV.P.26(a)(3) DISCLOSURES**

All disclosures under Fed. R. Civ. P. 26(a)(3) have been made.

The joint exhibit list of the parties will be filed in accordance with this Court's Civil Trial Order.

**Plaintiff's Statement on its Objections to Defendants' Trial Exhibits and Defendants' Objections to Plaintiff's Trial Exhibits:**

PSF objects to the exhibit numbers listed on Schedule A for the reasons stated.  PSF reserves the right to make additional objections at trial, including (but not limited to) based on how the exhibits are used, the potential for cumulative exhibits and time-wasting, and this Court's motion *in limine* rulings.  PSF further reserves (1) the right to object to the admission of each of Defendants' trial exhibits without a proper foundation being laid at trial by an appropriate witness, (2) all rights and objections related to FRE 106; and (3) objections to admission of exhibits or portions of exhibits in open court that are confidential in nature and subject to sealing.

PSF has expressed to Defendants that it is prepared to stipulate to the authenticity of the documents on the joint exhibit list.  PSF has also expressed to Defendants its belief that the documents listed on the joint exhibit list do not present "best evidence" problems, but also reserved its right to make best evidence objections based testimony at trial or unanticipated use of documents on the exhibit list.  PSF has further expressed to Defendants its willingness to engage in a good faith effort to agree on the admission of certain documents not reasonably susceptible to objection prior to the start of trial.

Despite having over two months to review PSF's exhibit list, which includes approximately 1400 documents, Defendants maintain that they cannot meaningfully

1

2   meet and confer on the admissibility of exhibits due to the size of the list.

3   Defendants produced hundreds of thousands of documents in this litigation.  PSF

4   bears the burden of proof on its claims.  PSF's exhibit list is not at all unreasonable

5   in light of the Court's disclosure requirements and the complexity of the issues

6   involved in this case.  In fact, Defendants' own exhibit list contains nearly 400

7   exhibits—despite the fact that they do not bear the burden of proof on PSF's claims.

8   Moreover, Defendants produced the vast majority of documents on PSF's list.

9   Thus, Defendants have likely reviewed these documents several times during the

10  last two years as they prepared the documents for production, prepared witnesses for

11  deposition, prepared discovery responses, and prepared summary judgment and

12  other court filings.  In short, Defendants have had more than enough time during the

13  last two months to determine which documents, if any, on PSF's list are

14  objectionable.  Defendants have also refused to stipulate to facts that would narrow

15  the issues requiring documentary proof substantially, and have refused to request an

16  earlier hearing on the motions *in limine* in order to narrow the issues for trial.

17  Defendants cannot now escape their obligations to meaningfully meet and confer by

18  asserting baseless complaints about the size of PSF's exhibit list.

19       **Defendants' Statement on Objections to Plaintiff's Trial Exhibits**:  PSF's

20  trial exhibit list is currently more than 1400 exhibits.  This list is entirely out of

21  proportion with the length of trial, and appears to be an effort to bury in a proverbial

22  haystack the evidence PSF actually intends to present to the jury at trial.  It has also

23  prevented the parties from engaging in a productive meet and confer regarding the

24  admissibility of exhibits.  Furthermore, the list contains a number of referenced

25  "summaries" of evidence that PSF provided to Defendants only shortly before the

26  Pretrial Conference Order was to be filed.  Accordingly, Defendants state objections

27  to the current exhibit list in attached Schedule B, but reserve the right to make

28  additional objections at trial, including (but not limited to) based on how the exhibits

    are used and the potential for cumulative exhibits and time-wasting.  Defendants

further reserve (1) the right to object to the admission of each of Plaintiffs' trial exhibits without a proper foundation being laid at trial by an appropriate witness, (2) all rights and objections related to FRE 106; and (3) objections to admission of exhibits or portions of exhibits in open court that are confidential in nature and subject to sealing.

## 11.    WITNESSES

Witness lists of the parties will be filed with the Court five (5) days prior to the Final Pretrial Conference.

Only the witnesses identified in the lists will be permitted to testify (other than solely for impeachment).

Each party intending to present evidence by way of deposition testimony will mark such depositions in accordance with L.R. 16-2.7. For this purpose, the following depositions shall be lodged with the Clerk as required by L.R. 32-1:

**a. Depositions taken in this action:**

Mary Ann Brown

William Browne

Kathleen Clune

Ruth Falchetti

Thomas Ford

Robert Fort

Christina He

Howard Hirakawa

Robert Hitchings

Mark Holmlund

Lawrence Mannix

Michael McDermott

Anthony Nazzaro

Dale Patrick

1

2    Katherine Rulong

3    David Tant

4    Robin Yonis

5    **b. Depositions taken in *CompSource Oklahoma v. BNY Mellon, N.A.*, No.**

6    **08-cv-00469 (E.D. Okla. filed Dec. 19, 2008):**

7    Denise Bonacci

8    Robert Brady

9    William Browne

10   Laurie Carroll

11   Diane Demmler

12   Ruth Falchetti

13   Thomas Ford

14   Robert Fort

15   Todd Gibbons

16   Mitchell Harris

17   Gerald Hassel

18   Timothy Keaney

19   Robert Kelly

20   William Kelly

21   Raymond Kronz

22   Lawrence Mannix

23   Richard Marchione

24   Michael McDermott

25   James Palermo

26   Renee Rawls

27   Timothy Robison

28   Katherine Rulong

     Patricia Smith

David Tant

Edward Von Sauers


Plaintiff objects to the presentation of all or portions of the testimony by deposition of the following witnesses:

Kathleen Clune

Lance Doherty

Mark Holmlund

Robin Yonis

Dale Patrick

Howard Hirakawa

Christina He

Mary Ann Brown


Defendants objects to the presentation of all or portions of the testimony by deposition of the following witnesses:

Denise Bonacci (*CompSource* deposition)

Robert Brady (*CompSource* deposition)

William Browne (*Pacific Select Fund* and *CompSource* depositions)

Laurie Carroll (*CompSource* deposition)

Diane Demmler (*CompSource* deposition)

Ruth Falchetti (*Pacific Select Fund* and *CompSource* depositions)

Thomas Ford (*Pacific Select Fund* and *CompSource* depositions)

Robert Fort (*Pacific Select Fund* and *CompSource* depositions)

Todd Gibbons (*CompSource* deposition)

Mitchell Harris (*CompSource* deposition)

Gerald Hassel (*CompSource* deposition)

Robert Hitchings (*Pacific Select Fund* deposition)

1

2  Timothy Keaney (*CompSource* deposition)

3  Robert Kelly (*CompSource* deposition)

4  William Kelly (*CompSource* deposition)

5  Raymond Kronz (*CompSource* deposition)

6  Lawrence Mannix (*Pacific Select Fund* and *CompSource* deposition)

7  Richard Marchione (*CompSource* deposition)

8  Michael McDermott (*Pacific Select Fund* and *CompSource* deposition)

9  James Palermo (*CompSource* deposition)

10  Renee Rawls (*CompSource* deposition)

11  Timothy Robison (*CompSource* deposition)

12  Katherine Rulong (*Pacific Select Fund* and *CompSource* deposition)

13  Patricia Smith (*CompSource* deposition)

14  David Tant (*Pacific Select Fund* and *CompSource* deposition)

15  Edward Von Sauers (*CompSource* deposition)

16

17  **12.   LAW AND MOTION MATTERS**

18  The following pretrial motions, and no others, are pending (as of the time of

19  lodging of this Final Pretrial Conference Order) or contemplated:

20   • Motions in Limine

21     o Plaintiff Pacific Select Fund's Motion *in Limine* No. 1 to

22       Exclude the Testimony and Report of Robert Glenn Hubbard

23     o Plaintiff Pacific Select Fund's Motion *in Limine* No. 2 to

24       Exclude the Report and Certain Testimony of Edmon W. Blount

25     o Plaintiff Pacific Select Fund's Motion *in Limine* No. 3 to

26       Exclude Evidence of Unrelated Third-Party Investments in

27       Sigma

28     o Plaintiff Pacific Select Fund's Motion *in Limine* No. 4 to

       Exclude Evidence of Pacific Life's General Account Investments

1

2        o  Plaintiff Pacific Select Fund's Motion *in Limine* No. 5 to

3           Exclude Evidence Regarding Citigroup SIVs

4        o  Plaintiff Pacific Select Fund's Motion *in Limine* No. 6 to

5           Exclude Evidence of PSF's Purported Securities Lending Profits

6        o  Defendants' Motion *in Limine* No. 1 to Exclude Testimony and

7           Opinions of Bella Borg-Brenner

8        o  Defendants' Motion *in Limine* No. 2 to Exclude Opinions of

9           Plaintiff's Expert Allen Ferrell

10       o  Defendants' Motion *in Limine* No. 3 to Exclude References to

11          Standish Mellon and Its Investment Strategies and Decisions

12       o  Defendants' Motion *in Limine* No. 4 to Exclude References to

13          Other Litigations and Disputes

14       o  Defendants' Motion *in Limine* No. 5 to Exclude References to

15          Defendants' Size or Net Worth

16

17  **13.    BIFURCATION OF ISSUES**

18       No issues have been bifurcated for trial at this time.

19

20  **14.    CONCLUSION**

21       The foregoing admissions having been made by the parties, and the parties

22  having specified the foregoing issues remaining to be litigated, this Final Pretrial

23  Conference Order shall supersede the pleadings and govern the course of the trial of

24  this cause, unless modified to prevent manifest injustice.

25

26  Dated:  July 17, 2012

27                                          _____

28                                          Hon. Josephine Staton Tucker